**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                *Plaintiff,*

     v.

ERIC EARNEST, et al.,

             *Defendants.*

---

Case No. 25 Cr. 323 (LDH)

**DATE OF SERVICE**
**(BY EMAIL):**
**DECEMBER 12, 2025**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT TERRY ROZIER'S MOTION TO DISMISS INDICTMENT**

James M. Trusty
A. Jeff Ifrah
IFRAH PLLC
1717 Pennsylvania Ave. N.W.
Suite 650
Washington, D.C. 20006
Tel. (202) 524-4140
Fax (202) 524-4141
jtrusty@ifrahlaw.com
jeff@ifrahlaw.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT...................................................................................................1

BACKGROUND ......................................................................................................................2

    A.  The Alleged Wagering Scheme ...........................................................................2

    B.  The Alleged Money Laundering Conspiracy .......................................................4

    C.  Procedural History ...............................................................................................5

ARGUMENT ...........................................................................................................................6

    I.  Legal Standard ....................................................................................................6

    II.  The wire fraud conspiracy count must be dismissed. ..............................................7

        A.    A wire fraud conspiracy must involve a scheme to deprive a person of a
            traditional property interest. .........................................................................8

        B.    Because the indictment alleges a scheme aimed at depriving the
            Betting Companies of economically valuable information, the wire fraud
            conspiracy count must be dismissed. ............................................................10

        C.    Charging the alleged scheme as federal wire fraud flouts the Supreme
            Court's repeated warnings against overuse of the federal fraud statutes. ......11

        D.    The indictment does not state a wire fraud conspiracy offense under a
            "fraudulent inducement" theory. ...................................................................14

    III.  The money laundering conspiracy count must be dismissed....................................19

CONCLUSION......................................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Ciminelli v. United States*,
598 U.S. 306 (2023) ........................................................................ passim

*Cleveland v. United States*,
531 U.S. 12 (2000) ................................................................. 8, 12, 13

*Jones v. United States*,
529 U.S. 848 (2000) ............................................................................ 9

*Kelly v. United States*,
590 U.S. 391 (2020) .......................................................................... 14

*Kousisis v. United States*,
605 U.S. 114 (2025) .......................................................................... 15

*McNally v. United States*,
483 U.S. 350 (1987) ............................................................................ 8

*Murphy v. Nat'l Collegiate Athl. Ass'n*,
584 U.S. 453 (2018) .................................................................... 12, 13

*Russell v. United States*,
369 U.S. 749 (1962) ........................................................................ 6, 7

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ................................................................ 7

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ............................................................ 14

*United States v. Binday*,
804 F.3d 558 (2d Cir. 2015) ...................................................... 10, 11

*United States v. Chandler*,
376 F.3d 1303 (11th Cir. 2004) ...................................................... 18

*United States v. Chandler*,
388 F.3d 796 (11th Cir. 2004) ........................................................ 18

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) .................................................... 14, 19

*United States v. Cochran*,
109 F.3d 660 (10th Cir. 1997) ........................................................ 17

*United States v. Connolly*,
24 F.4th 821 (2d Cir. 2022) ............................................................ 19

*United States v. Finnerty*,
533 F.3d 143 (2d Cir. 2008) ............................................................ 17

*United States v. Garcia*,
587 F.3d 509 (2d Cir. 2009) ............................................................ 19

*United States v. Gotti*,
   459 F.3d 296 (2d Cir. 2006) ................................................................. 21

*United States v. Hassan*,
   578 F.3d 108 (2d Cir. 2008) ................................................................. 20

*United States v. Hunt*,
   No. 05 Cr. 395 (DAB), 2006 WL 2613754 (S.D.N.Y. Sept. 6, 2006) ..................... 17

*United States v. Hwa*,
   No. 18-CR-538 (MKB), 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) .................. 19

*United States v. Kahale*,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) ..................................................... 17

*United States v. Lebedev*,
   932 F.3d 40 (2d Cir. 2019) ............................................................. 9, 10

*United States v. Leslie*,
   103 F.3d 1093 (2d Cir. 1997) ............................................................. 21

*United States v. Moses*,
   109 F.4th 107 (2d Cir. 2024) .......................................................... 16, 17

*United States v. Ness*,
   565 F.3d 73 (2d Cir. 2009) ................................................................ 20

*United States v. Olin Corp.*,
   465 F. Supp. 1120 (W.D.N.Y. 1979) ...................................................... 15

*United States v. Peraire-Bueno*,
   No. 24 Cr. 293, 2025 WL 2062021 (S.D.N.Y. July 23, 2025) .................... 14, 15, 16

*United States v. Percoco*,
   13 F.4th 158 (2d. Cir. 2021) ...................................................... 7, 9, 10, 11

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ........................................................... 6, 7, 15

*United States v. Runner*,
   143 F.4th 146 (2d Cir. 2025) ............................................................ 6, 14

*United States v. Szur*,
   289 F.3d 200 (2d Cir. 2002) ............................................................... 20

*United States v. Walters*,
   963 F. Supp. 2d 125 (E.D.N.Y. 2013) .................................................... 19

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017) ................................................................. 9

*United States v. Zemlyansky*,
   945 F. Supp. 2d 438 (S.D.N.Y. 2013) ................................................. 16, 17

**Statutes**

18 U.S.C. § 1341 ................................................................................................ 8

18 U.S.C. § 1343 ................................................................................................ 8

18 U.S.C. § 1956 .............................................................................................. 20

18 U.S.C. § 1957 .............................................................................................. 20

N.J. Stat. Ann. 5:12-76 ................................................................................... 13

N.J. Stat. Ann. 5:12-77 ................................................................................... 13

N.Y. Racing, Pari-Mutuel Wagering & Breeding Law § 104 ......................... 13

N.Y. Racing, Pari-Mutuel Wagering & Breeding Law § 1367 .................... 4, 13

**Rules**

Fed. R. Crim. P. 7 ............................................................................................. 6

Fed. R. Crim. P. 12 ........................................................................................... 6

**Regulations**

9 N.Y.C.R.R. § 5329.1 .................................................................................... 12

9 N.Y.C.R.R. § 5329.19 .................................................................................. 12

9 N.Y.C.R.R. § 5330.1 .................................................................................... 12

9 N.Y.C.R.R. § 5330.19 .................................................................................. 12

N.J. Admin. Code 13:69B-6.1 ........................................................................ 12

N.J. Admin. Code 13:69N-1.1 .................................................................. 12, 13

N.J. Admin. Code 13:69N-1.6 ........................................................................ 13

N.J. Admin. Code 13:69N-1.10 ...................................................................... 13

**Constitutional Provisions**

U.S. Const., amend. V ...................................................................................... 6

U.S. Const., amend. VI ..................................................................................... 6

## PRELIMINARY STATEMENT

For decades, the government has devised, and courts have sometimes accepted, sweeping theories of fraud untethered to the text, history, and structure of the federal fraud statutes. Although the Supreme Court has repeatedly warned against transforming the statutes into a tool to criminalize conduct traditionally regulated by the states, the government continues to do just that. This case is yet another example.

The government has billed this case as involving "insider betting" and "rigging" professional basketball games.[1] But the indictment alleges something less headline-worthy: that some bettors broke certain sportsbooks' terms of use against wagering based on non-public information and "straw betting." The government charged Terry Rozier with one count of wire fraud conspiracy and one count of money laundering conspiracy[2] because allegedly the sportsbooks completed wagering transactions they otherwise might not have honored. This theory of fraud has repeatedly been rejected and should be rejected again in this case.

Mr. Rozier has played in the NBA since 2015, and he played for the Charlotte Hornets during the 2022-2023 season. His alleged involvement in the wire fraud and money laundering conspiracies is limited. As the indictment tells it, Mr. Rozier informed Defendant Deniro Laster that, unbeknownst to the NBA, the sportsbooks, and the public, he would exit a game prematurely. He allegedly shared this information to allow Laster to place wagers using that information. Laster proceeded to sell that information to others, who passed it to others, placed wagers, or both. Eventually, Laster received the proceeds from this alleged wagering scheme and drove to Rozier's home in Charlotte, where the indictment alleges Mr. Rozier helped him count the money.

The wire fraud conspiracy count does not state an offense. The Supreme Court, in *United States v. Ciminelli*, rejected using the wire fraud statute to criminalize schemes which rest

---

[1] *Current and Former National Basketball Association Players and Four Other Individuals Charged in Widespread Sports Betting and Money Laundering Conspiracy*, U.S. Atty's Off., Eastern District of New York (Oct. 23, 2025), https://www.justice.gov/usao-edny/pr/current-and-former-national-basketball-association-players-and-four-other-individuals.

[2] The money laundering conspiracy count identifies wire fraud as its predicate specified unlawful activity.

exclusively on depriving someone of economic information necessary to make discretionary economic decisions, as opposed to depriving someone of a tangible property interest, 598 U.S. 306, 309 (2023). And that is the theory of fraud in this case. The indictment's characterization of the fraud is that the scheme deprived the sportsbooks of making informed decisions of accepting certain wagers because they were unaware that Terry Rozier informed Laster of this non-public information. This is the precise theory of fraud that the Supreme Court rejected in *Ciminelli.*

But even if a viable theory supported the indictment, the allegations would still fail to state an offense. While the statute refers broadly to material misrepresentations and omissions, the factual allegations are silent as to whether any defendant or co-conspirator actually made any such misrepresentation or failed to fulfill a duty to disclose. The only basis for any alleged misconduct is breaching the sportsbook rules themselves, rather than any cognizable theory of fraud. Courts have rejected extending such activity to be covered by the wire fraud statute. Regardless of the underlying theory of fraud, Count One must therefore be dismissed.

The indictment also fails to sufficiently allege a money laundering conspiracy. First, because the indictment fails to sufficiently allege wire fraud conspiracy, it also fails to allege a money laundering conspiracy predicated on wire fraud. Moreover, the indictment fails to allege an essential element of money laundering conspiracy: that Mr. Rozier agreed to commit the offense. Count Two must also be dismissed.

**BACKGROUND**

   **A.  The Alleged Wagering Scheme**

The indictment describes what it calls a "fraudulent wagering scheme" to provide, obtain, and use "non-public information relating to NBA games to place and cause others to place fraudulent sports wagers for profit." (Indictment ¶ 30, Dkt. No. 1.) The targets of this scheme were certain licensed gambling companies, which offered sports wagering services related to NBA games and player performance (the "Betting Companies"). (*See id.* ¶ 9.) As part of the scheme, defendants and certain co-conspirators provided other co-conspirators "non-public information"

"likely to affect the outcome of upcoming NBA games or individual players' performance." (*Id.* ¶ 31.) According to the indictment, the wagers were "fraudulent" because the Betting Companies' "terms of use" (for mobile sportsbooks) or "house rules" (for retail sportsbooks) "generally prohibited" bettors from wagering on sporting events when the bettors had or relied on "pre-release, confidential information or other non-public information." (*Id.* ¶ 24.) They also prohibited "straw betting," that is, when one person uses another to place wagers on his or her behalf. (*Id.*)

Mr. Rozier has played professional basketball in the NBA since 2015. (*Id.* ¶ 6.) During the 2022-2023 season, he played for the Charlotte Hornets (*Id.*) Like all NBA teams, the Hornets were required to provide an "injury report" to the league. (*Id.* ¶ 8.) The injury report described "player injuries, illnesses, and rest for all NBA games." (*Id.*) On each gameday, the NBA would distribute each playing team's injury report, identifying players as "available," "probable," "questionable," "doubtful," or "out." (*Id.*) The injury reports were updated multiple times each gameday. (*Id.*)

Mr. Rozier's only role in the alleged scheme was to provide nonpublic information to Deniro Laster that enabled Laster to place wagers using that information. (*Id.* ¶ 36.) Before a 2023 Hornets' game against the New Orleans Pelicans, Mr. Rozier allegedly told Laster that he was going to leave the  game in the first quarter "due to a supposed injury,"[3] and that he would not return to the game. (*Id.*) According to the indictment, Mr. Rozier was not on the Hornet's injury report, and the Betting Companies and the public were therefore unaware of his plan. (*Id.*) The indictment does not allege that Mr. Rozier ever placed a bet, whether himself or through a proxy, on any NBA game. Nor does it allege that he knew that Laster intended to sell this information to others, or that using it to place wagers would violate the Betting Companies' rules.

From there, Laster sold this information to "multiple co-conspirators," so that they could use it to place wagers with the Betting Companies. (*Id.* ¶ 37.) At least one defendant, Shane Hennen, and certain co-conspirators placed a number of bets on Mr. Rozier's performance before the March 2023 game. (*See id.* ¶¶ 39–40.) On the one hand, the indictment broadly alleges that

---

[3] The government's cynicism as to whether Mr. Rozier was injured is belied by a variety of witnesses and medical professionals who were aware of Rozier's injury, in many cases *before* the Pelicans game.

placing these wagers involved "materially false and misleading statements and representations" or omissions of "one or more material facts which made what was represented under the circumstances misleading," specifically, "that the wagers were placed in accordance with the Betting Companies" rules. (*Id.* ¶ 32.) On the other hand, it does not identify any instance in which a bettor actually made such a representation or omission. (*See id.* ¶¶ 39–40 (describing amounts and kinds of wagers)).[4] Nevertheless, the indictment alleges that the Betting Companies would not have paid out the successful wagers had they known that the bettors had relevant non-public information or were engaged in straw betting. (*Id.* ¶ 33.)

### B.  The Alleged Money Laundering Conspiracy

In Count Two, the indictment charges Mr. Rozier with conspiracy to commit money laundering. (Indictment ¶¶ 65–66.) The only predicate unlawful activity the indictment identifies is wire fraud. (*See id.*)

Mr. Rozier's alleged role in the money laundering conspiracy is even more limited than his alleged role in the wagering scheme. While Count Two tracks the statutory language, stating that Mr. Rozier and others "did knowingly and intentionally conspire" "to conduct one or more financial transactions" involving "the proceeds of some form of unlawful activity," here, wire fraud, (*id.* ¶ 66), the indictment's factual allegations do not support this assertion. Nowhere does the indictment allege, or even suggest, that Mr. Rozier knew of, let alone agreed to, any future transaction involving the wagering scheme's proceeds. The only allegation even conceivably related to money laundering is that Laster drove to Mr. Rozier's home in North Carolina where Laster and Mr. Rozier allegedly counted Laster's cut of the proceeds. (*See* Indictment ¶ 43.) But at no point is Mr. Rozier alleged to have knowledge of any potential transaction involving those

---

[4] While the indictment describes the amount of the wagers, in many cases it is silent as to whether any specific bet was successful, whether the Betting Companies voided any of the wagers, or whether the Betting Companies, as is common, placed "layoff bets" to manage their exposure. (*See* Indictment ¶ 41 (stating only that "numerous" wagers were successful)) *See* N.Y. Racing, Pari-Mutuel Wagering & Breeding Law § 1367(2)(e) (describing requirements for sports pools placing layoff bets); *Jontay Porter Banned from NBA for Violating League's Gaming Rules*, NBA Commc'ns, (Apr. 17, 2024), https://pr.nba.com/jontay-porter-ban/ (noting that sportsbook froze and did not pay out suspicious prop bet).

proceeds. But even if the government could cure these deficiencies, Count Two would fail because it relies upon an alleged wire fraud predicate that fails as a matter of law.

### C. Procedural History

On October 23, 2025, the USAO unsealed the six-defendant indictment that includes Mr. Rozier. Despite undersigned counsel reaching out months earlier to establish a line of communication with the prosecutors, a decision was made to arrest Mr. Rozier in Orlando, Florida, after the Heat's season-opener in that city hours earlier. Even before Mr. Rozier had an initial appearance in the Middle District of Florida ("MDFL") a widely covered press conference took place in Brooklyn, where the USAO press release included quotes such as one about "the defendants secretly pocketing their lavish winnings and corrupting NBA games." At the ensuing press conference itself, there were countless instances of speakers blurring Mr. Rozier's case with a 31-defendant indictment that alleges Mafia involvement[5] and several examples of condemning Mr. Rozier's *morality*, rather than describing criminal allegations. For instance, the U.S. Attorney for the Eastern District referred specifically to Mr. Rozier as a "corrupt individual" and the NYPD Police Commissioner pronounced that, "[a]s the NBA season tips off, his career is already benched—not for injury, but for integrity." The same speaker issued a written statement announcing that, "[r]igging a professional basketball game for personal profit is as immoral is it is illegal."

In some respects, the press posturing seemed more important than traditional law-enforcement decisions, such as whether defendants could self-surrender. On the first full day of the NBA season, the government was intent on declaring that the NBA (or former NBA) players named in the two indictments were "taken into custody." Meanwhile, as the courthouse in the MDFL geared up to handle an out-of-district initial appearance and Rule 5 proceeding, those same prosecutors acknowledged that this was a bond-eligible offense in which the government would not be seeking detention. In short, the Government always knew that Mr. Rozier—a man with no

---

[55] Indictment, *United States v. Aiello*, No. 25 Cr. 00314 (JMA) (CHK) (E.D.N.Y. 2025), Dkt. No. 1.

criminal record or history of failing to appear—never posed a risk of flight or of danger to the community. But handcuffing and arresting him, even if for just a few hours, was important to the prosecution team's adherence to the press release and press conference.

At Mr. Rozier's initial appearance in MDFL, the Court imposed a surety bond for the value of Mr. Rozier's primary residential property, worth approximately $6 million,[6] and a series of specific conditions of release. He is scheduled for arraignment and a status conference in the Eastern District of New York on December 8, 2026.

**ARGUMENT**

**I.    Legal Standard**

An indictment must "state[] the essential elements of the charge." *United States v. Runner*, 143 F.4th 146, 156 (2d Cir. 2025); *see also* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). This requirement ensures the defendant is "tried on the evidence presented to the grand jury," and, as an "important corollary," allows the Court to "evaluate whether [the] facts alleged could support conviction." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 768–70 (1962)); *see also* U.S. Const., amends. V, VI.

A defendant may challenge an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment may fail to state an offense in two ways. First, an indictment must be dismissed if it "fails to allege the essential facts constituting the offense charged." *Pirro*, 212 F.3d at 91. Second, "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012). In other words, an indictment is legally insufficient where the alleged conduct does "not constitute an offense." *Id.* at 76.

---

[6] Of the 37 defendants spanning the two indictments unsealed and described at the afore-mentioned press conference, Mr. Rozier has the highest bond amount, despite other defendants being alleged to involved in La Cosa Nostra or having significant criminal histories.

Because Mr. Rozier has objected to the indictment before trial, he is "entitled to a more exacting review." *Pirro*, 212 F.3d at 92. In carrying out this review, the Court must consider the indictment "as it was actually drawn, not as it might have been drawn." *Id.* And where, as here, a statute "includes generic terms," it is not enough that the indictment repeat those terms—"it must descend to particulars." *Id.* at 93 (quoting *Russell*, 369 U.S. at 765).

## II.    The wire fraud conspiracy count must be dismissed.

The government charges Mr. Rozier with participating in a conspiracy to commit wire fraud. In essence, the government's theory is that, by stating that certain wagers were placed in accordance with the Betting Companies' rules, or failing to disclose that they were not, defendants and co-conspirators deprived the Betting Companies of their right to decide whether to enter into certain transactions. That is, they deprived the Betting Companies of valuable economic information that affected their economic decisionmaking.

This theory, previously adopted by the Second Circuit, is no longer sound. The Supreme Court rejected this "right-to-control" just two years ago in *Ciminelli v. United States*, 598 U.S. 306 (2023). *Ciminelli* involved politically connected insiders tailoring the bidding process for state-funded development projects to favor related companies, depriving the sponsoring entity of the "potentially valuable economic information" that would inform the entity's decisionmaking. *Id.* at 310–11; *United States v. Percoco*, 13 F.4th 158, 171 (2d. Cir. 2021), *rev'd sub nom. Ciminelli v. United States*, 598 U.S. 306 (2023). The government relies on the same theory here, alleging that Defendants and co-conspirators deprived the Betting Companies of information that would inform their decision to accept (or reject) those wagers.

Not only does the government's theory contravene recent—and unequivocal—Supreme Court precedent, it represents precisely the kind of overreach the Court has cautioned against for decades. In charging violations of state-licensed Betting Companies' rules as federal wire fraud, the government asks this Court to read the wire fraud statute to place "conduct traditionally policed by State under federal superintendence." *Ciminelli*, 598 U.S. at 316 (citing *Cleveland v. United*

*States*, 531 U.S. 12, 27 (2000)). The Court should reject the government's invitation and dismiss the indictment.

### A. A wire fraud conspiracy must involve a scheme to deprive a person of a traditional property interest.

Beginning with *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court has become increasingly wary of the government's—and the courts'—expansive interpretations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. Now, the statutes' scope is clear: they protect only "traditional property interests." *Ciminelli*, 598 U.S. at 309.

The narrowing of the federal fraud statute proceeded in multiple steps. The first step came in *McNally*. In *McNally*, the Court held that the mail fraud statute did not encompass the "intangible right of the citizenry to good government." 483 U.S. at 356. Shortly after *McNally*, in *Carpenter*, the Court determined that certain intangible property, such as "confidential business information" had "long been recognized as property" and were therefore within the mail and wire fraud statutes' reach. 484 U.S. 19, 26 (1987). At the same time, the Court reaffirmed that a "contractual right" to "honest and faithful service" was not. *Id.* at 25. That interest was "too ethereal" to be the kind of "individual property right[]" the statutes protect. *Id.* Shortly after *McNally* and *Carpenter*, Congress enacted the honest-services statute, 18 U.S.C. § 1346 to cover just one of the intangible rights that courts had protected under the mail fraud statute before *McNally*. *See Cleveland*, 531 U.S. at 19–20 (explaining the history of the federal fraud statutes).

Then, a bit more than a decade later, in *Cleveland v. United States*, 531 U.S. 12 (2000), the Court reiterated that the federal fraud statutes criminalize only schemes to deprive people of "traditional property interests." It therefore vacated the defendant's conviction for making false statements in his video poker license application, which the Court viewed as an exercise of the state's regulatory power, not property. *Cleveland*, 531 U.S. at 26–27. But as the Court observed, there was another important reason to reject the government's theory: approving it would result in "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Id.* at 24. In declining to do so, the Court explained that "unless Congress conveys its

purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Id.* at 25 (quoting *Jones v. United States*, 529 U.S. 848, 858 (2000)).

Finally, in 2023, the Supreme Court dealt what should have been the decisive blow to prosecutions like this one. In *Ciminelli v. United States*, the Supreme Court was called upon to determine whether the "right to control" theory was a valid basis for criminal liability under the wire fraud statute. 598 U.S. 306, 308 (2023). Under this theory, a defendant could be guilty of wire fraud if he schemed "to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" *Id.* (quoting *Percoco*, 13 F.4th at 170). The Second Circuit had explained the theory this way: because the right to control an asset is a "defining feature of most property," *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019), "the withholding or inaccurate reporting of information that could impact on economic decisions [could] provide the basis for a mail [or wire] fraud conviction." *United States v. Wallach*, 935 F.2d 445, 462–63 (2d Cir. 1991); *see United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (mail fraud and wire fraud statutes analyzed in same way).

No more. In *Ciminelli*, the Court rejected the right to control theory as inconsistent with the federal fraud statutes' text, history, and structure. Starting with the text and the history, the theory could not be "squared with the text of the federal fraud statutes" because the "right to control" is not an "interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Ciminelli*, 598 U.S. at 314. The right-to-control theory was also inconsistent with the statutes' structure. *Id.* at 315. As the Court observed, Congress revived "the intangible right of honest services" when it enacted § 1346. *Id.* Its "reverberating silence" about other intangible interests "foreclose[d]" the use of the wire fraud statute to "cover the intangible right to control." *Id.* Accordingly, allegations that defendants conspired to deprive a person of the right to valuable economic information needed to make discretionary economic decisions cannot support a federal wire fraud conspiracy charge. This is not to say that sports betting platforms are without recourse when their terms of use are violated—they can void bets, pursue civil remedies, or seek state

9

prosecutor involvement. But *Ciminelli* puts to rest the notion that federal prosecutors are here to enforce contractual agreements between bettors and platforms.

> **B. Because the indictment alleges a scheme aimed at depriving the Betting Companies of economically valuable information, the wire fraud conspiracy count must be dismissed.**

After *Carpenter*, *Cleveland*, and *Ciminelli*, a wire fraud conspiracy charge like this one should have been a nonstarter. According to the indictment, certain defendants and co-conspirators failed to disclose that they either (i) had relevant non-public information or (ii) were placing wagers for others. (Indictment ¶ 33.) As a result, the Betting Companies completed wagering transactions they might not have had they been fully informed. (*Id.* ¶ 34.) In other words, the indictment charges defendants and co-conspirators with depriving the Betting Companies of information that could have influenced the Betting Companies' decisions to accept and pay out, or not, the successful wagers. (*See id.*) The Supreme Court rejected this theory in *Ciminelli*. This Court should too.

It is not enough that the government alleges that the wagers were placed "for profit." After all, the profit motive was present in right-to-control cases too. *See e.g.*, *Percoco*, 13 F 4th. at 172 (defendants rigged request-for-proposal process to make it more likely that their companies would receive development contracts); *United States v. Calderon*, 944 F.3d 72, 80–81, 85–88 (2d Cir. 2019); *Lebedev*, 932 F.3d at 46–49 (defendant assisted company in misrepresenting Bitcoin exchange's business so that banks and credit card companies would process its transactions); *United States v. Binday*, 804 F.3d 558, 565–66 (2d Cir. 2015) (defendant and co-conspirators used straw buyers to apply for insurance policies and received profit in the form of commissions, among other things).

What matters here is the object of the fraud, not the ultimate result. As the indictment describes it, the object was to place wagers while withholding information relevant to the Betting Companies' decision to accept those wagers. *Percoco*, 13 F.4th at 170 ("In a right-to-control case, . . . it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a

transaction without the relevant facts necessary to make an informed economic decision." (quoting *Binday*, 804 F.3d at 579). In other words, the object of the scheme was to place wagers without disclosing to the Betting Companies all of the relevant facts. The indictment also alleges that the Betting Companies entered transactions based on betting lines that did not reflect or account for this non-public information. *Id.* This too reflects a classic right-to-control theory: by withholding certain information, the scheme affected the Betting Companies' "economic calculus or the benefits and burdens of the agreement" or exposed them to "unexpected economic risk." *Binday*, 804 F.3d at 570.

Consider the Second Circuit's no longer viable right-to-control analysis in *Percoco*. There, the court concluded that defendants had deprived the victim of "potentially valuable economic information that would have resulted from a legitimate and competitive RFP process." 13 F.4th at 172. Because depriving the victim of that information was "precisely the object of defendants' fraudulent scheme," the court affirmed the conviction under the right-to-control theory. *Id.* at 172, 180. As the Second Circuit explained, the "bargain at issue" was the victim's "ability to contract in the first instance" based on potentially valuable economic information that would have resulted from legitimate bidding process. *Id.* at 172. Here too, the indictment alleges that defendants and their co-conspirators aimed to deprive the Betting Companies of information that would affect their economic decisionmaking, *see Percoco*, 13 F.4th at 170, whether in the form of accepting wagers, paying out successful wagers, or setting betting lines. While that may have been enough to support a wire fraud charge under the line of cases leading up to and including *Percoco*, it is not under *Ciminelli*.

### C. Charging the alleged scheme as federal wire fraud flouts the Supreme Court's repeated warnings against overuse of the federal fraud statutes.

The Supreme Court has repeatedly warned against expansive applications of the federal fraud statutes. In *Ciminelli*, for example, the Court reminded courts not to "read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States." *Ciminelli*, 598 U.S. at 316 (quoting *Cleveland*, 531 U.S. at 27) (brackets in original).

And before that, in *Cleveland*, it warned that expansive interpretations of the federal fraud statutes would "subject to federal mail [or wire] fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Cleveland*, 531 U.S. at 24–25.

That is what the government has done here. It has taken an alleged violation of state-regulated sportsbooks' rules and transformed it into a federal wire fraud conspiracy, upsetting the "coherent federal policy" regarding sports wagering. *Murphy v. Nat'l Collegiate Athl. Ass'n*, 584 U.S. 453, 484 (2018). Under that policy, the federal government "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Id.*

In fact, state gaming regulation specifically addresses the conduct of Mr. Rozier's co-defendants and alleged co-conspirators. Take the New York Gaming Commission's expansive regulation of brick-and-mortar and mobile sports wagering. The Gaming Commission defines the term "prohibited sports bettor" to include, among others, "any individual placing a sports wager as an agent or proxy" and "any person with access to material, non-public confidential information about a sports event that is the subject of such wagering." 9 N.Y.C.R.R. § 5329.1(k)(1), (4) (defining terms applicable to brick-and-mortar sports wagering); *see also* 9 N.Y.C.R.R. § 5330.1(b)(11)(i), (iv) (applying same definitions to mobile sports wagering). The regulations further state that sports wagering licensees "shall not knowingly accept any sports wager from any prohibited sports bettor," and that any such wager "shall be deemed void." 9 N.Y.C.R.R. § 5329.19; 9 N.Y.C.R.R. § 5330.19. In other words, under the federal policy the Supreme Court described in *Murphy*, New York has crafted a comprehensive regulatory scheme aimed at maintaining the integrity of licensed sports wagering.

New York is not alone. New Jersey sports wagering regulations define "prohibited sports pool participants" to include "any individual placing a wager as an agent or proxy." N.J. Admin. Code 13:69N-1.1.  And while the regulations do not specifically identify all persons with nonpublic information as prohibited participants, the regulations do account for the use of confidential information. *See id.* (defining "suspicious betting activity" to include activity indicative of misuse

of inside information); *see also id.* 13:69N-1.6 (setting out requirements for controls to maintain sports pool and online sports pool integrity).[7]

Not only does state law set the ground rules for sports wagering, it also guides enforcement. State regulators monitor sports wagering activities and conduct investigations into suspected violations. *See e.g.*, N.Y. Racing, Pari-Mutuel Wagering & Breeding Law ("PML") § 104(4), (6), (9); N.J. Stat. Ann. 5:12-76. And if a sportsbook or bettor has violated the rules, regulators can impose civil penalties, and, if necessary, refer suspected criminal activity to state law enforcement for investigation. *See e.g.*, N.Y. PML § 1367(12)(a); N.J. Stat. Ann. 5:12-76, -77; N.J. Admin. Code 13:69B-6.1; N.J. Admin. Code 13:69N-1.10. Accordingly, state regulators and law enforcement agencies can—and do—police the conduct the indictment alleges.[8] The states' comprehensive regulatory and enforcement regimes reflect that the policy that states are "free to act on [their] own" in regulating sports wagering. *Murphy*, 584 U.S. at 486.

Here, the government flouts this carefully crafted state-federal balance, seeking to make a federal felony out of sports-wagering conduct "traditionally policed by the States." *Ciminelli*, 598 U.S. at 316 (quoting *Cleveland*, 531 U.S. at 27); *see also Cleveland*, 531 U.S. at 25 ("'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes."). [9] The government takes it upon itself not to

---

[7] Notably, the statutes and regulations do not purport to prohibit Mr. Rozier's only alleged conduct here: sharing information about his injury. *See generally* 9 N.Y.C.R.R. §§ 5329.1, 5330.1; N.J. Admin. Code 13:69N-1.1.

[8] *See e.g.*, Order, *New Jersey v. The Amount of 13,587.03 in Gaming Winnings Theoretically Owed to MS, NA, RP, CB1, DT, RT, KM, VDX, ADG, SK, EL, KC, CB2, and Eight Unknown Individuals by Boardwalk Regency, LLC d/b/a Caesars Atlantic City*, No. 24-0964-FC (N.J. Div. Gaming Enforcement, Jan. 27, 2025) (ordering forfeiture of gaming winnings confiscated from individuals who "failed produce adequate identification, abandoned certain assets, or were otherwise prohibited from engaging in gaming activity"), https://www.nj.gov/oag/ge/docs/Rulings/2025/jan16_31/B3caesarsforfeit13587.pdf; Order, *New Jersey v. Crown NJ Gaming Inc., D/B/A/ DraftKings*, No. 21-0615-VC (N.J. Div. Gaming Enforcement, Feb. 18, 2022) (imposing civil penalty for violation of regulations regarding proxy wagering), https://www.nj.gov/oag/ge/docs/Rulings/2022/feb16_28/b2_draftkings.pdf; *see also PA Gaming Control Board Fines Casino for Sports Wagering Regulatory Violations*, Penn. Gaming Control Bd. (June 26, 2024) (stating that proxy wagers were not permitted under casino policies as approved by Board), https://gamingcontrolboard.pa.gov/news-and-transparency/press-release/pa-gaming-control-board-fines-casino-sports-wagering-regulatory/

[9] State law enforcement and regulatory bodies, including those in New Jersey and New York, have also targeted larger-scale illegal gambling operations. *See e.g.*, *Fourteen People Charged for Roles in Organized Crime Sports*

punish a deprivation of property, but to enforce its "view of[] integrity" in sports wagering. *United States v. Chastain*, 145 F.4th 282, 296 (2d Cir. 2025) (quoting *Ciminelli*, 598 U.S. at 312). But as the Supreme Court and Second Circuit have recognized, that is not a valid basis for a prosecution. *Cf. Kelly v. United States*, 590 U.S. 391, 399 (2020) (recognizing, in honest-services context, "that federal fraud law leaves much public corruption to the States . . . to rectify"); *Chastain*, 145 F.4th at 296 (federal wire fraud statute cannot be read to criminalize conduct that "merely depart[s] from traditional notions of fundamental honesty and fair play").

The indictment alleges a scheme that could only be wire fraud under the no-longer-valid right-to-control theory and seeks to impose federal criminal liability for allegedly deceptive conduct traditionally regulated by the states. The wire fraud conspiracy count must therefore be dismissed.

### D.  The indictment does not state a wire fraud conspiracy offense under a "fraudulent inducement" theory.

In an effort to salvage the indictment, the government may respond that it states an offense because it alleges that defendants conspired to fraudulently induce the Betting Companies to enter wagering transactions. The fraudulent inducement theory requires allegations of material misrepresentations or omissions. Because the indictment fails to allege any cognizable misrepresentation or omission, it does not state an offense under this theory either.

To allege a wire fraud conspiracy premised on fraudulent inducement, an indictment must allege that defendants or their co-conspirators engaged in a deceptive course of conduct by making material misrepresentations or omissions. *See United States v. Peraire-Bueno*, No. 24 Cr. 293, 2025 WL 2062021, at *8 n.4, *8–9 (S.D.N.Y. July 23, 2025) (citing *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)); *see also United States v. Runner*, 143 F.4th 146, 155 (2d Cir. 2025) (observing that Supreme Court endorsed the fraudulent-inducement theory in *Kousisis v. United*

*Betting Ring*, Off. of the Att'y Gen., (Nov. 13, 2025), https://www.njoag.gov/fourteen-people-charged-for-roles-in-organized-crime-sports-betting-ring/; *Attorney General James Announces Arrests of Alleged Crime Family Members on Staten Island for Illegal Gambling and Loan Shark Operation*, Off. of the N.Y. State Att'y Gen., (Jun. 5, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-announces-arrests-alleged-crime-family-members-staten.

*States*, 605 U.S. 114 (2025)). An indictment sufficiently alleges material misrepresentations when it explains "the nature of these misrepresentations, how those misrepresentations were false and material, and where they were offered." *Peraire-Bueno*, 2025 WL 2062021, at *8 (citing *United States v. Olin Corp.*, 465 F. Supp. 1120, 1132 (W.D.N.Y. 1979)). The indictment here does not.

To be sure, the indictment refers, in general terms, to "materially false and misleading statements." (Indictment ¶ 32.) It also states that the Betting Companies "generally" prohibited users from placing wagers based on non-public information and placing bets on behalf of others. (*Id.* ¶ 24.) But nowhere does it, as it must here, "descend to particulars," *Pirro*, 212 F.3d at 92, and explain what, if anything, any defendant or co-conspirator actually said about whether they possessed nonpublic information when they placed the allegedly fraudulent wagers. (*See e.g.*, Indictment ¶¶ 39–40.)

Also absent from the indictment is any allegation that the sportsbooks offered bettors an opportunity to make any representation about the information they relied on in placing wagers. In upholding the wire fraud and conspiracy convictions in *Kousisis*, by contrast, the Supreme Court observed that the defendant made a number of fraudulent representations in response to a state agency's request for proposals. 605 U.S. at 118–19, 123. Specifically, in line with federal funding requirements, the agency required bidders to "commit to subcontracting a percentage of the total contract amount . . . to a disadvantaged business." 605 U.S. at 119. The defendant submitted a bid and falsely represented that he and his company would acquire certain supplies from a disadvantaged business. *See id.* at 119, 123. Unlike *Kousisis*, nothing in the indictment suggests that the Betting Companies ever asked patrons to disclose the information supporting their wager—or that such disclosure was even possible. For this reason too, it fails to allege a material misrepresentation. *See Pirro*, 212 F.3d at 92; *Peraire-Bueno*, 2025 WL 2062021, at *8.

This indictment stands in stark contrast to those courts have upheld under the fraudulent-inducement theory. Take, for example, the wire fraud allegations in *United States v. Peraire-Bueno*, No. 24 Cr. 293, 2025 WL 2062021 (S.D.N.Y. July 23, 2025). There, the government charged defendants with fraudulently obtaining millions of dollars' worth of cryptocurrency by engineering

an exploit of the Ethereum blockchain. *Id.* at *1. The indictment alleged that defendants, among other things, proposed transactions that they never intended to execute as proposed. *See id.* at *9–10. In concluding that the indictment alleged a material misrepresentation, the court observed that the indictment alleged that defendants sent "incorrect or incomplete information" that "effectively promised" that certain blockchain transactions would occur in a certain order, obscuring defendants' "private intent" to alter that order. *Id.* at *8–9.

Here, although the indictment alleges several wagering transactions, it does not allege that the bettors who placed the wagers misrepresented anything. Take the wagers placed on Mr. Rozier's performance, for example. The indictment alleges that multiple bettors placed wagers totaling about $200,000 through multiple Betting Companies' retail or mobile sportsbooks. (Indictment ¶¶ 39–40.) Despite the detailed recounting of these wagers, nowhere does the indictment allege that anyone so much as suggested that they did not have nonpublic information. *Peraire-Bueno*, 2025 WL 2062021, at *8 (indictment sufficiently alleged material misrepresentations where it described, among other things, where they were offered).

Nor does the indictment allege a material omission. A material omission may violate the wire fraud statute where the "defendant has a duty to disclose." *United States v. Reese*, 2025 WL 1770789, at *6 (S.D.N.Y. Jun. 25, 2025) (quoting *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)). While a duty to disclose may arise from sources other than a fiduciary relationship, it must arise from somewhere. Along with a fiduciary relationship, it may arise from a regulatory framework requiring disclosure or through a defendant's own statements. *See United States v. Moses*, 109 F.4th 107, 114 (2d Cir. 2024) (duty to disclose may arise from fiduciary or similar relationship); *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 448 n.3 (S.D.N.Y. 2013) (duty to disclose may arise from regulatory framework combine with required disclosure); *United States v. Kahale*, 789 F. Supp. 2d 359, 379 (E.D.N.Y. 2009) (duty to disclose may arise where a party makes a partial or ambiguous statement).

The indictment here alleges no such duty. At most, it alleges that defendants and their co-conspirators agreed to violate the Betting Companies' rules. But it does not allege that those rules

16

imposed a criminally enforceable duty to disclose. *Cf. Zemlyansky*, 945 F. Supp. 2d at 448 n.3. Nor does it allege that defendants, co-conspirators, or even bettors in general stand in a fiduciary or any other relationship of trust with respect to the Betting Companies. *Cf. Moses*, 109 F.4th at 14. It does not even allege, for example, silence in response to a Betting Company's question about the information on which they relied. And because it fails to allege that any bettor made any statement at all, it cannot allege that a duty arose out of a "partial or ambiguous statement." *Kahale*, 789 F. Supp. 2d at 379. Other than a perfunctory reference to misrepresentations and omissions, it is silent. That is not enough.

In essence, the government seeks to impose criminal liability based on defendants' and co-conspirators' violations of the Betting Companies' rules. But as courts have recognized, that is not enough to allege a material omission: a person does not commit fraud "by failing to disclose that he or she is not complying with certain rules." *United States v. Hunt*, 05 Cr. 395 (DAB), 2006 WL 2613754, at *7 (S.D.N.Y. Sept. 6, 2006) (failure to disclose that defendant violated stock exchange rules could not support material omission allegation); *see also United States v. Finnerty*, 533 F.3d 143, 149 (2d Cir. 2008) (affirming judgment of acquittal where theory of prosecution relied in part on "background assumption of compliance" with stock exchange rules); *United States v. Cochran*, 109 F.3d 660, 665, 669 (10th Cir. 1997) (reversing wire fraud conviction where government could not point to any statute, regulation, common law, or contractual provision requiring disclosure).

That is all the indictment alleges. In the absence of any affirmative duty to disclose, defendants and co-conspirators at most "conspired" to breach a contract with the Betting Companies. That is not a wire fraud conspiracy. The Eleventh Circuit's decision in *United States v. Chandler*, in which the court rejected a similar theory, is instructive. 376 F.3d 1303 (11th Cir. 2004), *amended on reh'g*, 388 F.3d 796 (11th Cir. 2004).[10] *Chandler* involved an allegedly

---

[10] The Eleventh Circuit, on a government motion for rehearing, later issued an amended opinion rescinding the section of the opinion discussed below. *See Chandler*, 388 F.3d at 798. However, as the court noted, it did so only because the government sought "no modification of the judgment," a concession that rendered the court's "alternative holding" unnecessary. *Id.* The court was careful to note that it engaged in "no further consideration" of the motion's merits. *Id.*

fraudulent scheme involving McDonald's promotional games, including the well-known "Monopoly" game. 376 F.3d at 1306–07. The indictment alleged that "defendants conspired to defraud McDonald's by having conspirators falsely claim that they legitimately obtained the winning game piece(s)." *Id.* at 1308. Before trial, the government sought a ruling that these alleged misrepresentations "constituted a fraud sufficient to support their conviction for conspiracy to commit mail fraud." *Id.* In the government's view, the fraud occurred "when the 'winner' stated that they obtained the game piece legitimately." *Id.* at 1309.

The Eleventh Circuit rejected this theory. As the court explained, holding that "allegations of an agreement to participate in 'illegitimate' conduct—a fraudulent breach of contract— sufficient to convict under the federal conspiracy statute," would permit a "breathtaking" expansion of the statute. *Chandler*, 376. F.3d at 1314 (quoting *United States v. Handakas*, 286 F.3d 92, 108 (2d Cir. 2002)). Recognizing that the "mail fraud conspiracy statute applie[d] broadly enough as it is," the court refused to "extend its reach even further." *Id.* At most, the government had alleged that the defendants had engaged in "illegitimate," not illegal, conduct. *Id.* at 1313. Accordingly, the court concluded that the "allegations that defendants' claims to be legitimate winners of McDonald's games violated the mail fraud statute should have been stricken from the indictment." *Id.* at 1314.

This Court too should reject the government's sweeping theory. Like the indictment in *Chandler*, the indictment here alleges that defendants and co-conspirators engaged in a conspiracy to violate the Betting Companies' rules: they represented "that the wagers were placed in accordance with the Betting Companies' terms and conditions and house rules." (Indictment ¶ 32.) Because this theory amounts to charging defendants and co-conspirators with "falsely representing that they had performed as required by the terms of a contract," here, the Betting Companies' rules, it cannot support a wire fraud conspiracy charge. *Chandler*, 376 F.3d at 1313–14.

Taking the indictment's allegations as true, it may allege that Mr. Rozier and others acted dishonestly. But if the "wire fraud statute criminalized conduct that merely departed from traditional notions of fundamental honesty and fair play, 'almost any deceptive act could be

18

criminal.'" *Chastain*, 145 F.4th at 296 (quoting *Cimimelli*, 598 U.S. at 315). "That approach would 'vastly expand[] federal jurisdiction without statutory authorization.'" *Id.* (quoting *Ciminelli*, 598 U.S. at 315). Before one can be punished for fraud, "it must be shown that his case is plainly within the statute." *United States v. Connolly*, 24 F.4th 821, 834 (2d Cir. 2022). Mr. Rozier's conduct is not.  Count One must be dismissed.

### III.    The money laundering conspiracy count must be dismissed.

Count Two charges Mr. Rozier with money laundering conspiracy under 18 U.S.C. § 1965(h). To sufficiently allege a money laundering conspiracy, the indictment must allege "that two or more people agree[d] to violate the federal money laundering statute[s], and that the defendant 'knowingly engaged in the conspiracy with the specific intent to commit the offenses that [are] the objects of the conspiracy.'" *United States v. Hwa*, No. 18-CR-538 (MKB), 2021 WL 11723583, at *31 (E.D.N.Y. Sept. 3, 2021) (quoting *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009)). The elements necessary to support a money laundering charge include that a defendant "knowingly engaged" in a "monetary transaction involving criminally derived property," which has "actually been derived from specified unlawful activity." *United States v. Walters*, 963 F. Supp. 2d 125, 133 (E.D.N.Y. 2013). Count Two fails to allege a money laundering conspiracy for two reasons.

First, the only predicate "unlawful activity" is the alleged wagering scheme which, under *Ciminelli*, is not wire fraud. The indictment therefore fails to allege an essential element of money laundering conspiracy, that the criminally derived property was "derived from a specified unlawful activity." *Walters*, 963 F. Supp. 2d at 133. That alone is reason enough to dismiss Count Two. *See United States v. Pierce*, 224 F.3d 158, 160 (2d Cir. 2000); *cf. United States v. Karony*. By doubling up the charges with a money laundering conspiracy, inextricably bound to the wire fraud predicate, the Government has merely added a second, cumulatively defective, count to the indictment.

Second, the indictment fails to allege that Mr. Rozier ever knowingly agreed and intended to commit money laundering. The "essence" of conspiracy is "the agreement to commit the crime."

*United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008). Among the essential elements of the money laundering offenses identified in the indictment are a "financial transaction," 18 U.S.C. § 1956(c)(4), or a "monetary transaction," 18 U.S.C. § 1957(a). The terms financial transaction and monetary transaction are similar, but not identical. Under section 1956, a financial transaction is:

> (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.

18 U.S.C. § 1956(c)(4). Under section 1957, a monetary transaction is a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument, . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1); *see also United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) ("[T]o sustain a § 1957(a) conviction, a financial institution must have been involved.").

Nowhere does the indictment allege that Mr. Rozier knew of, let alone agreed to engage in, any potential financial or monetary transaction involving the alleged wagering proceeds. Mr. Rozier's only alleged conduct is (1) providing nonpublic information "for the purpose" of enabling Laster to place wagers and (2) counting money that defendant Fairley gave defendant Laster as payment for that information. (Indictment ¶¶ 36, 43.) The wagers themselves, however, cannot be the relevant transactions; only transactions involving the allegedly fraudulent winnings can be. *United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002) ("[P]roceeds of unlawful activity [must] exist before money laundering can occur.") And counting money, without any allegation that the money changed hands, is not a "transaction." *See* 18 U.S.C. §§ 1956(c)(4), 1957(f)(1); *see also United States v. Gotti*, 459 F.3d 296, 335 (2d Cir. 2006) (transfer and delivery may constitute

transaction where there is some "disposition" of funds); *United States v. Leslie*, 103 F.3d 1093, 1101 (2d Cir. 1997) (transactions include pledges, gifts, transfers, deliveries, or other disposition).

Because the money laundering conspiracy is based upon a predicate the indictment fails to allege and otherwise fails to allege the essential elements of money laundering conspiracy, Count Two fails to state an offense and must be dismissed.

**CONCLUSION**

This indictment is premised upon the right-to-control theory of wire fraud the Supreme Court expressly rejected just two years ago. That alone is enough reason to dismiss it but it is not the only reason. Charging the alleged wagering scheme as a federal wire fraud conspiracy runs counter to the Supreme Court's repeated warnings against using the federal fraud statutes to federalize state matters and criminalize civil matters. Contrary to the theory underlying the indictment here, the federal wire fraud statute does not vest the government with the general power to enforce its view of integrity in sports wagering. Accordingly, Count One and Two should be dismissed for failure to state a cognizable offense.

Dated: December 12, 2025                    Respectfully submitted,

                                            */s/James M. Trusty*
                                            James M. Trusty (*pro hac vice*)
                                            A. Jeff Ifrah
                                            IFRAH PLLC
                                            1717 Pennsylvania Ave, N.W.
                                            Suite 650
                                            Washington, D.C. 20006
                                            Tel. (202) 524-4140
                                            Fax (202) 524-4141
                                            jtrusty@ifrahlaw.com
                                            jeff@ifrahlaw.com