## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

No. 25-CR-323 (S-1) (LDH)

UNITED STATES OF AMERICA,

v.

TERRY ROZIER,

Defendant.

** ORAL ARGUMENT REQUESTED**

## TERRY ROZIER'S MOTION TO DISMISS
## COUNTS THREE AND FOUR OF THE SUPERSEDING INDICTMENT

**MARKUS/MOSS** PLLC

David Oscar Markus
Anita Margot Moss
Lauren Field Krasnoff

40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

*Served on opposing counsel June 30, 2026*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................3

    A.  The Original Indictment and the Sportsbook-Fraud Theory ..........................3

    B.  The Superseding Indictment Adds Counts Three and Four .........................3

    C.  The Allegations Underlying Counts Three and Four ....................................3

    D.  Counts One and Four Charge Conspiracies under Section 1349 .................4

    E.  Procedural Posture ......................................................................................5

LEGAL STANDARD ..........................................................................................................6

ARGUMENT .......................................................................................................................7

    I.      COUNT THREE FAILS TO STATE A § 224 OFFENSE, AND VENUE IS
            IMPROPER IN THIS DISTRICT ...........................................................................7

          A.  The Superseding Indictment Does Not Allege a Scheme to Influence the
              Sporting Contest; It Alleges Wagers on Mr. Rozier's Individual
              Statistics ......................................................................................................7

          B.  Section 224 Reaches Schemes Aimed at the Outcome, Score, or Margin
              of a Contest, Not Individual Prop Lines .............................................9

          C.  The Rule of Lenity and Section 224's Savings Clause Independently
              Require Dismissal ......................................................................................11

          D.  Venue Is Not Proper on Count Three in This District ....................................12

    II.     COUNT FOUR FAILS TO STATE AN HONEST-SERVICES OFFENSE ..........14

          A.  Count Four Fails Because Mr. Rozier Did Not Deprive the Hornets or
              the NBA of His Honest Services .......................................................14

          B.  Count Four Also Fails Because the Alleged Payors Had No Transaction,
              Dealing, or Matter Before the Hornets or the NBA ......................................18

          C.  Count Four Does Not Allege a Cognizable Honest-Services Duty to the
              NBA ............................................................................................................21

D.  Fair Notice, Lenity, and Section 224 Foreclose This Unprecedented Extension........................................................................................................22

III.  COUNTS ONE AND FOUR ARE MULTIPLICITOUS.......................................23

CONCLUSION .................................................................................................................25

**TABLE OF AUTHORITIES**

**CASES:**

*Abouammo v. United States,* 608 U.S. —, No. 25-5146 (U.S. June 11, 2026)......12, 13, 14

*Albernaz v. United States,* 450 U.S. 333 (1981) ................................................................24

*Blockburger v. United States,* 284 U.S. 299 (1932)............................................................24

*Braverman v. United States,* 317 U.S. 49 (1942)........................................................23, 24

*Brown v. Ohio,* 432 U.S. 161 (1977).......................................................................................6

*Carpenter v. United States,* 484 U.S. 19 (1987) ................................................................16

*Ciminelli v. United States,* 598 U.S. 306 (2023)........................................................18, 22

*Cleveland v. United States* 531 U.S. 12 (2000)....................................................................11

*Dowling v. United States,* 473 U.S. 207 (1985)....................................................................6

*Hamling v. United States,* 418 U.S. 87 (1974)......................................................................6

*Kelly v. United States,* 590 U.S. 391 (2020) .................................................................11, 18

*McDonnell v. United States,* 579 U.S. 550 (2016).............................................................12, 22

*McNally v. United States,* 483 U.S. 350 (1987)...................................................18, 19, 21

*Percoco v. United States,* 598 U.S. 319 (2023)...................................................... 18, 21-24

*Rewis v. United States,* 401 U.S. 808 (1971) .......................................................................11

*Russell v. United States,* 369 U.S. 749 (1962) ......................................................................6

*Skilling v. United States,* 561 U.S. 358 (2010)........................................... 12, 14, 16, 18-24

*Snyder v. United States,* 603 U.S. 1 (2024)...................................................................11, 22

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023)......................................................22

*United States v. Adams,* No. 25-cr-00523-NIQA (E.D. Pa.)..............................................10

*United States v. Aleynikov,* 676 F.3d 71 (2d Cir. 2012).......................................................6

*United States v. Ansaldi,* 372 F.3d 118 (2d Cir. 2004).......................................................6

*United States v. Bahel,* 662 F.3d 610 (2d Cir. 2011)........................................................20

*United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181 (2d Cir. 1989).......................14

*United States v. Burke,* 700 F.2d 70 (2d Cir. 1983).............................................................9

*United States v. Cabrales,* 524 U.S. 1 (1998)....................................................................12

*United States v. Chacko,* 169 F.3d 140 (2d Cir. 1999).........................................................6

*United States v. Chastain,* No. 23-7038, 2025 WL 2165839,
(2d Cir. July 31, 2025) ...............................................................................................22, 23

*United States v. Czubinski,* 106 F.3d 1069 (1st Cir. 1997).....................................14, 15, 16

*United States v. DiNapoli,* 557 F.2d 962 (2d Cir. 1977) ....................................................10

*United States v. Estrada,* 320 F.3d 173 (2d Cir. 2003) ........................................................6

*United States v. Gaskin,* 364 F.3d 438 (2d Cir. 2004).........................................................25

*United States v. Gerry,* 515 F.2d 130 (2d Cir. 1975)............................................................9

*United States v. Josephberg,* 459 F.3d 350 (2d Cir. 2006)....................................................6

*United States v. Mangano,* 128 F.4th 442 (2d Cir. 2025).....................................................21

*United States v. Manni,* 09-CR-20192-MAG. (E.D. Mich. 2009).......................................10

*United States v. Mazzei,* 700 F.2d 85 (2d Cir. 1983)............................................................9

*United States v. Napout,* 963 F.3d 163 (2d Cir. 2020) ...................................................20, 21

*United States v. O'Hagan,* 521 U.S. 642 (1997)..................................................................16

*United States v. Pinto,* 503 F.2d 718 (2d Cir. 1974) ..........................................................10

*United States v. Pirro,* 212 F.3d 86 (2d Cir. 2000)..........................................................6, 9

*United States v. Polizzi*, 257 F.R.D. 33 (E.D.N.Y. 2009).....................................................25

*United States v. Reed,* 639 F.2d 896 (2d Cir. 1981).............................................................25

*United States v. Rodriguez-Moreno,* 526 U.S. 275 (1999)...................................................12

*United States v. Rybicki,* 354 F.3d 124 (2d Cir. 2003) .......................................14, 18, 19, 21

*United States v. Smith,* 26-CR-00023-NIQA (E.D. Pa. 2026) ...........................................10

*United States v. Tokhtakhounov,* 02-CR-01122-DC (S.D.N.Y. 2002)................................10

*United States v. Tzolov,* 642 F.3d 314 (2d Cir. 2011)....................................................14

*United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218 (1952)................................11

*United States v. Walsh,* 544 F.2d 156 (4th Cir. 1976) ................................................9, 10

*United States v. Walters,* 997 F.2d 1219 (7th Cir. 1993)................................................2, 16

**STATUTES:**

18 U.S.C. § 224 ........................................................................................ 1, 3, 7-14

18 U.S.C. § 224(a) ......................................................................................1, 7, 8

18 U.S.C. § 224(b) ...........................................................................................11

18 U.S.C. § 224(c)(2).......................................................................................1, 7

18 U.S.C. § 666...............................................................................................11

18 U.S.C. § 1343..........................................................................................3, 5, 14, 24

18 U.S.C. § 1346........................................................................... 3, 5, 16, 18-24

18 U.S.C. § 1349.........................................................................................3, 4, 5, 24

18 U.S.C. § 1956(h)............................................................................................3

21 U.S.C. § 846...............................................................................................24

21 U.S.C. § 963...............................................................................................24

**RULES:**

Fed. R. Crim. P. 12.............................................................................................6

Fed. R. Crim. P. 12(b)(3)(B)(ii) ............................................................................6

Fed. R. Crim. P. 12(b)(3)(B)(v).............................................................................6

# INTRODUCTION

Terry Rozier is innocent. He is a basketball player, not a gambler. He never bet on anything, never agreed to underperform, never did underperform, and did not know that anyone was wagering on his statistics in the Charlotte Hornets' March 23, 2023, game. The Government's own discovery bears that out.

On March 29, 2023 — as the alleged proceeds related to the March 23 game were being collected — co-defendant Deniro Laster sent a text message to a third party that the Government produced in this case: "**Dont tell chum bout the bet**." (emphasis added). "Chum" is Mr. Rozier's nickname. (Doc. 101 ¶ 4.) The recipient answered, "Hell no." *This should end the case*. One does not hide a bet from the person who supposedly sold it.

The Court need not wade into the facts for this motion to dismiss. For purposes of this motion, we accept the allegations in the Superseding Indictment as true and respectfully move to dismiss Counts Three and Four. Each fails as a matter of law, for independent reasons.

Count Three, which charges Terry Rozier under 18 U.S.C. § 224, the Sports Bribery Act of 1964, is unsustainable because this section does not federalize the conduct at issue here. This statute does not criminalize every alleged sports-betting scheme, every internal league-integrity issue, or every wager affected by a player's individual performance. It reaches a narrower offense: a "scheme in commerce to influence, in any way, by bribery any **sporting contest**, with knowledge that the purpose of such scheme is to influence by bribery **that contest**." 18 U.S.C. § 224(a) (emphasis added). The statutory object is the "sporting contest": the publicly announced game between contestants or teams, not a sportsbook's collateral market on one player's points, rebounds, assists, minutes, or three-pointers. 18 U.S.C. § 224(c)(2).

In addition, there is no venue for Count Three. Nothing related to this Count is alleged to have occurred in this District. Not the game. Not the supposed disclosure of information. Not the alleged counting of money. Venue is not proper here.

Count Four, the honest services count, must be dismissed because Terry Rozier always gave his honest services to the Charlotte Hornets and to the NBA. He always gave everything he had to every minute he played. He gave his blood, sweat, and tears for basketball, often playing injured and doing everything asked of him by his coaches and teammates. The Superseding Indictment does not allege otherwise. It alleges instead that Mr. Rozier violated a league rule by disclosing non-public information about a real injury. Even if true, that is not honest services fraud. With Count Four, the Government seeks to expand the federal fraud statute to reach conduct far beyond rigging or throwing a game.

As Judge Easterbrook explained in rejecting a mail fraud theory built on the violation of sports rules, the wire and mail fraud statutes do "not make a federal crime of every deceit," and "any theory that makes criminals of cheaters raises a red flag." *United States v. Walters*, 997 F.2d 1219, 1224–25 (7th Cir. 1993). There is no federal crime here.

Finally, Counts One and Four charge Mr. Rozier with the same wire-fraud conspiracy twice — once as a fraud on the Betting Companies, and again, under a relabeled honest-services theory, as a fraud on the Charlotte Hornets and the NBA. Charging a single agreement as two conspiracies under the same statute is multiplicitous, and Count Four should be dismissed on that independent ground as well.

## BACKGROUND

### A.  The Original Indictment and the Sportsbook-Fraud Theory.

The original Indictment, returned October 16, 2025, charged a scheme to defraud sports-betting companies by using material, non-public information about NBA players and games, including that certain players would leave games early, to place and direct profitable wagers against sportsbooks. Count One charged conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343. Count Two charged conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The victims of that alleged scheme are the "Betting Companies." Doc. 101 ¶¶ 7, 30, 67. Mr. Rozier previously moved to dismiss those counts and we maintain that motion here.

### B.  The Superseding Indictment Adds Counts Three and Four.

The Superseding Indictment, Doc. 101, returned May 28, 2026, added two counts tied to a single game: the Charlotte Hornets' March 23, 2023, contest against the New Orleans Pelicans. Count Three charges bribery in a sporting contest, in violation of 18 U.S.C. § 224. Count Four charges conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. §§ 1349, 1346, and 1343. It alleges that Hennen, Laster, and Mr. Rozier conspired to defraud the Charlotte Hornets and the NBA of "the intangible right of the honest and faithful services of ROZIER through bribery and kickbacks." Doc. 101 ¶ 73; *see also* ¶ 35.

### C.  The Allegations Underlying Counts Three and Four.

The Superseding Indictment alleges that Mr. Rozier was a professional basketball player employed by the Charlotte Hornets during the 2022–23 season, Doc. 101 ¶ 4, and that he was not employed by the NBA.

"Towards the end of the season," the Superseding Indictment alleges, Mr. Rozier "suffered a lower leg injury and, although he continued to play with the injury, planned to use the injury as

a basis to withdraw early during an upcoming game." *Id*. ¶ 37. "In exchange for an approximately $100,000 bribe," he allegedly agreed that he would withdraw early from a game "purportedly on the basis of his injury so that co-conspirators could bet on the information before it became public," and that he would "give LASTER a portion of the bribe." *Id*. ¶ 37. Before the March 23 game, he allegedly told Laster he would remove himself in the first quarter. The co-conspirators then placed wagers on Mr. Rozier's individual statistical "unders." *Id*. ¶¶ 38–42. Every wager alleged in the relevant paragraphs was placed with the Betting Companies, not with the Hornets or the NBA. *Id*. ¶¶ 40–42.

During the game, Mr. Rozier left in the first quarter and did not return. *Id*. ¶ 43. The Indictment alleges that his points, assists, and three-pointers fell below their betting lines, but that his rebounds were "in line with his per-game average of approximately 4.1 rebounds and above the line set by oddsmakers." *Id*. ¶ 43. "Not all of the bets" succeeded, "because ROZIER collected four rebounds, and thus went over his betting line." *Id*. ¶ 44. As a result, the Indictment alleges, the payment was renegotiated downward, from about $100,000 to about $70,000. *Id*. ¶ 44. Days later, Fairley allegedly gave Laster "tens of thousands of dollars in cash as payment for the non-public information that LASTER had obtained from ROZIER," and Laster and Mr. Rozier later "counted the money that LASTER had obtained from Fairley." *Id*. ¶¶ 45–46. The Superseding Indictment does not allege that any cash payment was made to Mr. Rozier.

### D. Counts One and Four Charge Conspiracies under Section 1349.

Count One charges all four defendants with "Conspiracy to Commit Wire Fraud," in violation of 18 U.S.C. § 1349. It alleges that, between December 2022 and March 2024, they "did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Betting Companies," and, "for the purpose of executing such scheme," to transmit interstate wires,

4

"contrary to Title 18, United States Code, Section 1343." Doc. 101 ¶ 67. Count One incorporates paragraphs 1 through 65. *Id.* ¶ 66.

Count Four charges three of those same defendants, Hennen, Laster, and Rozier, with "Honest Services Wire Fraud Conspiracy," also in violation of 18 U.S.C. § 1349. It alleges that, between January and April 2023, they "did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Charlotte Hornets and NBA of the intangible right of the honest and faithful services of ROZIER through bribery and kickbacks," and, "for the purpose of executing such scheme," to transmit interstate wires, "contrary to Title 18, United States Code, Sections 1343 and 1346." Doc. 101 ¶ 73. Both counts incorporate the identical factual allegations in paragraphs 1 through 65. *Id.* ¶¶ 66, 72.

Both counts therefore (i) arise under the same conspiracy statute, Section 1349; (ii) are predicated on the same substantive wire-fraud offense, Section 1343; (iii) incorporate the same factual paragraphs 1 through 65; (iv) overlap entirely in their participants as to Count Four, because Hennen, Laster, and Rozier are each charged in Count One as well; (v) overlap in time, with Count Four's January–April 2023 window falling wholly within Count One's December 2022–March 2024 window; and (vi) as to Mr. Rozier, rest on the very same alleged agreement concerning the very same March 23 game.

### E. Procedural Posture.

On June 26, 2026, this Court approved of the parties' proposed briefing schedule on the motion to dismiss newly added counts. Trial is set for February 8, 2027. The next status conference is scheduled for August 11, 2026.

**LEGAL STANDARD**

A defendant may move before trial to dismiss a count that "fail[s] to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment must allege every element of the offense and fairly inform the defendant of the charge. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *Russell v. United States*, 369 U.S. 749, 763–64 (1962). Because "federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (quoting *Dowling v. United States*, 473 U.S. 207, 213 (1985)) (internal quotations omitted); *United States v. Pirro*, 212 F.3d 86, 91–93 (2d Cir. 2000) (affirming dismissal where the Government's proof would not establish a crime within the statute's terms).

An indictment is multiplicitous when it "charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); accord *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003). "An indictment is multiplicitous if it charges the same crime in two counts." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004). Multiplicity implicates the Fifth Amendment's Double Jeopardy Clause, which protects against multiple punishments for the same offense. *See Brown v. Ohio*, 432 U.S. 161, 165 (1977); *United States v. Josephberg*, 459 F.3d 350, 354–55 (2d Cir. 2006); *Chacko*, 169 F.3d at 145. Rule 12 expressly identifies "charging the same offense in more than one count (multiplicity)" as a defect in the indictment that must be raised before trial if the basis for the motion is then reasonably available. Fed. R. Crim. P. 12(b)(3)(B)(ii).

**ARGUMENT**

I.     **COUNT THREE FAILS TO STATE A § 224 OFFENSE, AND VENUE IS IMPROPER IN THIS DISTRICT.**

    **A. The Superseding Indictment Does Not Allege a Scheme to Influence the Sporting Contest; It Alleges Wagers on Mr. Rozier's Individual Statistics.**

Section 224 punishes a "scheme in commerce to influence, in any way, by bribery any **sporting contest**." 18 U.S.C. § 224(a) (emphasis added). The statute then repeats the same object in the scienter element: the defendant must know that "the purpose of such scheme is to influence by bribery **that contest**." *Id.* (emphasis added). The repeated word "contest" matters. A "sporting contest" is the publicly announced event "between individual contestants or teams of contestants." 18 U.S.C. § 224(c)(2). It is not a betting market, a player prop line, a minutes total, or an individual statistic. The object of the scheme therefore must be the contest: who wins, the score, the margin, or the competitive result of the game itself.

The Superseding Indictment alleges no scheme directed at the contest and does not allege that Mr. Rozier intentionally played poorly. It alleges that co-conspirators wagered on Mr. Rozier's individual "unders": his points, rebounds, assists, and three-pointers, and that he withdrew from the March 23 game early so those personal numbers would come in below their lines. *See* Doc. 101 ¶¶ 37-43. It does not allege that anyone wagered on, or sought to change, who won the Hornets-Pelicans game, the final score, or the margin of victory. The result of the contest was irrelevant to the charged wagers.

The Government cannot bridge that gap by pointing to incidental effects on game flow, substitution patterns, or competitive balance. Section 224 requires that the purpose of the scheme be to influence the contest. A collateral side effect is not the statutory object.

The Government's own definitions establish the defect. The Superseding Indictment defines a "proposition" or "prop" bet as "a bet made regarding the occurrence or non-occurrence during a game of an event *not directly affecting the game's outcome*," including bets on an individual player's "points, rebounds, assists, minutes played and/or three-pointers made." Superseding Indictment ¶ 26 (emphasis added). It separately defines the bets that do concern the contest: a "money line" bet is "a bet placed on a game's outcome (i.e., which team would win or lose the game)," and a "point spread" bet is "a bet placed on the margin of victory or defeat." *Id.* ¶ 27. The Superseding Indictment alleges only the former. The Government has thus conceded, in the charging instrument itself, that the wagers at the heart of Count Three concerned events "not directly affecting the game's outcome." A scheme to move a bettor's position on one player's statistics is not a scheme to "influence . . . [the] sporting contest."

The "in any way" language in § 224 does not save the count. That phrase modifies the manner in which a contest may be influenced; it does not change the object that must be influenced. Put differently, "in any way" answers the how, not the what. The what remains "that contest." Read the Government's way, § 224 would become a general federal anti-prop-betting statute whenever a player's alleged conduct touches a sportsbook market. No court has adopted that reading in sixty years, and the Superseding Indictment's own words refute it. The phrase broadens how a contest may be corrupted; it does not convert a wager on a collateral statistic into corruption of the contest.

The scienter element independently fails. Section 224 requires "knowledge that the purpose of such scheme is to influence by bribery that contest." 18 U.S.C. § 224(a). On the pleaded facts, the purpose was to profit on prop bets keyed to Mr. Rozier's individual statistics, not to influence the result, score, or margin of the Hornets-Pelicans contest. The Superseding Indictment therefore

does not allege the knowledge-of-purpose the statute demands. Where an element "implicit in the statute" is not satisfied by the conduct alleged, the count fails. *Pirro*, 212 F.3d at 93.

### B. Section 224 Reaches Schemes Aimed at the Outcome, Score, or Margin of a Contest, Not Individual Prop Lines.

Section 224 is among the least-litigated statutes in the United States Code. Its reported authority and public charging history point in the same direction: game-fixing, point-shaving, and bribed judging, all directed at the outcome, score, or margin of the contest. No reasoned decision applies § 224 to the manipulation of a single player's individual statistics for prop wagers where the contest's result, score, and margin were not the object of the scheme. The Government asks this Court to be the first.

The Supreme Court has never construed § 224. The Boston College cases are the paradigmatic § 224 prosecutions. In *Burke* and *Mazzei*, mob-connected gamblers bribed Boston College basketball players to shave points, and to underperform deliberately so the team would stay under the betting spread in selected games and the syndicate could win wagers on the games' margins. *See United States v. Burke*, 700 F.2d 70, 73–75 (2d. Cir. 1983); *United States v. Mazzei*, 700 F.2d 85, 86–87 (2d. Cir. 1983). The defendants were convicted of RICO conspiracy, conspiracy to commit sports bribery under § 224, and Travel Act violations, and the Second Circuit affirmed. Those are paradigmatic § 224 cases because the object of the bribery was the games themselves: their margins against the spread. Point-shaving is corruption of the contest. Manipulating a player's individual prop line, while the contest's result and margin are not the object of the scheme, is different in kind.[1]

---

[1] The reported § 224 decisions outside the point-shaving context are a line of horse-racing prosecutions, and each was directed at the outcome of the contest. In *United States v. Gerry*, 515 F.2d 130, 133 (2d Cir. 1975), the defendants were convicted under § 224 of "influencing the outcome of harness races by bribery" and of conspiring to do so. In *United States v. Walsh*, 544

The remaining public applications confirm the pattern. The 2002 Olympic figure-skating matter concerned alleged bribery of judges to fix medal outcomes; i.e., who would win the contest. *United States v. Tokhtakhounov,* 02-CR-01122-DC, Indictment at ECF No. 5 (S.D.N.Y. 2002) (charging sports bribery under 18 U.S.C. § 224, among other offenses, for a scheme to bribe judges to fix the pairs figure-skating and ice-dancing results at the 2002 Winter Olympics). The University of Toledo prosecution concerned payments to players to affect final scores and point spreads in football and basketball games. *United States v. Manni*, 09-CR-20192-MAG, Indictment at ECF No. 5 (E.D. Mich. 2009) (twenty-count indictment charging conspiracy to commit sports bribery under § 224 for payments to University of Toledo football and basketball players to influence the final scores of games; resolved by guilty pleas). And the recent Eastern District of Pennsylvania § 224 charges involving NCAA and CBA basketball allege classic point-shaving: bribed players underperforming so teams would fail to cover spreads. *United States v. Smith,* 26-CR-00023-NIQA, Indictment at ECF No. 1 (E.D. Pa. 2026) (charging twenty defendants under 18 U.S.C. §§ 224 and 2 with a point-shaving scheme to fix the spreads of NCAA and CBA men's basketball games); *United States v. Adams*, No. 25-cr-00523-NIQA (E.D. Pa.). Those matters all target the outcome, score, or margin of the contest. None involves the individual-prop theory the Government presses here. In sixty years, § 224 has never been applied to the manipulation of a single player's individual statistics for prop bets where the contest's result, score, or margin was not the object of the scheme.

---

F.2d 156, 157–58 (4th Cir. 1976), jockeys were convicted of a § 224 conspiracy in which they agreed to "bring about a winning combination" and a particular order of finish so they could collect on "Trifecta" tickets keyed to which horses finished first, second, and third. *See also United States v. DiNapol*i, 557 F.2d 962 (2d Cir. 1977) (§ 224 prosecution for conspiring to influence by bribery the outcome of horse races); *United States v. Pint*o, 503 F.2d 718, 724 (2d Cir. 1974) (defining § 224 to "prohibit bribery of any person who can influence sports *results*") (emphasis added). In each case, the object of the bribery was the competitive result of the contest.

### C. The Rule of Lenity and Section 224's Savings Clause Independently Require Dismissal.

Even if the Government could manufacture ambiguity in § 224 to suggest that "influenc[ing] … any sporting contest" could somehow be stretched to cover a prop wager on one player's statistics, that ambiguity must be resolved in Mr. Rozier's favor. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)), and "before [a court] choose[s] the harsher alternative, [it should] require that Congress should have spoken in language that is clear and definite," *id.* (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952)). Congress did not speak in clear and definite language extending § 224 to individual-prop manipulation, and for sixty years no court has read it to do so.

Section 224's own text reinforces the point. Subsection (b) is an express savings clause: Congress disclaimed any intent "to occupy the field . . . to the exclusion of a law of any State," and preserved state and local jurisdiction over the same conduct. 18 U.S.C. § 224(b). That is a deliberate signal that § 224 occupies a narrow federal slice: bribery to influence sporting contests. It is not a roving federal code of sports-betting integrity. Reading § 224 to reach every player-performance prop allegedly affected by a player's conduct would federalize an enormous new domain traditionally regulated by States and sports leagues, without a clear statement from Congress. *See Cleveland*, 531 U.S. at 27.

The Court's anti-overreach jurisprudence points the same way. Restraint in construing federal criminal statutes is the throughline of the Supreme Court's recent decisions curbing prosecutorial overreach. *See Snyder v. United States,* 603 U.S. 1, 16–20 (2024) (holding § 666 criminalizes bribes, not gratuities, and emphasizing federalism and fair-notice concerns); *Kelly v. United States,* 590 U.S. 391, 402–06 (2020) (rejecting federal fraud convictions where defendants

engaged in political misconduct but did not seek to obtain money or property); *McDonnell v. United States,* 579 U.S. 550, 574–77 (2016) (narrowly construing "official act" to avoid sweeping ordinary political activity into federal bribery law); *Skilling v. United States,* 561 U.S. 358, 404–11 (2010) (limiting honest-services fraud to bribery and kickback schemes to avoid vagueness concerns). The same restraint forecloses the Government's effort to make § 224 do work it has never done.

### D. Venue Is Not Proper on Count Three in This District.

Count Three must also be dismissed because there is no venue in this District as to that count. The Constitution "twice safeguards the defendant's venue right"—in Article III and again in the Sixth Amendment. *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Consistent with those guarantees, venue must be determined from "the nature of the crime alleged and the location of the act or acts constituting it." *Id.* at 6–7. The act § 224 proscribes is carrying into effect a scheme to influence a sporting contest by bribery; that scheme, as pleaded, was hatched and executed in Charlotte (the tip and the later money-counting), New Orleans (the game), and Philadelphia (the payment). There was no act in EDNY.

This month, the Supreme Court decided *Abouammo v. United States*, 608 U.S. —, No. 25-5146 (U.S. June 11, 2026), and it forecloses the only theory for venue here. A unanimous Court held that venue for a substantive offense is fixed by "the conduct constituting the offense"—the things a defendant must do to violate the statute—and by nothing else. *Id.*, slip op. at 4 (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)). A statute's intent element does not enlarge venue; neither do the effects a crime was designed to produce; neither does conduct that happens to be an element of some other crime. "[V]enue … must be based on the conduct that [the

statute] itself proscribes, not on the conduct another law does." *Id.*, slip op. at 9. That holding is dispositive.

Applying the conduct-elements test to the Government's own allegations places this offense squarely outside the Eastern District of New York. The alleged bribe was supposedly agreed to in North Carolina, between a Charlotte Hornet and his associates. Doc. 101 ¶ 37. The information that supposedly carried the scheme into effect—Mr. Rozier's plan to leave the game— was allegedly conveyed in North Carolina. *Id.* ¶ 38. The contest the scheme sought to "influence … by bribery" was played in Louisiana. *Id.* ¶¶ 38, 43–44. The payment that completed the bribe allegedly changed hands in Pennsylvania. *Id.* ¶¶ 45–46. And the post-game "count[ing of] the money" supposedly occurred in North Carolina. *Id.* ¶ 46. Each of these is an "act[] constituting" the § 224 offense—or, at the very least, a step in carrying the bribery scheme into effect—and not one of them happened here.

The Government's lone hook to this District—Pham's communications "in furtherance of the fraudulent wagering scheme" Doc. 101 ¶ 41(b)—cannot establish venue for Count Three, for three independent reasons.

First, it is an effect, not an element. The wagering is the consequence the bribe was designed to produce. *Abouammo* holds that such effects, "[because they are] not elements of [the] crime," "cannot figure in determining where [the] crime was committed." Slip op. at 7. Pham's bets and messages did not influence the contest; they sought to profit from it. They are not part of the § 224 offense.

Second, the New York communications are the conduct of a different crime. The "fraudulent wagering scheme" is the gravamen of the wire-fraud counts, whose victims are the "Betting Companies." *Abouammo* squarely forbids using the conduct of one offense to lay venue

13

for another: venue "must be based on the conduct that [the charged statute] itself proscribes, not on the conduct another law does." Slip op. at 9. The conduct § 224 proscribes is bribery of the contest; the betting belongs to § 1343, not § 224.

Finally, the New York communications are, at most, preparatory and collateral. Even setting *Abouammo* aside, the Second Circuit has long held that acts "not part of the offense" cannot anchor venue. *United States v. Beech-Nut Nutrition Corp.,* 871 F.2d 1181 (2d Cir. 1989). For example, defendants' flights through this District—"an important part of furthering the [fraudulent] scheme"—could not support venue on the substantive fraud count, because they "were not a constitutive part" of that offense. *United States v. Tzolov*, 642 F.3d 314, 318–19 (2d Cir. 2011). A non-defendant's wagering messages are at least one step further removed than the defendants' own travel in *Tzolov*; they cannot do for Count Three what the *Tzolov* defendants' conduct could not do for the fraud count there.

## II.     COUNT FOUR FAILS TO STATE AN HONEST-SERVICES OFFENSE.

### A. Count Four Fails Because Mr. Rozier Did Not Deprive the Hornets or the NBA of His Honest Services.

Honest services fraud requires an actual deprivation of honest services — that the defendant, induced by a bribe or kickback, dishonestly perform or withhold the very services he owes the principal. It is not triggered by every act of dishonesty, every conflict of interest, or every violation of a workplace rule. *Skilling*, 561 U.S. at 409–10; *United States v. Rybicki,* 354 F.3d 124, 135 (2d Cir. 2003) ("[N]ot every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud."). The leading application of that limit is *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997), in which an Internal Revenue Service employee used his authorized access to confidential taxpayer files to run unauthorized searches in violation of agency rules, and was convicted of honest-services wire fraud. The First Circuit reversed. "The conclusive

consideration," it explained, "is that the government simply did not prove that [the defendant] deprived, or intended to deprive, the public or his employer of their right to his honest services." *Id.* at 1077. "Although he clearly committed wrongdoing in searching confidential information, there is no suggestion that he failed to carry out his official tasks adequately." *Id.* Section 1346 does not exist to transform routine workplace misconduct into federal felonies. As the First Circuit explained, "the threat is one of transforming governmental workplace violations into felonies," yet there was "no evidence that Congress intended to create what amounts to a draconian personnel regulation." *Id.*

The same is true here, on the Superseding Indictment's own allegations. Mr. Rozier rendered his services. He was genuinely injured; he "continued to play with the injury"; and he removed himself from the game because of it. Doc. 101 ¶ 37. His rebounds came in "in line with his per-game average of approximately 4.1 rebounds and above the line set by oddsmakers." Doc. 101 ¶ 43. And his points and assists were in line with his averages for the time he played. The Superseding Indictment does not allege that he threw the game, shaved points, manipulated the score, gave less than his honest effort on the court, performed less well than he usually does during the minutes he played, or faked the injury. As in *Czubinski*, there is no suggestion that he failed to carry out his job. The Hornets received the honest, on-court services of an injured player who played for the time he was able to play. That is not a deprivation of honest services.

What the Superseding Indictment actually describes is the disclosure of material non-public information — Mr. Rozier's intended shorter playing time as the result of his injury — so that others could wager on it before it became public. Doc. 101 ¶¶ 37–42. That is not a failure to render honest services. It is, in substance, an insider-trading theory: the use and tipping of confidential information. But the misuse of information is a different wrong from the deprivation of honest

services, and it is addressed by different doctrines. The unauthorized use of confidential information is a property concept — the Supreme Court has long held that "[c]onfidential business information" is property, the misappropriation of which may deprive its owner of a property right. *Carpenter v. United States*, 484 U.S. 19, 25–28 (1987); *see United States v. O'Hagan*, 521 U.S. 642 (1997) (misappropriation theory of insider trading rests on deception of the source of the information). The wrong of trading on inside information runs to the source of the information and to the counterparties in the trade — here, the sportsbooks, which is exactly the wire-fraud theory the Government already charges in Count One. It is not a deprivation of the playing services Mr. Rozier owed the Hornets. The Government cannot take an insider-trading or misappropriation theory and recharacterize it as honest-services fraud; the two doctrines protect different interests and run to different victims.

Suppose Mr. Rozier had sold information about a *teammate's* anticipated early exit. No one could say that he thereby deprived anyone of honest services; he would have leaked information, perhaps in breach of a rule, but he would not have failed to perform his job. The honest-services theory cannot turn on whose decision the information happened to concern. Count Four bootstraps the "honest services" label onto an information leak that, at most, breaks a confidentiality rule.

Moreover, the breach of a league or workplace rule, even a breach for money, is not honest-services fraud. *Skilling* removed undisclosed self-dealing and conflicts of interest from § 1346's reach precisely because reading the statute to reach every paid disloyalty would give it an indeterminate breadth. 561 U.S. at 409–10. *Czubinski* refused to convert workplace misconduct into a federal felony. And courts have repeatedly declined to treat the violation of sports rules as federal fraud. In *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), Judge Easterbrook reversed the mail-fraud conviction of a sports agent who signed college athletes in violation of

16

NCAA rules, explaining that the agent's efforts "to circumvent the NCAA's rules" did not "amount[] to mail fraud," because the fraud statutes punish "schemes to get money or property by fraud rather than methods of doing business that incidentally cause losses." *Id.* at 1227. The NBA's codes and collective bargaining agreement create a contractual and disciplinary regime; their violation is a matter for league discipline, not a twenty-year federal felony. The fraud statutes are not a substitute for those private remedies, and they do not make a breach of a private contract a federal crime.

The point is easy to test. Suppose a sponsor paid Mr. Rozier to wear an unauthorized advertisement on his jersey, which the league's uniform rules forbid. Or suppose someone paid him to break curfew and attend an event the night before a game. Each would violate a team or league rule, and each would be done for money, yet no one would call either one honest services fraud. In every such case the player still gives his team the services he owes; a paid violation of a collateral rule is simply not federal criminal fraud. If the Hornets or the NBA believe their rules were broken, they may pursue the remedies that govern player conduct, contractual and disciplinary. The criminal fraud laws are not a substitute for those private remedies.

An injured player who leaves a game for health reasons commits no offense. The Government's theory would make him a felon solely because of what he allegedly hoped bettors would do with the information. The alleged money, moreover, was tied to wagering outcomes against sportsbooks, not to any service rendered to or withheld from the Hornets or the NBA. On these allegations, Count Four does not identify any honest service of which the team or the league was deprived.

**B. Count Four Also Fails Because the Alleged Payors Had No Transaction, Dealing, or Matter Before the Hornets or the NBA.**

Because the Hornets and the NBA were not deceived into giving the bettors anything, Count Four fails. Section 1346 protects a principal's right to the honest and faithful performance of the duties a fiduciary owes. The unifying feature is a *fiduciary* relationship and the *loyalty* it demands: honest-services fraud occurs when a fiduciary, induced by a bribe or kickback and in breach of that duty of loyalty, betrays the principal he is supposed to serve. *Skilling*, 561 U.S. at 407 (the doctrine's "solid core" comprised "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"); *Rybicki*, 354 F.3d at 141. The interest protected, in short, is the right to a fiduciary's loyal *service* — not a general right to honesty, not the integrity of a betting market, and not the confidentiality of information. Those interests, where the law protects them at all, are protected by other doctrines.

Congress enacted § 1346 after the Supreme Court in *McNally v. United States*, 483 U.S. 350, 360 (1987), held that the mail and wire-fraud statutes are "limited in scope to the protection of property rights." Section 1346 provides that a "scheme or artifice to defraud" includes a scheme to deprive another of "the intangible right of honest services." But the Supreme Court has refused to let that open-ended phrase become a general federal power to punish disloyalty or unethical conduct.

In *Skilling*, the Court held that § 1346 would be unconstitutionally vague unless confined to its core, and so "h[e]ld that § 1346 covers only bribery and kickback schemes." 561 U.S. at 408–09. The Court excluded the "amorphous category" of undisclosed self-dealing and conflict-of-interest cases as too indefinite to give fair notice or to prevent arbitrary enforcement. *Id.* at 409–10. It has since repeatedly declined to expand the fraud statutes beyond that core. *See Kelly v. United States*, 590 U.S. 391, 398–400 (2020) (rejecting property-fraud liability based on an

exercise of regulatory power); *Ciminelli v. United States,* 598 U.S. 306, 312–16 (2023) (rejecting the Second Circuit's "right-to-control" theory because it was untethered to traditional property interests); *Percoco v. United States,* 598 U.S. 319, 330–32 (2023) (rejecting an expansive and indeterminate theory of honest-services fraud based on a private citizen's informal political influence).

These principles decide this case. First, the bribe in the paradigmatic honest-services case is "supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404. The doctrine reaches corruption that, unlike ordinary fraud, lacks symmetry: "the betrayed party suffered no deprivation of money or property; instead, a third party, who had not been deceived, provided the enrichment." *Id.* at 400. That third party supplies the enrichment because it profits from the corrupt act — ordinarily through a dealing of its own with the victim. *McNally* itself "presented a paradigmatic kickback fact pattern" in which an official "conspired with a third party so that both would profit from wealth generated by public contracts." *Id.* at 407.

Second, the controlling description of private-sector honest-services fraud in this Circuit is *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc), as cabined by *Skilling*. *Rybicki* holds that, as applied to private actors, § 1346 means:

> a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

*Rybicki*, 354 F.3d at 141–42. *Rybicki* was itself a paradigmatic case: personal-injury lawyers paid insurance adjusters to expedite the lawyers' clients' claims *against* the adjusters' employers, the

insurers. *Id.* at 128–30. The payors had an adverse matter pending with the victims — the claims — and the bribe corrupted the fiduciaries' handling of that matter.

That structural feature is constant across the honest-services cases, including in the sports context. In the FIFA cases, sports-media companies bribed soccer-federation officials to steer valuable broadcasting and marketing rights, which were rights the federations controlled and the payors wanted. *United States v. Napout*, 963 F.3d 163, 169–70 (2d Cir. 2020). In the United Nations procurement case, a vendor bribed a procurement officer to obtain U.N. business, which was business the U.N. controlled and the vendor sought. *United States v. Bahel*, 662 F.3d 610, 616, 632–33 (2d Cir. 2011). In each of these cases, the payor sought something from the victim, and the bribe corrupted a fiduciary's handling of that very matter. The constant, in short, is that the briber's gain comes from the victim itself. Section 1346 does not reach a bribe whose entire payoff is realized in a separate market in which the victim has no part.

Measured against that paradigm, Count Four fails. The alleged payors were gamblers. They were not vendors, bidders, claimants, agents, contractors, licensees, applicants, employees, or counterparties of the Hornets or the NBA. They had no matter pending before the team or the league. They did not seek a contract, payment, licensing right, league approval, roster decision, discipline decision, officiating decision, or any other benefit from either alleged victim.

The Government may respond that bribery is bribery whenever a third party pays an employee to breach a duty to his employer. That formulation proves too much. It would convert undisclosed conflicts, side deals, outside compensation, and disloyal motives into federal honest-services crimes whenever the Government can attach the word "bribe." *Skilling* rejected exactly that move. Section 1346 reaches the bribe-and-kickback core, not every paid breach of workplace loyalty. *See* 561 U.S. at 409–10. The distinction is especially important here, where the alleged

economic object of the scheme was not to obtain anything from the Hornets or the NBA, but to win wagers from sportsbooks. *Skilling*'s own application makes the point: the theory there failed because the Government never alleged "that Skilling solicited or accepted side payments from a third party in exchange for" the disloyal act. *Id.* at 413. Here, there were alleged side payments — but from third parties (gamblers) who had no transaction with the supposed victims, in exchange for an exit that cheated only the sportsbooks. That is the *McNally* structure turned inside out: the third party's gain came not from any dealing with the victim, but from a separate market in which the supposed victim had no part.

### C. Count Four Does Not Allege a Cognizable Honest-Services Duty to the NBA.

Honest-services fraud requires a fiduciary duty running to the alleged victim. *Skilling*, 561 U.S. at 407 & n.41; *Rybicki*, 354 F.3d at 141–42; *see also United States v. Mangano*, 128 F.4th 442, 470 (2d Cir. 2025) (quoting *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020)) ("a violation of a fiduciary duty is an element of honest services fraud"). Count Four names two victims: the Charlotte Hornets and the NBA. But if the entire count is not dismissed, at a minimum, the NBA portion must be stricken.

The Superseding Indictment alleges that Mr. Rozier was employed by the Charlotte Hornets, not the NBA. Doc. 101 ¶ 4. *Rybicki*'s private-sector formulation rests on the duty an employee owes to his employer, or a comparable duty of loyalty. 354 F.3d at 141–42. And *Percoco* warns that an honest-services duty cannot be extended through vague concepts of influence, association, or relationship. 598 U.S. at 328–30. The Superseding Indictment's allegation that the NBA maintained conduct rules and a collective bargaining agreement does not transform the league into Mr. Rozier's employer or create a fiduciary duty to the league cognizable under § 1346.

At most it alleges a contractual or disciplinary regime. Section 1346 does not federalize every alleged breach of a league rule.

This matters because Count Four does not charge a fraud on the Hornets alone. It charges a conspiracy to deprive "the Charlotte Hornets and NBA" of Mr. Rozier's honest services. Doc. 101 ¶ 73. If the Government intends to proceed on a league-victim theory, it must identify a fiduciary duty defined with the clarity that criminal law requires. It has not done so.

**D. Fair Notice, Lenity, and Section 224 Foreclose This Unprecedented Extension.**

Counsel is aware of no decision holding that a professional athlete commits honest-services fraud by deciding how long to play through an actual injury. That absence of precedent is not a technicality. It is the point of *Skilling*, *Percoco*, *Ciminelli*, *McDonnell*, *Snyder*, and *Chastain*. When the Government seeks to apply a broad federal fraud statute to a new category of conduct, courts demand a clear statutory hook and a limiting principle.

There is none here. If Count Four states an offense, then any player, coach, trainer, executive, or league employee who breaches an internal sports rule for outside compensation could face a twenty-year federal honest-services charge.

In the "Varsity Blues" college-admissions prosecution, the First Circuit vacated the defendants' honest-services fraud convictions and held that the Government's theory fell outside the narrow bribery-and-kickback core preserved by *Skilling*. *United States v. Abdelaziz*, 68 F.4th 1, 29–32 (1st Cir. 2023). The court squarely rejected the Government's contention that conduct qualifying as bribery under another federal statute necessarily qualifies as honest-services bribery: § 1346 reaches only the classic core of bribery, which is narrower than the bribery defined elsewhere in the United States Code. *Id.* The same logic governs here, demonstrating that the alleged conduct does not fit § 1346's honest services bribery paradigm.

The rule of lenity resolves any remaining doubt. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling*, 561 U.S. at 410 (citation omitted). The Second Circuit's recent decision in *Chastain* underscores the same principle in the related property-fraud context: the fraud statutes do not criminalize conduct merely because it departs from "fundamental honesty and fair play" unless the statute's traditional elements are satisfied. *United States v. Chastain*, No. 23-7038, 2025 WL 2165839, at 7–8 (2d Cir. July 31, 2025). And Justices Gorsuch and Thomas have warned that "no one knows what 'honest-services fraud' encompasses," an uncertainty that is intolerable "when criminal sanctions loom." *Percoco*, 598 U.S. at 333 (Gorsuch, J., concurring in the judgment). Section 1346 cannot be stretched, for the first time, to make an athlete's injury-based participation decision a federal crime.

## III.  COUNTS ONE AND FOUR ARE MULTIPLICITOUS.

Counts One and Four charge a single Section 1349 conspiracy, requiring dismissal. In *Braverman v. United States*, the defendants were charged in seven counts, each alleging a conspiracy to violate a different provision of the internal-revenue laws, but all charged under a single conspiracy statute. 317 U.S. 49, 52–53 (1942). The record showed but "a single agreement to commit the offenses." *Id.* at 52. The Court held that the seven counts charged only one conspiracy offense:

> Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

*Id.* at 53. "The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute. … For such a violation, only the single penalty prescribed by the statute can be imposed." *Id*. at 54.

There is a narrow exception to *Braverman*, and it does not reach this case. In *Albernaz v. United States*, 450 U.S. 333 (1981), the Court permitted cumulative punishment for a single agreement charged under two different conspiracy statutes, conspiracy to import marijuana under 21 U.S.C. § 963 and conspiracy to distribute it under 21 U.S.C. § 846. The Court grounded that result on the dispositive distinction from *Braverman*: the *Albernaz* counts arose under two distinct statutory provisions, each requiring proof of a fact the other did not, whereas *Braverman* involved a single conspiracy statute. *Id*. at 339–40 & n.3. Where two conspiracy counts arise under different statutes, the same-elements test of *Blockburger v. United States*, 284 U.S. 299 (1932), may permit both. Where they arise under the same statute, *Braverman* governs, and a single agreement yields a single count.

Counts One and Four arise under the same statute. Both are charged under 18 U.S.C. § 1349, which punishes any "conspir[acy] to commit any offense under this chapter," Chapter 63 of Title 18. Both also identify the same Chapter 63 offense as the conspiracy's object: wire fraud under Section 1343. Count One is "contrary to … Section 1343." Doc. 101 ¶ 67. Count Four is "contrary to … Sections 1343 and 1346." *Id.* ¶ 73. The addition of Section 1346 to Count Four changes nothing for multiplicity purposes, because Section 1346 is not a separate crime. It is a definitional provision that, "[f]or the purposes of this chapter," expands the term "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Honest services fraud is prosecuted as wire fraud under Section 1343, with Section 1346 supplying the honest-services theory of the "scheme." *See Skilling*, 561 U.S. at 404–09 (Section 1346 defines the reach of the fraud statutes' "scheme to defraud" element and is confined to bribery-and-kickback schemes); *Percoco*, 598 U.S. at 323 (describing prosecution for conspiracy to commit honest-services wire fraud under 1343, 1346, and 1349).

Third, as to Mr. Rozier, the two counts rest on the identical alleged act. The only agreement the Superseding Indictment attributes to him is his alleged agreement to leave the March 23 game early in exchange for payment so that others could bet his unders. Doc. 101 ¶¶ 37–39. That single alleged agreement is simultaneously the basis for the Betting-Companies fraud (Count One) and the Hornets/NBA honest-services fraud (Count Four). One act of agreement cannot be two conspiracies. The honest-services count is wholly contained within the broader wire-fraud count as charged against Mr. Rozier: it covers a narrower victim, a shorter time period falling entirely within Count One's window, and a strict subset of Count One's participants. A defendant may be convicted of overlapping conspiracies, but not "where a smaller conspiracy is wholly contained within a larger one." *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) (internal quotation marks omitted).

Multiplicity inflicts a harm beyond the risk of cumulative punishment: a multiplicitous indictment "may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) (Friendly, J.). Once the Government conveys that inflated picture to the jury, "the risk increases that the jury will be diverted from a careful analysis of the conduct at issue, and will reach a compromise verdict or assume the defendant is guilty." *United States v. Polizzi*, 257 F.R.D. 33, 37 (E.D.N.Y. 2009) (internal quotation marks omitted). This Court should order the Government to elect whether to proceed on Count One or Count Four to prevent the multiplicity problem and the Government's attempt to convict Mr. Rozier twice for one alleged agreement. Permitting both counts to go forward risks jury compromise and other evils that can be cured now.

## CONCLUSION

Counts Three and Four of the Superseding Indictment should be dismissed.

Dated June 30, 2026

Respectfully submitted,

**MARKUS/MOSS** PLLC
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:    <u>/s/ David Oscar Markus</u>
David Oscar Markus
dmarkus@markuslaw.com

<u>*/s/ Anita Margot Moss*</u>
Anita Margot Moss
mmoss@markuslaw.com

<u>*/s/ Lauren Field Krasnoff*</u>
Lauren Field Krasnoff
lkrasnoff@markuslaw.com