**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:KTF/BLW/DIB
F. #2025R00609

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 3, 2026

By ECF and E-Mail

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Deniro Laster and Terry Rozier
Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

The government respectfully writes in opposition to the defendants Deniro Laster ("Laster") and Terry Rozier's ("Rozier") joint motion to sever their trials in this case. See ECF No. 158 ("Def. Mot."). Though the defendants argue that Rozier's defense theory requires him to prove Laster's guilt, that conclusion is not supported by Rozier's stated defense theory. Rozier's defense theory—that he exited the March 23, 2023 National Basketball Association ("NBA") game (the "March 23 Game") because of an injury and not as part of a predetermined plan—essentially amounts to an argument that no crime occurred here.[1] Unlike cases in which one defendant's theory of defense necessarily requires that defendant to prove another defendant's guilt, that is not the case here, since Rozier's defense theory—that no crime occurred—would actually exculpate both him and Laster. Further, severance would result in a significant waste of resources, requiring the Court to hold two nearly identical trials, each of which would last approximately three weeks.[2] For these reasons, the Court should deny the defendants' motion and trial for both defendants should commence on February 8, 2027, as scheduled.

---

[1] Notably, Rozier argues that there was no predetermined plan to leave the March 23 Game, and not that Laster stole Rozier's confidential medical information that included an expectation that he would leave the March 23 Game due to an injury after starting. Even if Rozier transitioned his defense to the latter theory, that still would not provide a basis for severance, because it would amount to a lack of knowledge defense rather than a mutually antagonistic defense, as discussed more fully below.

[2] The government anticipates the defendants' joint trial to last approximately three weeks. In their motion, the defendants argue that separate trials for Rozier and Laster would be completed within that same three-week period, with Rozier's trial beginning first, followed by

## I. Background

A Grand Jury sitting in the Eastern District of New York returned the initial indictment in this case on October 16, 2025, and a superseding indictment on May 28, 2026. The superseding indictment charges Rozier with conspiring with Laster and others to accept a bribe in exchange for manipulating his performance in the March 23 Game, thereby enabling his co-conspirators to defraud sports betting companies by placing successful fraudulent wagers based on his anticipated performance, in violation of 18 U.S.C. §§ 1349, 1956(h), and 224. See ECF No. 101. On June 10, 2026, the Court scheduled trial to commence in this case for both defendants on February 8, 2027.

## II. The Defendants' Motion

In the defendants' joint motion, Rozier asserts that his "defense is simple. He did not know about any bets." Def. Mot. at 1. He asserts that he will argue that he prematurely exited the March 23 Game "because he was hurt . . . and not because of any arrangement with Mr. Laster." Id. Stated differently, Rozier intends to argue that there was no scheme to defraud or to accept bribe payments predicated on his coordinated, predetermined decision to exit the March 23 Game prematurely and that he had no knowledge of what Laster and other alleged co-conspirators were doing vis-à-vis placing bets on Rozier's underperformance in the March 23 Game. By claiming that he exited the March 23 Game because of a legitimate injury, and not as part of a predetermined plan, Rozier functionally argues that no crime was committed in this case.

Though styled as a joint motion, the instant motion is really made on behalf of Laster. The motion claims that Rozier, in order to assert his intended defense, needs to serve as a "second prosecutor" against Laster and prove Laster's guilt, which will prejudice Laster. The motion asserts that in order to advance Rozier's defense, Rozier's counsel "will argue that Mr. Laster is guilty and will present evidence supporting that conclusion." Id. at 3. Accordingly, the defendants assert that their defenses will be "mutually antagonistic or irreconcilable." Id. at 2. For the reasons stated further herein, Rozier's argument is unconvincing. Laster, meanwhile, does not identify any defense theory that he anticipates advancing at trial.

## III. Applicable Law

### A. Federal Rule of Criminal Procedure 14(a)

Federal Rule of Criminal Procedure 14(a) ("Rule 14(a)") permits severance of properly joined defendants based on prejudice to a defendant or the government. Fed. R. Crim. P. 14(a). "A defendant seeking severance under Rule 14 bears an extremely difficult burden of proving that the prejudice would be so great as to deprive him of his right to a fair trial." United States v. Rivera, 89 F. Supp. 3d 376, 398 (E.D.N.Y. 2015) (internal quotation marks and alterations omitted). "[D]efendants are not entitled to severance merely because they may have a better

---

Laster's trial. See Def. Mot. at 1, 3. The defendants are wrong. Each defendant's trial would be nearly identical and would last approximately three weeks.

chance of acquittal in separate trials." Zafiro v. United States, 506 U.S. 534, 540 (1993). A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991). Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials." United States v. Rucker, 586 F.2d 899, 902 (2d Cir. 1978); see also United States v. Rittweger, 524 F.3d 171, 179 (2d Cir. 2008).

Even where a defendant may be prejudiced by joinder, the question under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986). The Supreme Court has made plain that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro, 506 U.S. at 537. "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998).

This preference reflects a settled precept in criminal law: "Joint trials play a vital role in the criminal justice system, as they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." United States v. O'Connor, 650 F.3d 839, 858 (2d Cir. 2011). Joint trials also "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." United States v. Barret, 824 F. Supp. 2d 419, 432 (E.D.N.Y. 2011); see also United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979) (a joint trial "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials").

In light of these considerations, the Supreme Court has set a high bar for severance for properly joined defendants, such that a severance motion should be granted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. Accordingly, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) (denial of severance motion is improper only where defendant will incur "prejudice so severe that his conviction [would] constitute[] a miscarriage of justice").

B. Severance Based on Mutually Antagonistic Defenses

The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." Cardascia, 951 F.2d at 484-85. Moreover, "[m]ere fingerpointing does not require severance." United States v. Casamento, 887 F.2d 1141, 1154 (2d Cir. 1989).

The term "mutually antagonistic" has been adopted to describe a narrow category of adversarial defenses where "accepting one defense requires that the jury must of necessity convict a second defendant." United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003) (emphasis added); see also Zafiro, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually

antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").

However, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial per se," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown." Zafiro, 506 U.S. at 538-39. Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can demonstrate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539; see also United States v. Scott, 637 F. App'x 10, 13 (2d Cir. 2015) (summary order) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial."). "In those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" United States v. Abakporo, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013) (quoting Zafiro, 506 U.S. at 539.

Accordingly, to determine if severance is warranted on the basis of asserted mutually antagonistic defenses, the Court must undertake a three-step analysis under Zafiro and its progeny. First, the Court must determine whether the defenses are in fact "mutually antagonistic," such that acceptance of one defense necessarily precludes the acceptance of the other, or if they are merely finger pointing. Zafiro, 506 U.S. at 537-39. Second, the Court must determine whether, if the defenses are in fact "mutually antagonistic," such defenses are "prejudicial" to one or both defendants. Id. And finally, even if the Court determines that one or both defendants might suffer prejudice as a result of a joint trial, the Court must find that there is a serious risk that a "joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment" about the defendants' guilt or innocence that cannot be mitigated by a less drastic measure than severance, such as through limiting instructions. Id.

## IV. Severance Is Not Warranted

As described below, because the defendants' motion fails at each step of the Zafiro analysis, it should be denied.

### A. Step One: Mutually Antagonistic Defenses

Neither Rozier nor Laster has established that their defenses are mutually antagonistic. Rozier would be perfectly capable of advancing his defense without needing to establish Laster's guilt and, for this reason, Rozier's defense is not mutually antagonistic to Laster's. One defendant's defense is "mutually antagonistic" to another defendant's defense where "accepting one defense requires that the jury must of necessity convict a second defendant." Yousef, 327 F.3d at 151 (emphasis added). However, a jury can fully accept Rozier's defense that he left the March 23 Game early because he was injured—and not as part of a prearranged plan with Laster and others—without needing to find Laster guilty of any crime. In fact, Rozier's stated defense would actually exculpate Laster, rather than inculpate him. Rozier's theory is that he left the March 23 Game early solely because of an injury and not as part of a prearranged plan. Taken

to its logical conclusion, Rozier suggests that Laster could not have known prior to the March 23 Game that Rozier intended to exit prematurely; that Laster did not possess inside information regarding Rozier's performance in the March 23 Game; and that the placement of wagers on Rozier's unders were not part of a scheme to defraud the online sportsbooks and bribe a professional athlete to alter his performance.[3]

Likewise, to the extent Rozier's defense is also premised on an argument that Rozier had no knowledge of Laster's (and others') conduct, that defense does not require the jury to convict Laster in order to believe Rozier. Rozier does not need to introduce any evidence whatsoever regarding what Laster did or did not do in order to convince a jury that Rozier simply had no knowledge of anything Laster did. Nor do the defendants explain in their motion why a jury would necessarily need to find Laster guilty in order to find Rozier not guilty. Beyond stating in a conclusory fashion that "Rozier's lawyers cannot present [their] defense without effectively prosecuting Mr. Laster," the defendants do not explain why that is the case, in light of Rozier's stated defense theories. Def. Mot. at 2. The defendants identify no aspect of Rozier's defense that requires—or would even suggest—a finding of Laster's guilt, no factual proposition the jury must accept to acquit Rozier that would inculpate Laster, and no testimony or evidence that would render their defenses conflicting.

Indeed, the only such evidence the defendants identify in their motion undermines their argument. They cite to a March 29, 2023 text message in which Laster told a mutual friend, "Don't tell chum [Rozier] bout the bet," which they contend refers to a wager placed by Laster in connection with the March 23 Game. Def. Mot. at 1–2. Even assuming that this message supports Rozier's defense theory—which, as the government will explain in its motions in limine, it does not—that text does not establish Laster's guilt. That is because if, as Rozier states he will argue at trial, he left the March 23 Game because of injury and not as part of a prearranged plan, the bet that Laster supposedly does not want Rozier to learn of would not have been a fraudulent bet, because it would not have been based on inside information. Thus, as discussed above, Rozier's theory would exculpate, rather than inculpate, Laster by undermining the premise that the charged scheme existed at all.

The recent decision in United States v. Javice, No. 23-CR-251 (AKH), 2025 WL 283211 (S.D.N.Y. Jan. 23, 2025) is particularly instructive. There, the defendants Javice and Amar, who were, respectively, the Chief Executive Officer and Chief Growth Officer of a financial technology company, were charged with participating in the same scheme to defraud financial institutions. See Government's Memorandum of Law in Opposition to Defendant Charlie Javice's Motion to Sever at 1-3, 13, Javice, ECF No. 216. Javice sought to sever her trial from Amar's on

[3] Although Rozier does not articulate this defense theory in the instant motion, even if Rozier shifts theories and later argues that he decided, prior to the March 23 Game, that he was going to exit the game prematurely and shared that decision with Laster (without the knowledge or intent that Laster might bet on that information), that does not constitute a mutually antagonistic defense warranting severance. Stated differently, if Rozier argues that he innocuously shared his decision to prematurely exit the March 23 Game with Laster and then Laster used that non-public information to bet, Rozier could fully advance a lack-of-knowledge defense without needing to prove Laster's guilt. Courts have repeatedly rejected such a defense as a basis for severance. See, e.g., Yousef, 327 F.3d at 151; Cardascia, 951 F.2d at 484 (same).

the ground that their defenses would be mutually antagonistic and that Amar would effectively serve as a second prosecutor against her. Id. at *1-2. Specifically, Javice claimed that Amar would argue that Javice had deceived him regarding the company's representations to prospective investors, thereby inculpating Javice. Id. In opposing severance, the government argued that Amar's anticipated lack-of-knowledge defense would not compel the jury to convict Javice, because even if Amar had been deceived by Javice, the jury could nevertheless conclude that Javice lacked the requisite intent to defraud. Id. at 8-18. The court denied Javice's severance motion. See Javice, 2025 WL 283211 at *2. In denying the severance motion, Judge Hellerstein concluded that the defendants' positions were not so mutually antagonistic as to establish substantial prejudice warranting separate trials. See id. The court further emphasized the substantial overlap in the evidence and witnesses and concluded that judicial economy favored a joint trial. Id.

Thus, in Javice, the court rejected severance even where a defendant identified a particularized defense that could inculpate a co-defendant. Here, by contrast, Rozier has identified no argument, evidence or testimony by which he will prove, or even suggest, Laster's guilt. Instead, Rozier maintains only that there was never any prearranged plan to exit the March 23 Game early (and thus no inside information to share or to place bets based on) and that he lacked knowledge of the charged conspiracy, including of Laster's conduct. Therefore, if severance was unwarranted in Javice, it is even less warranted here.

The recent decision in United States v. Chierchio is similarly instructive. There, defendants charged in a fraud scheme sought severance based on anticipated conflicts between their defenses. See United States v. Chierchio, No. 20-CR-306 (NGG), 2022 WL 523603, at *5–9. Judge Garaufis denied severance, finding that the defendants' competing efforts to assign blame for the alleged fraud did not justify separate trials. Id. The court further concluded, like here, that the defendants had not demonstrated a sufficient risk of prejudice that could not be adequately mitigated through ordinary trial procedures, including limiting instructions. Id.

Likewise, the court's decision in United States v. Webb is instructive. In Webb, a corporate defendant sought severance from two individual defendants "because of a substantial risk of 'double prosecution' by the individual defendants against the corporate defendants." United States v. Webb, No. 15-CR-252 (PKC), 2020 WL 6393012, at *4 (E.D.N.Y. Nov. 11, 2020). The corporate defendant argued that the individual defendants "would unfairly subject it to prosecution by both the government and counsel for [the individual defendants], who would be constantly reminding the jury that the government's allegations and evidence implicate only [the corporate defendant]." Id. at *5. Judge Chen disagreed, noting that the corporate defendant's "theory rests on the fundamentally flawed premise that a reminder that certain evidence pertains only to [the corporate defendant] is akin to a charge that [the corporate defendant] is guilty." Id. Further, while the court acknowledged that the individual defendants' lawyers "will seek to remind the jury as often as possible that certain allegations and evidence pertain only to [the corporate defendant] . . . such reminders do not come close to pointing the finger at [the corporate defendant], much less presenting a serious risk that [the corporate defendant] will not receive a constitutionally fair trial." Id. As relevant here, the defendants' motion indicates that Rozier intends to argue that much of the evidence implicates only Laster, and not him. See Def. Mot. at 1-2. However, even if Rozier intends to highlight Laster's conduct as a way of highlighting Rozier's supposed lack of involvement, such arguments—as the Webb court found—do not require the jury to find Laster guilty and do not come close to presenting a serious enough risk that Laster would not receive a constitutionally fair trial to warrant severance.

Accordingly, the defendants have not identified mutually antagonistic defenses. At most, they argue that Rozier may attempt to distance himself from Laster's alleged conduct. But that is ordinary finger-pointing, not grounds for severance. See Casamento, 887 F.2d at 1154.

B. Step Two: Prejudice

For the same reasons, Rozier and Laster fail to demonstrate that Rozier's proffered defense would prejudice Laster. See Zafiro, 506 U.S. at 538-39. The only argument the defendants advance regarding prejudice is that Rozier's counsel "will argue that Mr. Laster is guilty and will present evidence supporting that conclusion." But, as described above, that argument is simply logically incompatible with Rozier's stated defense. Again, if Rozier—as he claims in the instant motion—plans to argue that he left the March 23 Game solely because of injury and not as part of a predetermined plan—then Laster would likely argue that, because there was no predetermined plan, the jury cannot find that he (and others) possessed inside information and placed wagers based on inside information. Thus Rozier's anticipated defense is supportive of Laster's defense, not antagonistic. And even if Rozier plans to argue or introduce evidence that Laster acted without Rozier's knowledge, under Rozier's defense theory in which Rozier did not predetermine that he was going to exit the March 23 Game prematurely, Laster could still argue that his conduct would not have been illegal. Thus, Laster would simply argue that it would be immaterial whether he acted with or without Rozier's knowledge, because he would not have acted illegally. Further, as Webb found, even if Rozier repeatedly highlights that the evidence points to Laster's involvement but not Rozier's, that type of argument does not rise to the level of prejudice that warrants severance.

Thus, Rozier's claim that he did not prearrange with anyone to leave the March 23 Game early and was unaware of Laster's conduct does not prejudice Laster and the defendants' claim that Laster would be prejudiced by the fact that he "would face two prosecutors, and the jury would hear the case against him twice" is baseless and should be rejected. See Def. Mot. at 3.

C. Step Three: Prejudice Cannot Be Mitigated

Because there is no prejudice to Laster (or Rozier) there is no risk to either defendant's fundamental right to a fair trial that needs to be mitigated. That said, any potential prejudice can be mitigated through less drastic measures than severance. See Zafiro, 506 U.S. at 538-39. For example, the Court may instruct the jury that the government bears the burden of proving each defendant's guilt beyond a reasonable doubt and that all evidence must be considered separately as to each defendant. See Chierchio, 2022 WL 523603, at *5–7.

D. The Cases Relied Upon by the Defendants are Distinguishable

The defendants unavailingly rely on United States v. Shkreli, 260 F. Supp. 3d 247 (E.D.N.Y. 2017), United States v. Copeland, 336 F. Supp. 2d 223 (E.D.N.Y. 2004), United States v. Nordlicht, No. 16-CR-640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018), and United States v. Volpe, 42 F. Supp. 2d 204 (E.D.N.Y. 1999). Def. Mot. at 2–3. Each case is readily distinguishable.

In Shkreli, Judge Matsumoto, based on facts similar to those in this case, denied severance on the basis of mutually antagonistic defenses, but nevertheless severed the trial for other reasons not applicable here. Shkreli, 260 F. Supp. 3d at 244-57. In support of severance based on mutually antagonistic defenses, Shkreli argued that his "primary defense," like Rozier's, was that "he had no criminal intent to defraud." Id. at 244. The court ultimately concluded that a jury "could have accepted [both defendants'] anticipated defenses, finding that neither defendant had intent to defraud under the circumstances." Id. The same is true here.

While Judge Matsumoto did sever Shkreli's trial, her reasons for doing so related to the "extraordinary and unique" facts of that case, which are inapposite to the facts here. Id. at 257 (emphasis added); see also id. at 256 (again noting the court's "serious concerns . . . under the unique circumstances presented) (emphasis added). There, unlike here, Shkreli was charged with participating in additional, independent, schemes and the co-defendants' defenses directly conflicted over whether Shkreli had lied to Greebel—a dispute that implicated Shkreli's advice-of-counsel defense and Greebel's claim that he had been deceived. Id. at 244-57. Moreover, Greebel's counsel argued that he would argue Shkreli was guilty of fraud and Greebel was his victim. Id. at 256–57. These "unique" circumstances are absent here, and courts have repeatedly declined to extend Shkreli beyond its "unique" facts, particularly in fraud cases.[4] See Javice, 2025 WL 283211 at *2; Chierchio, 2022 WL 523603, at *6; United States v. Webb, No. 15-CR-252 (PKC), 2020 WL 6393012, at *5 (E.D.N.Y. Nov. 11, 2020) (while acknowledging that "counsel [for individual defendants] will seek to remind the jury as often as possible that certain allegations and evidence pertain only to [the corporate defendant] . . . such reminders do not come close to pointing the finger at [the corporate defendant], much less presenting a serious risk that [the corporate defendant] will not receive a constitutionally fair trial"); United States v. Codner, No. 18-CR-609 (RJD), 2022 WL 3139119, at *2 (E.D.N.Y. Aug. 5, 2022) (defenses not mutually antagonistic where "[b]oth defendants focus on evidence that the other deceived them . . . [b]ut neither defense strategy traces this deception to the other's guilt in the charged offenses");

Copeland and Nordlicht are also distinguishable because there, unlike here, defendants claimed that their co-defendants committed the charged crimes. See Copeland, 363 F. Supp. 2d at 224 (finding mutually antagonistic defenses where one defendant denied involvement in a bank robbery and a second defendant claimed that the first defendant committed the robbery); Nordlicht, 2018 WL 1796542, at *2–3 (severing trial where one defendant conceded that the fraud occurred and was going to argue that his co-defendants were guilty). In Copeland, where there was no question that a crime (robbery) had been committed, the two defendants' defenses were mutually antagonistic because they were both outright blaming one another. Here, as discussed above, under Rozier's theory of defense, no crime was committed at all, and Rozier can fully prove his innocence without necessarily proving Laster's guilt. On the contrary, if Rozier proves he did not exit the March 23 Game for nefarious purposes, Laster will simply argue that he did not have inside information about Rozier's exit and thus is not guilty of the charged crimes. In Nordlicht, although a number of the defendants were arguing that no crime occurred, one of the defendants had fully embraced the government's theory and was planning to argue that his co-defendants had

[4] For example, Judge Matsumoto recently denied a severance motion in United States v. Clase et al., No. 24-CR-456 (KAM), ECF No. 211 (E.D.N.Y. Aug. 28, 2026) on similar grounds, finding that the defendants' asserted defenses were not mutually antagonistic.

committed the charged crimes and that he was a victim of their crimes. That is not the case here, since Rozier is not conceding that a crime occurred and blaming Laster for it, but rather maintaining that no crime occurred at all and, no matter what Laster did, he did without Rozier's knowledge.

Finally, Volpe is distinguishable as well. There, the court denied severance because the defendants failed to articulate any defenses that were mutually antagonistic or any particularized prejudice arising from any such defenses. Id. at 210-13. The court explained that even if some inconsistencies existed between the defendants' defenses, the jury could be instructed to consider the evidence against each defendant separately. Id. As discussed above, the same reasoning applies here.

Accordingly, the defendants fall well short of meeting their "extremely difficult burden" of demonstrating that severance—which would waste judicial resources and jurors' time by requiring two nearly identical, lengthy trials—is warranted. Barrett, 824 F. Supp. 2d at 433. Therefore, their motion should be denied.

## V. **Conclusion**

The government respectfully requests that the Court deny the defendants' motion and that trial should commence—jointly—on February 8, 2027, as scheduled.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: Benjamin Weintraub
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant United States Attorneys
(718) 254-7000

cc: Clerk of Court (LDH) (by ECF)
Counsel of Record (by ECF)