UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TERRY ROZIER,<br>Defendant. | No. 25-CR-323 (S-1) (LDH)<br><br>***ORAL ARGUMENT REQUESTED*** |

# TERRY ROZIER'S RESPONSE TO GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTIONS IN LIMINE

MARKUS/MOSS PLLC
David Oscar Markus
Anita Margot Moss
Lauren Field Krasnoff

40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

*Served on November 25, 2026*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 2

**I.** THE TEXT "DON'T TELL CHUM BOUT THE BET" IS ADMISSABLE .......... 4

A. Once the Government Offers Laster's Statements, Rule 806 Admits the Text .......... 6

B. The Text Is a Command, and a Command Is Not Hearsay .......... 8

C. The Text States Laster's Plan and Is Admissible Under Rule 803(3) .......... 12

D. The Text Is Also Admissible Under Rule 807 .......... 14

E. The Text Is Relevant .......... 15

F. Rule 403 Does Not Permit Exclusion of the Text .......... 17

G. Interviewing a Witness Does Not Disqualify Defense Counsel .......... 18

1. The Government Continues to Suggest the Friend Was Represented by Counsel When He Was Interviewed Even Though It Knows This To Be Untrue .......... 18

2. Counsel's Communication With a Witness Does Not Disqualify Him from the Case .......... 21

**II.** THE COURT SHOULD EXCLUDE EVIDENCE THAT MR. ROZIER PAID LEGAL FEES .......... 28

A. The Sixth Amendment Prohibits This Evidence .......... 29

B. Rule 403 Bars This Evidence .......... 30

**III.** THE COURT SHOULD APPLY THE SAME RULE TO EVERY TREATING PROVIDER REGARDLESS OF WHICH SIDE CALLS THEM .......... 32

**IV.** THE COURT SHOULD NOT ADMIT THREATS THAT THE GOVERNMENT HAS NOT TIED TO MR. ROZIER .......... 32

**V.** THE COURT SHOULD NOT LIMIT NBA EVIDENCE TO THE GOVERNMENT PREFERRED HALF OF THE STORY .......... 35

**VI.** THE REQUEST TO BAR ARGUMENT ABOUT THE GOVERNMENT'S MOTIVES AND INVESTIGATION IS PREMATURE AND OVERBROAD ..........36

**VII.** MR. ROZIER WILL NOT BLAME THE VICTIMS, BUT HE IS ENTITLED TO CONTEST MATERIALITY ..........36

**VIII.** THE JURY MAY HEAR ABOUT ROZIER'S CHARACTER, HIS BACKGROUND, AND HIS GOOD FAITH ..........38

**IX.** MR. ROZIER WILL NOT ARGUE WITHDRAWAL FROM THE CONSPIRACY BECAUSE HE WAS NEVER PART OF THE CONSPIRACY .......40

**TABLE OF AUTHORITIES**

**CASES:**


*Baines v. Walgreen Co.*, 863 F.3d 656 (7th Cir. 2017 ....................8

*California v. Trombetta,* 467 U.S. 479 (1984) ....................3

*Chambers v. Mississippi*, 410 US 284 (1973) ....................9

*Crane v. Kentucky,* 476 U.S. 683 (1986) ....................3, 4, 35

*Daugherty v. Commonwealth*, 467 S.W.3d 222 (Ky. 2015) ....................9

*Dudley v. Duckworth,* 854 F.2d 967 (7th Cir. 1988) ....................34

*First Trust Natl'l Ass'n v. Moses & Singer*
2000 WL 1093054 (S.D.N.Y. Aug. 4, 2000) ....................23

*Gregory v. United States,* 369 F.2d 185 (D.C. Cir. 1966) ....................18

*Greiner v. Wells,* 417 F.3d 305 (2d Cir. 2005) ....................18

*Grievance Comm. for S. Dist. of N.Y. v. Simels,* 48 F.3d 640 (2d Cir. 1995) ....................21

*Holmes v. South Carolina,* 547 U.S. 319 (2006) ....................3, 4, 6, 17

*Huddleston v. United States,* 485 U.S. 681 (1988) ....................15

*In re Drake,* 786 F. Supp. 229 (E.D.N.Y. 1992) ....................2

*In re Shargel*, 742 F.2d 61 (2d Cir. 1984) ....................31, 32

*Int'l Bus. Machs. Corp. v. Edelstein,* 526 F.2d 37 (2d Cir. 1975) ....................21

*Kousisis v. United States,* 605 U.S. 114 (2025) ....................37

*Lamborn v. Dittmer*, 873 F.2d 522 (2d Cir. 1989) ....................23

*Lefcourt v. United States,* 125 F.3d 79 (2d Cir. 1997) ....................31

*Luce v. United States,* 469 U.S. 38 (1984) ....................2, 32

*Luis v. United States*, 578 U.S. 5 (2016) ....................29

*Michelson v. United States,* 335 U.S. 469 (1948) ....................38, 39

*Murray v. Metro. Life Ins. Co.,* 583 F.3d 173 (2d Cir. 2009) ....................23

*Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285 (1892) ....................13

*Old Chief v. United States,* 519 U.S. 172 (1997) ....................31

R*othman v. Complete Packaging & Shipping Supplies, Inc.,* 2023 WL 2740862 E.D.N.Y. Mar. 31, 2023 ....................23

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999) ....................6

*Schulz v. Marshall,* 528 F. Supp. 2d 77 (E.D.N.Y. 2007) ....................18

*Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708 (6th Cir. 1975) ....................3

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................18

*TVT Records v. Island Def Jam Music Grp.,* 250 F. Supp. 2d 341 (S.D.N.Y. 2003) ....................3

*United States v. Abreu,* 342 F.3d 183 (2d Cir. 2003) ....................11

*United States v. Agajanian,* 852 F.2d 56 (2d Cir. 1988) ....................7

*United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989) ....................22

*United States v. Bellomo*, 176 F.3d 580 (2d Cir. 1999) ....................8, 9

*United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991) ....................35

*United States v. Bin Laden,* 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ....................21, 22

*United States v. Blackwell*, 853 F.2d 86 (2d Cir. 1988) ....................38, 39

*United States v. Blum,* 62 F.3d 63 (2d Cir. 1995) ....................17

*United States v. Brandt,* 196 F.2d 653 (2d Cir. 1952) ........................................................40

*United States v. Braun,* No. 9:19-cr-80030 (S.D. Fla. Oct. 6, 2021) ...............................3, 4

*United States v. Cardenas,* No. 24-2734, (2d Cir. Feb. 18, 2026) .....................................40

*United States v. Carneglia*, 256 F.R.D. 384 (E.D.N.Y. 2009)..............................................2

*United States v. Check,* 582 F.2d 668 (2d Cir. 1978) ..........................................................34

*United States v. Clase de la Cruz,* (No. 25-cr-346 (KAM)...................................22, 23, 24

*United States v. Collorafi,* 876 F.2d 303 (2d Cir. 1989) .....................................................40

*United States v. Cronic,* 466 U.S. 648 (1984).......................................................................4

*United States v. Cummings,* 858 F.3d 763 (2d Cir. 2017)...........................................33, 34

*United States v. Cunningham,* 672 F.2d 1064 (2d Cir. 1982) ............................................22

*United States v. Dawkins,* 999 F.3d 767 (2d Cir. 2021) .........................................9, 13, 15

*United States v. Dennis,* 843 F.2d 652 (2d Cir. 1988).........................................................25

*United States v. Diaz,* 176 F.3d 52 (2d Cir. 1999)..............................................................35

*United States v. Dupree,* 706 F.3d 131 (2d Cir. 2013) ........................................................12

*United States v. Finkelstein,* 2021 WL 2555832, (S.D.N.Y. June 22, 2021) .....................24

*United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006) ..............................................28, 29

*United States v. Grant,* 256 F.3d 1146 (11th Cir. 2001).......................................................7

*United States v. Han,* 230 F.3d 560 (2d Cir. 2000) ............................................................38

*United States v. Harris,* 733 F.2d 994 (2d Cir. 1984) ........................................................13

*United States v. Harwood,* 998 F.2d 91 (2d Cir. 1993)................................................11, 13

*United States v. Hwa,* 161 F.4th 127 (2d Cir. 2025) ............................................10, 11, 13

*United States v. Inniss,* No. 18-CR-134 (KAM), 2019 WL 6999912, (E.D.N.Y. Dec. 20, 2019) .......................................................................38, 39

*United States v. Iorizzo,* 786 F.2d 52 (2d Cir. 1986) .......................................................22

*United States v. James*, No. 19-CR-382 (JS), (E.D.N.Y. June 10, 2022)........................2, 3

*United States v. Jones,* 381 F.3d 114 (2d Cir. 2004) .......................................................22

*United States v. Kaiser,* 609 F.3d 556 (2d Cir. 2010).......................................................11

*United States v. Kuthuru,* 665 F. App'x 34 (2d Cir. 2016)..................................................8

*United States v. Kwang Fu Peng,* 766 F.2d 82 (2d Cir. 1985) ..........................................22

*United States v. Leung,* 40 F.3d 577 (2d Cir. 1994) .........................................................27

*United States v. Liszewski,* No. 06-CR-130 (NGG), 2006 WL 2376382 (E.D.N.Y. Aug. 16, 2006),...........................................................................................22

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993)..................................................22, 25

*United States v. Long,* 905 F.2d 1572 (D.C. Cir. 1990) ....................................................12

*United States v. Markovich,* No. 0:21-cr-60020-WPD, (S.D. Fla. Sept. 7, 2021) ..............3

*United States v. Maxwell*, No. 20-cr-330 (AJN) (S.D.N.Y.) ........................................3, 39

*United States v. Morgan,* 385 F.3d 196 (2d Cir. 2004) ........................................14, 34, 35

*United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976).........................................34, 35

*United States v. Paredes*, 176 F. Supp. 2d 192 (S.D.N.Y. 2001) ..................................2, 32

*United States v. Pujana-Mena,* 949 F.2d 24 (2d Cir. 1991) .............................................38

*United States v. Pulliam,* 973 F.3d 775 (7th Cir. 2020) ....................................................11

*United States v. Raniere,* No. 18-CR-204 (NGG), 2019 WL 2163189 (E.D.N.Y. May 16, 2019) .......... 31

*United States v. Regan,* 103 F.3d 1072 (2d Cir. 1997) .......... 22

*United States v. Saldarriaga,* 204 F.3d 50 (2d Cir. 2000) .......... 36

*United States v. Smith,* 629 F.2d 650 (10th Cir. 1980) .......... 34

*United States v. Stahl,* 616 F.2d 30 (2d Cir. 1980) .......... 31

*United States v. Stein,* 541 F.3d 130 (2d Cir. 2008) .......... 29

*United States v. Stewart,* 907 F.3d 677 (2d Cir. 2018) .......... 7

*United States v. Summers,* 414 F.3d 1287 (10th Cir. 2005) .......... 11

*United States v. Thomas,* 451 F.3d 543 (8th Cir. 2006) .......... 8

*United States v. Torres,* 794 F.3d 1053 (9th Cir. 2015) .......... 11

*United States v. Wali*, 860 F.2d 588 (3d Cir. 1988) .......... 7

*United States v. Watson*, 669 F.2d 1374 (11th Cir. 1982) .......... 39

*United States v. White*, 639 F.3d 331 (7th Cir. 2011) .......... 8

*United States v. Zenni*, 492 F. Supp. 464 (E.D. Ky. 1980) .......... 12

*Washington v. Texas*, 388 U.S. 14 (1967) .......... 4

*Wheat v. United States,* 486 U.S. 153 (1988) .......... 28

*Wood v. Georgia*, 450 U.S. 261 (1981) .......... 30

**RULES:**


Fed. R. Evid. 104(b) .......... 9, 15

Fed. R. Evid. 401 .......... 15, 39

Fed. R. Evid. 403 .......... 17, 18, 29, 30-32

Fed. R. Evid 404(a)(2)(A) .......... 38

Fed. R. Evid 404(b) .......... 40

Fed. R. Evid. 613(b) .......... 17

Fed. R. Evid. 801 .......... 8, 12

Fed. R. Evid. 801(a) .......... 8, 11

Fed. R. Evid. 801(c) .......... 8

Fed. R. Evid 803(3) .......... 6, 12, 13

Fed. R. Evid 806 .......... 6, 7

Fed. R. Evid 807 .......... 6, 14

Fed. R. Evid 807(a) .......... 14


**OTHER AUTHORITIES:**


2 McCormick on Evidence § 246 (9th ed.) .......... 11

4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.6 (4th ed. 2013) ... 11

ABA Standards for Criminal Justice, Standard 4-4.3(d) (2d ed. 1979) .......... 25

N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 884 (2011) .......... 21

N.Y. Rule of Prof'l Conduct R. 4.2(a) .......... 18, 21

U.S. Const. amend VI .......... 29

## INTRODUCTION

The Government's Motions in Limine suggest a simple two-part test for determining the admissibility of evidence.

Rule #1: What the government thinks helps its case comes in.

Rule #2: What the government thinks helps Mr. Rozier stays out.

The best example is a six-word text message. The government asks the Court to exclude a text in which Deniro Laster (the man the government calls the "intermediary between Rozier and the network of bettors") told a friend: "Dont tell [Rozier] bout the bet." Mem. of Law in Supp. of the Gov't's Mots. in Limine, ECF No. 170 ("Gov't Mem."), at 2, 9. The government intends to offer Laster's other statements against Mr. Rozier. *Id.* at 11 n.3. It objects only to the one that clears him. Here is another stellar example of how the government thinks these rules should be applied: "The Court Should Admit Relevant Factual Evidence Relating to the NBA's Investigation, But Preclude Evidence or Argument that the NBA's Investigation Exonerated Rozier." Gov't Mem. at 30. Yes, this is an actual quote.

And if the government doesn't get its way on its preferred method for resolving the admissibility of evidence, its fallback position is the extraordinary remedy of disqualifying defense counsel for nothing more than the everyday, basic act of interviewing a potential witness (a witness who the government well knows, but fails to disclose, was not represented by counsel at the time of the interview). Thankfully, the government's proposed rules are nowhere to be found in the Federal Rules of Evidence or case law.

We will demonstrate at trial that Terry Rozier is innocent. He did not bet on basketball, he did not know that anyone was betting on him, and he did not take a bribe to underperform. The government's own evidence says so. The government has now filed a forty-page motion asking

the Court to keep that evidence from the jury. It simultaneously asks the Court to let in far more dubious evidence that it wants for its own case. In addition to asking the Court to let the jury hear that the NBA investigated Mr. Rozier, but not that it exonerated him, *id.* at 30, the government asks to admit threats that a cooperating witness "believed" came from "either Rozier or someone associated with him." *Id.* at 29. It asks to tell the jury that Mr. Rozier paid other people's legal fees. *Id.* at 24. It asks to exclude his "lack of a criminal record" or good works. *Id.* at 38. And so on.

This is not how trials are supposed to work. Trials exist to allow jurors to weigh reliable evidence, and courts should not use the Rules as technical devices for excluding probative and demonstrably trustworthy evidence. *United States v. Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) (quoting *In re Drake*, 786 F. Supp. 229, 234–35 (E.D.N.Y. 1992)). The Court should let the jury hear the truthful evidence in the case, especially the evidence that exonerates Mr. Rozier.

## ARGUMENT

Before getting to the merits of each individual motion that the government raises, we respectfully request that the Court keep two important concepts in mind when considering the government's motions. First, the government's requests are premature, and second, Mr. Rozier has the constitutional right to present his defense to the jury.

"Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001). Short of that, "courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *Id.* at 194; accord *United States v. James*, No. 19-CR-382 (JS), ECF No. 164 at 5 (E.D.N.Y. June 10, 2022). A pretrial ruling "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the … proffer." *Luce v. United States*, 469 U.S. 38, 41 (1984).

In *TVT Records*, the parties sought to use their motions in limine "as preemptive weapons with which they endeavor to strike in shotgun fashion at whole topics and sources of prospective evidence, out of context and before any specific objection against its proper backdrop is raised." *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003). The court called those strategies "impermissible." *Id.* at 345.

In *James*, ECF No. 164 at 17 (quoting *TVT Records*, 250 F. Supp. 2d at 344), the government moved (in nearly the same words as here) to exclude evidence about the defendant's "background, family and relationship status, and lack of a criminal record, unless he testifies." *Id.* The court found that "such a blanket prohibition on such evidence and arguments is unwarranted at this stage of the proceedings." *Id; see also United States v. Maxwell*, No. 20-cr-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, Conf., ECF No. 465 at 36:18–20, and ECF No. 465 at 38 (refusing to rule pretrial on a number of issues, including some of the same ones raised here).[1] These cases and others like them establish that the government's attempt to pre-try the case is inappropriate.

Second, the Constitution affords defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also id.* ("[A]n essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence . . . central to the defendant's claim of innocence."); *Holmes*

[1] Courts outside this Circuit agree. "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). "Motions in limine are not designed for a Court to give advisory opinions." *United States v. Braun*, No. 9:19-cr-80030-WPD, ECF No. 495 at 1 (S.D. Fla. Oct. 6, 2021). Regarding a similar government motion, the court denied it because "it is difficult to rule in a vacuum." *United States v. Markovich*, No. 0:21-cr-60020-WPD, ECF No. 289 at 1 (S.D. Fla. Sept. 7, 2021). The court ruled that "the questions of lay witness testimony, co-conspirator statements, civil regulations and jury instructions are best decided at trial." *Id.*

*v. South Carolina*, 547 U.S. 319, 324 (2006). This is "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

*Crane* began with a motion like this one. "[B]efore any evidence was presented to the jury, the prosecutor moved in limine to prevent the defense from introducing any testimony bearing on the circumstances under which the confession was obtained." 476 U.S. at 685–86. The trial court granted the motion. *Id.* at 686. The Supreme Court reversed, finding that "the blanket exclusion of the proffered testimony" denied the defendant a fair trial. *Id.* at 690. The prosecution's case must "survive the crucible of meaningful adversarial testing." *Id.* at 690–91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

At trial, the government will have the opportunity to object to the evidence. That is the appropriate time for the Court to rule on admissibility in the context of how the evidence is coming in and what other evidence has been admitted. If necessary, the parties can take up the discussion outside the presence of the jury. *See Braun*, ECF No. 495 at 2. This may not be as convenient as the blanket pretrial rulings the government requests, but it is what the Constitution requires.

## I. THE TEXT "DONT TELL CHUM BOUT THE BET" IS ADMISSIBLE

The government seeks to exclude a text written by co-defendant Deniro Laster to a friend ("the Friend"). That text, by the simple fact that it was sent, reveals that Mr. Rozier did not know about the scheme. The text says, "Dont tell chum bout the bet" (the "Text"). The Friend wrote back: "Hell no." ECF No. 124 at 1. The government agrees that Laster sent the Text, that the Friend received it, and that "Chum" is Mr. Rozier. Gov't Mem. at 4. The dispute is over what these six words meant and whether the jury should have the opportunity to decide that factual question.

The government's theory of the case is that Mr. Rozier sold inside information through Laster so that Laster and others could bet on him. The defense theory is that Mr. Rozier did not sell information and did not know others were betting on him. The Text shows Laster *hiding* the bet from Mr. Rozier, which is obviously probative of whether he knew about the bet. The government spends fifteen pages asking the Court to keep these six words from the jury as hearsay, as irrelevant, and as a waste of time. *Id.* at 9–24. It adds that if the Court admits the Text, it expects to move to disqualify Mr. Rozier's lawyer. *Id.* at 21.

The government says there is "ample evidence suggesting that the Text refers to something else entirely" than the defense's interpretation. Gov't Mem. at 19. But that argument goes to weight, not admissibility. That is especially true where even if the text means what the government says, it is still relevant and probative to prove that Laster hides things from Mr. Rozier.

In another gambling trial going on right now in the same courthouse, this same United States Attorney's office tried a similar gambit. There, it argued that the text messages of the defendants and co-conspirators showed that they were using code about rooster betting to mean betting on baseball. The government put in a number of text messages through an agent (and not through the declarant co-conspirator). The defense cross-examined the agent and put in other text messages suggesting that the texts were, in fact, about roosters and not baseball. Of course, the parties argued about the meaning of the texts, but they were all admitted so that the jury could decide.

The government here argues that the Text, "Dont tell chum bout the bet," means something different than the defense interpretation. The Court need not settle that dispute because that goes to weight, not admissibility. The Text should be admitted. The government can call its witnesses at trial regarding its view of the Text's meaning. Mr. Rozier will cross-examine them. The jury will

read the text and decide what "the bet" means. A court may not exclude defense evidence because the prosecution has a different interpretation of what the evidence means; indeed, that's the whole point of a jury trial. *Holmes*, 547 U.S. at 329–31. "[B]y evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Id.* at 331. Where "the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact." *Id.* at 330.

The government calls the text hearsay and seeks its exclusion but fails to address four reasons that the Rules allow it. First, the text is admissible under Rule 806 to attack Mr. Laster's credibility. Second, the text is non-hearsay because it is a command, which is not offered for the truth of the matter. Third, the text is admissible under Rule 803(3) to show Mr. Laster's then-existing state of mind. And fourth, the text is admissible based on its trustworthiness under Rule 807. The Text is authentic and corroborated, and Mr. Rozier needs it to defend himself. The hearsay rule should not keep it out. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232–33 (2d Cir. 1999).

### A. Once the Government Offers Laster's Statements, Rule 806 Admits the Text.

The government's memo ignores entirely Federal Rule of Evidence 806, which permits introduction of Laster's Text once the government admits other text messages or statements by Laster. The government "intends to admit statements by the defendants and their co-conspirators." Gov't Mem. at 11 n.3. It says Laster was the "intermediary between Rozier and the network of bettors." *Id.* at 2. It alleges that Laster exchanged texts "confirming that Rozier planned to exit this particular game prematurely," ECF No. 101 ¶ 39, and it plans to admit these texts against Mr. Rozier.

When a co-conspirator statement "has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. "The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." *Id.* The declarant "is in effect a witness," and "[h]is credibility should in fairness be subject to impeachment and support as though he had in fact testified." Fed. R. Evid. 806 advisory committee's note.

The Text is clearly admissible under this Rule. *See United States v. Stewart*, 907 F.3d 677 (2d Cir. 2018). In *Stewart*, the Second Circuit vacated a conviction where prosecutors convinced a district judge to exclude similar statements. The government introduced a father's out-of-court statement that implicated his son in insider trading, *id.* at 682–83, but objected when the son offered the father's later statements that the son had not intended anyone to trade. *Id.* at 683–84. The Second Circuit found that the district court had wrongfully excluded these later statements and noted that "statements need not be diametrically opposed to be inconsistent." *Id.* at 687 (quoting *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988)). It found that the test is whether there is "any variance" between them "that has a reasonable bearing on credibility." *Id.* (internal quotation marks omitted).

Other circuits have reversed where the excluded evidence was a co-conspirator's statement that the defendant was not involved. *United States v. Grant*, 256 F.3d 1146, 1156 (11th Cir. 2001) (reversing conspiracy conviction where court excluded co-conspirator's affidavit exculpating defendant); *United States v. Wali*, 860 F.2d 588, 591 (3d Cir. 1988) (vacating conviction; co-conspirator's statements "that exculpated Wali were inconsistent" with his statements used to inculpate him). These cases all bear directly on the issue here.

The government wants the jury to hear Laster's texts when his words supposedly hurt Mr. Rozier and to hide only the text in which his words help. Rule 806 does not allow that.

**B. The Text Is a Command, and a Command Is Not Hearsay.**

The hearsay rule reaches only a "statement" offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The Second Circuit has applied this rule to exclude commands from the reach of the rule for decades because commands are not intended to be statements of assertion. "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999). "[C]ommands are ordinarily not hearsay because they are not offered for the truth of the matter asserted." *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) (cited at Gov't Mem. 12). "[A] command is not hearsay because it is not an assertion of fact." *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017) (quoting *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011)). "Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay." *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006).[2] The Text is a textbook command, as it is an imperative that can be obeyed or disobeyed. Laster gave a command, and the Friend agreed to obey. He answered: "Hell no."

The government rightfully concedes that commands are not ordinarily hearsay. To avoid this problem, it tries to fit this text into a limited exception to the general rule where the command contains a statement offered for the truth. But this exception does not apply here, as there is no "truth" contained in Laster's command. It is being offered to show that Laster made it (which he would not have done if Mr. Rozier already knew about it).

---

[2] The Rule places the burden of establishing that an utterance is a statement of intention that should be excluded under Rule 801 and "ambiguous and doubtful cases will be resolved against him and in favor of admissibility." Fed. R. Evid. 801(a) advisory committee's note.

A similar question of whether a command was hearsay was recently addressed in *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021). There, a defendant charged in a college basketball bribery scheme offered testimony that he was overheard saying, "Do not accept money from these people." *Id*. He said he was ordering coaches not to take money at the meetings where the bribes were paid. *Id.* at 789–90. He sought to introduce the command for the reason Mr. Rozier offers the Text, because the fact that the command was uttered tends to show he was not part of the scheme. Although the district court said it was hearsay, the Second Circuit disagreed, finding that the statement "was an order, i.e., an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said. It was therefore not hearsay." *Id.*[3]

Similarly, the Kentucky Supreme Court decided whether an instruction to conceal, offered by the accused to explain conduct the prosecution called guilty, was admissible. In *Daugherty v. Commonwealth*, 467 S.W.3d 222 (Ky. 2015), the defendant hid a gun. Her defense was that her husband ordered her to throw it away. The prosecutor objected that the husband's statement was hearsay, and the trial court agreed. The Kentucky Supreme Court reversed. "[A] statement consisting of a command to another person is not offered for the truth of the matter asserted." *Id.* at 229 (citing *Bellomo*, 176 F.3d at 586). The order "would give context to her actions and have at least some tendency to undermine the inference of guilt." *Id.* at 230. The exclusion of this evidence denied her the right to present a defense. *Id.* at 236–37 (citing *Chambers*, 410 U.S. at 294).

[3] Although *Dawkins* was affirmed on other grounds, (that there was no abuse of discretion for excluding the statement under Rule 104(b)), that's not an issue here where there is plenty of evidence to support Mr. Rozier's interpretation, including other corroborative texts, the rules of grammar, and the Friend's statements to the defense investigator, among other facts explained below in Section E, the section on relevance. By the government's own account, Laster was the "intermediary between Rozier and the network of bettors." Gov't Mem. at 2. Laster wrote "the bet," a single bet both men already knew about. The Friend answered "Hell no" without asking which one. The Friend later told a defense investigator that the Text was about Laster betting on Mr. Rozier. *Id.* at 8. The government's alternative explanations and the Friend's November [redacted] testimony go to weight. They are for the jury to sort out. They do not defeat a showing under Rule 104(b).

The government's citation to *Hwa* does not alter this analysis. The government asserts that the Text is "a version of the classically objectionable 'When did you stop beating your wife' question that assumes, without foundation, a prior beating." Gov't Mem. at 17–18 (quoting *United States v. Hwa*, 161 F.4th 127, 143 (2d Cir. 2025)). But that question and the questions in *Hwa* are nothing like the Text here.

The declarant in *Hwa* was the defendant's wife. In October 2018, ***after*** the government's cooperating witness had been arrested, she spoke with him on a call he was recording about a family investment made in 2005. While the defense argued that she had "merely asked questions," her questions had no relevance to the underlying case: "But the mere fact that [she] asked that question is irrelevant to any issue in this case." The Second Circuit found that "almost none of what [she] said in that conversation" "was a question." 161 F.4th at 143. Rather, the wife narrated with a specific purpose in mind after the arrest.

Putting aside that *Hwa* does not discuss commands at all, the Text at issue here was not like *Hwa* because it was sent during the supposed conspiracy and was not manufactured for litigation. Laster sent it in March 2023, two and a half years before anyone was charged. He sent it privately, to the Friend. No cooperator was on the other end in a recorded call. Its relevance does not depend on the truth of anything it implies. It comes from the fact that Laster sent it. He ordered the Friend to keep "the bet" from Mr. Rozier.

The beat-your-wife question is objectionable because it assumes a fact in dispute. The Text is different. There are no disputed facts in the Text. The government does not dispute that there was a bet (indeed, that is the crux of the case). It suggests only that "the bet" may have been Laster's gambling at a casino the night before. *Id.* at 4, 19. So the parties disagree about one thing:

which bet does the text refer to? That disagreement does not make the Text hearsay. Which bet Laster meant is a question for the jury because under either interpretation, the Text is a command.

The question, as the government's cases reveal, is whether the speaker intended to assert a fact. *See* Gov't Mem. 13–14 (citing 2 McCormick on Evidence § 246 (9th ed.); 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.6 (4th ed. 2013); *United States v. Torres*, 794 F.3d 1053, 1056 (9th Cir. 2015); *United States v. Pulliam*, 973 F.3d 775, 783–84 (7th Cir. 2020)). Laster did not intend to assert a fact. He told the Friend nothing the Friend did not already know. The government bears the burden on intent. Fed. R. Evid. 801(a) advisory committee's note; *Pulliam*, 973 F.3d at 784. It offers nothing to meet this burden.

Nor is there anything to the government's charge that Mr. Rozier seeks to "have it both ways" because the Text is being used as defense evidence to "prove his innocence." Gov't Mem. 16. If the rule were that commands were inadmissible if their implications could be used by the defense, no command would ever come in. A party offers evidence only because it helps the party's case. A command shows what the person who gave it wanted. This one shows that Laster wanted the bet kept from Mr. Rozier. *Hwa* itself recognizes that a statement is admissible when "the mere fact that [it was] made is relevant to some issue in the case." *Id.* (quoting *United States v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993)). The Text is that kind of statement because it shows Laster wanting to keep "the bet" secret from Rozier.[4]

---

[4] The government's cases do not help it. Each turned on a speaker conveying a fact. *Abreu*: a son told his father the drugs were "beat" and that the seller had cheated him, and the father's inference held only if that report was true. *United States v. Abreu*, 342 F.3d 183, 190 (2d Cir. 2003). *Pulliam*: an arrested defendant told police, "What gun?" along with "I don't know what you're talking about," and the court called it "a rhetorical question" and "a substantive assertion meant to deny knowledge." 973 F.3d at 783–84. *Summers*: an arrested robber asked police, "How did you guys find us so fast?", which "intimated both guilt and wonderment." *Torres*, 794 F.3d at 1060 (quoting *United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005)). *Kaiser*: the government itself offered an accusation by a company lawyer who never testified, relayed through two other people, and the Second Circuit vacated the conviction. *United States v. Kaiser*, 609 F.3d 556, 572–73 (2d Cir. 2010). Here, by contrast, Laster narrated nothing, denied nothing,

In many other cases, the government has proposed similar evidence, relying upon the command exception. In *United States v. Long*, 905 F.2d 1572 (D.C. Cir. 1990), for example, after the police answered the telephone during a search, a caller asked for "Keith" and asked about buying drugs. The defendant sought to exclude the caller's questions, arguing the questions implied the defendant was a dealer. The court admitted them because "the crucial distinction under rule 801 is between intentional and unintentional messages," and the caller's questions "were nonassertive." *Id.* at 1579–80. In *United States v. Zenni*, 492 F. Supp. 464 (E.D. Ky. 1980), agents searching a bookmaking operation answered the telephone, and callers tried to place bets. The government offered the calls to show the callers believed the place took bets. The court admitted them because "it is obvious these persons did not intend to make an assertion about the fact sought to be proved." *Id.* at 469. Bettors' instructions to a bookie came in for the government. A gambler's instruction to a friend likewise properly comes in for the defense.

The government wants the jury to hear Laster's words when it believes they hurt Mr. Rozier and to never hear the words that help him. The hearsay rule does not permit that. A man who, by the government's account, had just collected the proceeds of Mr. Rozier's bet payment told his friend to hide it from Mr. Rozier. Those six words are a command, and a command is not hearsay. The jury should see the Text.

### C. The Text States Laster's Plan and Is Admissible Under Rule 803(3).

Even if there *were* an element of truth within the Text (there is not), it would be admissible as "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)."

---

accused no one, and wondered at nothing. He told a friend to keep quiet. The government's remaining Second Circuit authority supports admission. In *Dupree*, the court admitted an order that "consist[ed] primarily of imperative statements" because the "significance of the Order lies in the fact that it issued." Gov't Mem. 13–14 (quoting *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013)). The significance of Laster's order lies in the fact that he gave it.

Fed. R. Evid. 803(3). The Text demonstrates that on March 29, 2023, Laster's plan was to keep "the bet" from Mr. Rozier. A statement of plan is admissible to prove that the declarant carried the plan out. Rule 803(3) preserves the rule of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285 (1892), "allowing evidence of intention as tending to prove the doing of the act intended." Fed. R. Evid. 803(3) advisory committee's note. *See also United States v. Harris*, 733 F.2d 994, 1004 (2d Cir. 1984) (defendant's statements admissible "not for their truth, but instead as circumstantial evidence of [his] state of mind"). Laster planned to keep the bet from Mr. Rozier. The jury may infer from the Text that he did.

The government says Rule 803(3) admits only "statements of future intent," and it attributes that phrase to the Second Circuit. Gov't Mem. at 18 n.4. The phrase, however, belongs to the district court in *Hwa*. The Second Circuit quoted it while describing the ruling below. 161 F.4th at 142. The Circuit's own test is the one in the Rule. A statement of memory or belief is excluded when offered "to prove the fact remembered or believed," and "the statement must face forward, rather than backward." *Id.* at 144 (quoting *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993)); Fed. R. Evid. 803(3).

The Text faces forward. "Dont tell" is an instruction about what Laster plans to happen next: that everyone will keep the bet from Mr. Rozier. It likewise satisfies the *Hwa* district court's phrasing of "a statement of future intent." The government says the Text reveals "only what [Laster] knew or believed about past events." Gov't Mem. at 18 n.4. But the Text describes no past event; it describes the forward-looking plan. In *Hwa* the declarant described a 2005 investment in 2018. In *Dawkins* the defendant offered a recorded call in which he recounted something he had said earlier. 999 F.3d at 790–91. Those statements looked back. This one does not.

The government's other answer is that the exception applies only if the Text "means what the defense says it means." Gov't Mem. at 18 n.4. This is false; under either interpretation of the bet, it is plainly a statement of Laster's forward-looking plan to keep a bet (whichever bet) from Mr. Rozier.

**D. The Text Is Also Admissible Under Rule 807.**

As a fourth basis of admissibility, Rule 807 allows admission of a statement that has "sufficient guarantees of trustworthiness" and is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). The Second Circuit applied the Rule in *United States v. Morgan*, 385 F.3d 196 (2d Cir. 2004), in which a co-defendant wrote a letter to her boyfriend from a hotel room. She "had no reason to expect that it would ever find its way into the hands of the police." *Id.* at 209. The Second Circuit found the letter trustworthy and upheld its admission. *Id.* at 207–09.

The Text is the same kind of statement that was made in circumstances that suggest trustworthiness. Laster sent it privately, to a friend, hours after he picked up what the government calls the payoff for the March 23 game and two and a half years before anyone was charged. He was not talking to the police. The Text implicates Laster rather than exonerating him, such that he would have had no reason to send it as a litigation tactic. There is absolutely no reason to think he sent it for any reason other than his intention to communicate the command, nor was there any reason he would have suspected it would be read by anyone other than its intended recipient.

As to the second consideration of Rule 807, no other evidence Mr. Rozier can obtain is as probative of Laster's knowledge about Mr. Rozier's awareness of the betting scheme. Laster is a defendant with a Fifth Amendment privilege, and Mr. Rozier cannot call him as a witness. Laster's

own words, written that morning, are the only evidence Mr. Rozier can enter to show Laster's plan to keep the scheme from Mr. Rozier.

### E. The Text Is Relevant.

Evidence is relevant if it has "*any* tendency" to make a fact of consequence more or less probable. Fed. R. Evid. 401 (emphasis added). Here, the fact of consequence is whether Mr. Rozier was a part of the conspiracy. A text from his alleged partner telling a friend to hide "the bet" from him has that tendency regardless of whether "the bet" means what the government says it means.

The government says the Text is irrelevant "unless it means what Rozier claims it means." Gov't Mem. at 19. That is a question of conditional relevance, and the jury decides it. Fed. R. Evid. 104(b). The Court's role is "simply [to] examine[] all the evidence in the case and decide[] whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Dawkins*, 999 F.3d at 789 (internal quotation marks omitted); see *Huddleston v. United States*, 485 U.S. 681, 690 (1988). The court "neither weighs credibility nor makes a finding" that the fact has been proved. *Id.* Here, a jury could easily find that the text referred to wagering on the March 23 game that is the subject of this litigation. This interpretation is what makes the most sense when reading the text. (Among other things, why would Laster refer to an evening filled with a series of casino gambling in the singular as "the bet"?). And the Friend told a defense investigator that the Text referred to the March 23 game before the government scared him [redacted] *See* Exhibit A (Defense Investigation Report).[5]

The government says "the bet" might refer to "gambling activity and financial dealings in Philadelphia unrelated to the charged scheme." Gov't Mem. at 4. It says Laster may have "lost some of Rozier's bribe proceeds the night before in the casino." *Id.* at 19. It mentions "an illegal

[5] Exhibit A, as with all exhibits in this Motion, will be included only in the sealed version of this filing.

drug transaction involving the purchase of Percocet." *Id.* at 22. The government calls these "alternative explanations." *Id.* at 4. The government may offer every one of these alternative explanations to the jury. An alternative explanation goes to weight but does not eliminate the relevance of the Text.

The government's reliance on the testimony of the Friend to support one of its alternative explanations is both factually dubious and not of consequence to the admissibility of the Text. The government says the Friend has "unequivocally denied under oath" that the Text concerned betting on Mr. Rozier, and that his testimony on the point "remained unwavering." *Id.* at 6, 8. The transcripts say otherwise.

In January 2026, the Friend told [redacted] In March, he told the defense investigator that the Text referred to Laster's betting on Mr. Rozier. Gov't Mem. at 8. On April 2, a prosecutor asked him what the Text meant. He answered: "That don't tell someone about the bet? I mean, I can't recall the call. I have no recollection of after, like, we spoke." Apr. 2, 2026, [redacted] Then the Friend asked to speak with his lawyer. [redacted] When he came back, the prosecutor asked whether the Text might be about a casino. The Friend invoked the Fifth Amendment. [redacted] On November 4, [redacted] a prosecutor asked again what the Text referred to. "I don't -- I don't remember." [redacted] "I don't even know if the text was for me." [redacted] Her next question was leading and supplied the answer: "Is it fair to say this text is not about the fact that he confided in you secretly that he had bet on Terry Rozier and was asking you to hide that from Terry Rozier?" [redacted] He said: "Correct." [redacted] This course of events makes clear that the Friend's testimony is neither "unwavering" nor "unequivocal," to say the least.

The government calls the investigator's report "[t]he only contrary account" and says it raises "obvious reliability concerns." Gov't Mem. at 19 n.5. If there are reliability concerns, it is the testimony grudgingly given during the November [redacted] testimony after intense pressure, as further discussed in depth below. If in fact the Friend testifies at trial as the government expects, defense counsel can call the investigator to impeach this testimony. Fed. R. Evid. 613(b). Which account is true is a credibility question, and credibility questions belong to the jury. *Holmes*, 547 U.S. at 330–31. And as stated, regardless of the meaning, the Text still proves that Laster hides things from Mr. Rozier, which is a central premise of the defense.

**F. Rule 403 Does Not Permit Exclusion of the Text.**

Rule 403 permits exclusion of evidence only when probative value is "substantially outweighed" by one of the dangers the Rule lists. The government describes the Text as evidence Mr. Rozier has "identified . . . as central to his defense." Gov't Mem. at 6. It does not claim that the Text itself is unfairly prejudicial.

Instead, the government's rather bizarre complaint is that it will have to respond to the defendant's defense. It says it "will be required to present substantial additional evidence" to "debunk" the defense. *Id.* at 22. It predicts "a lengthy, detailed minitrial into the meaning of one six-word text message." *Id.* at 24. Obviously, however, having to answer the defense on the central issue in the case is the government's obligation and cannot be avoided by invoking Rule 403. Asking the jury to decide between competing interpretations of a text is not confusing or difficult. It is what juries do every day. The Second Circuit rejected the same argument in *United States v. Blum*, 62 F.3d 63 (2d Cir. 1995), in which the defense offered evidence that a key government witness was fabricating a record to cover up his own thefts. *Id.* at 68. The district court excluded

the evidence as confusing under Rule 403. *Id.* at 67–68. The Second Circuit found that this was an abuse of discretion and reversed. *Id.* at 68–69.

The Text is the central exhibit of the defense. Mr. Rozier has a right to show it to the jury.

### G. Interviewing a Witness Does Not Disqualify Defense Counsel.

The Court should reject the government's threat that it may move to disqualify undersigned defense counsel ("Counsel") if the Text is admitted. Gov't Mem. at 20–21. The act of interviewing a potential trial witness is an everyday constitutionally-mandated activity for defense lawyers, just as it is for government attorneys. Not only is it permissible, but the failure to do it would constitute obvious malpractice.[6] In New York, defense counsel is even permitted to speak to a represented witness without that person's lawyer present, as N.Y. Rule of Prof'l Conduct R. 4.2(a) applies only to represented *parties*, not witnesses. The government's suggestion (without citation to any rule or case) that Counsel engaged in misconduct by interviewing an *un*represented witness, and especially misconduct that might raise the specter of disqualification, is entirely improper and baseless.

It is especially improper because the government's position depends on (1) ***a fact that it knows to be untrue*** – that the witness in question was represented by an attorney at the time Counsel spoke with him (he was not); and (2) ***an argument that has no support in the law*** – that speaking to a witness without another person present is disallowed (it is not).

#### 1. The Government Continues to Suggest the Friend Was Represented by Counsel When He Was Interviewed Even Though It Knows This To Be Untrue.

---

[6] *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005) ("The duty to investigate is essential to the adversarial testing process"); *Schulz v. Marshall*, 528 F. Supp. 2d 77 (E.D.N.Y. 2007) (counsel ineffective for failing to interview an eyewitness); *see also Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966) (witnesses "are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.").

When the defense investigator hired by predecessor counsel first interviewed the Friend, he was not represented. By the time of the Friend's [redacted] appearance in April, the Friend was then represented by an appointed CJA lawyer.

Subsequently, when Counsel sought to interview the Friend, the government provided the name of this CJA lawyer. Counsel called and then emailed that lawyer on June 30, 2026, and asked to speak with the lawyer and the Friend, receiving no response. Ex. B. Counsel wrote again on July 2. Ex. B. Counsel called numerous times. On July 23, Counsel wrote a third time: "I've tried emailing and calling without the courtesy of a response. I will take that to mean that you [no] longer represent [the Friend] and will reach out to him directly. If that is not correct, please let me know immediately so that I can communicate with you instead." Ex. B. No answer came.

On August 3, Counsel texted the Friend directly. Counsel gave his name and said he represented Mr. Rozier. Counsel wrote: "I tried reaching out to your lawyer [CJA Counsel] many times by phone and email and he has not responded so I assume he doesn't represent you anymore. Let me know if that's not the case and I will try him again." Ex. C. The Friend did not respond that he had counsel, and only then did Counsel and the Friend speak.

And, in fact, the Friend ***<u>was not represented by the CJA lawyer</u>***, or any other lawyer, at the time Counsel spoke with him. The appointed CJA counsel has since confirmed in writing that "at the times this summer when you reached out," he "was not officially representing [the Friend] as my CJA appointment had ended." Ex. D. The Friend told [redacted] the same thing. "I didn't know [he] was my attorney." Nov. 4, 2026, [redacted] The Friend "never called [the lawyer] ever." [redacted]

*The government knew this, but did not reveal it when the parties spoke. Instead it told Counsel that the Friend was represented, which the government knew was wrong and irrelevant*

*since he is not a party.* At this time, on information and belief, the CJA Lawyer had already told the government about the gap in representation. Plus, the government must have known this because it arranged for the CJA lawyer to be *re*-appointed for the [redacted] appearance. The government hid those facts from Counsel, instead suggesting to Counsel that he had violated bar rules by speaking with a "represented party." It similarly asked questions of the Friend before the grand jury that implied Counsel had acted improperly. Nov. 4, 2026, [redacted]

Even more unbelievably, the government had confirmed knowledge that the Friend was not represented, and knew it beyond any shadow of doubt, before it drafted its Memorandum to this Court. Before the government's motion was filed, Counsel provided the government all the written communications that documented the steps Counsel took to ensure he was not speaking with a represented witness, and *also sent the government the email from CJA counsel confirming that he did not represent the Friend at the time Counsel spoke with the Friend.* Yet the government did not disclose this critical fact and instead said to this Court suggesting the opposite was true.

Tellingly, the government's motion does not disclose to the Court that the Friend's CJA appointment had ended before Counsel spoke with the Friend. It does not tell the Court that the Friend testified [redacted] that he did not know he had a lawyer. Instead, the government erroneously suggested that Counsel spoke to a "represented party":

> Although the government presently takes no position on whether defense counsel's direct outreach to the Friend after receiving no response from the CJA Counsel violated the relevant rule of professional conduct barring contact with a represented party, the government does anticipate eliciting the facts that such contact occurred outside of the presence of the Friend's CJA Counsel and without the CJA Counsel's consent. Such facts are highly relevant to the Friend's susceptibility to having his recollection influenced in favor of his longtime friend Rozier, even assuming no improper intent on Rozier's counsel's behalf. And any factual testimony touching on defense counsel's potential unauthorized contact with a represented party creates a conflict of interest between Rozier and his counsel.

Gov't Mem. at 20–21. These statements, which are based on facts the government knows to be untrue, impugning undersigned counsel and suggesting that there was a *single* thing improper about Counsel's actions are wholly inappropriate. Counsel did nothing at all to violate or even approach violating a bar rule. Accordingly, there is no basis for any further discussion of this issue except to make clear to the government that it should not make any further reference to unauthorized contact with a represented party because there was no such contact. There can be no "factual testimony touching on defense counsel's potential unauthorized contact with a represented party," Gov't Mem. at 21, because there was no contact with a represented party.[7]

**2. Counsel's Communication With a Witness Does Not Disqualify Him from the Case.**

The government also is wrong in suggesting that by speaking to a third party who is a witness, Counsel has somehow conflicted himself off the case.[8] Courts do not disqualify lawyers for interviewing witnesses. *See, e.g.*, *United States v. Bin Laden*, 91 F. Supp. 2d 600, 622–25

[7] In a New York criminal case, it is not a violation of the no-contact rule to speak with a represented witness who is not a party. So even if the Friend was represented, which he was not, Counsel did not violate any rule. Perhaps this is why the government did not cite to any case or rule in its papers. For example, in *Simels*, a defense lawyer interviewed a represented government witness without his lawyer's consent and was censured. The Second Circuit reversed. *Grievance Comm. for S. Dist. of N.Y. v. Simels*, 48 F.3d 640 (2d Cir. 1995). The court found that the lawyer conducting that kind of investigation (*even* where the party is represented) "is providing the effective defense and the zealous representation required by the Sixth Amendment." *Id.* at 651. The State Bar agrees: "A non-party witness in a criminal matter is not protected by Rule 4.2." N.Y. State Bar Ass'n Comm. on Prof'l Ethics, Op. 884 (2011). Counsel "have a right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel." *Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 42 (2d Cir. 1975).

[8] Defense Counsel and the Friend spoke four times between his [redacted] appearances. The first was a short introductory call on August 3. The Friend then attempted to call Counsel on August 8, but counsel did not pick up. They then spoke on August 13 for only 3 minutes because Counsel stepped into an elevator and they got disconnected. They spoke on October 26 for 8 minutes, where the discussion centered on where and when they could have a full conversation. They settled on the next day, which was the only substantive conversation, albeit short (also 8 minutes). Two other members of the defense team were on that call. Counsel asked the Friend about the Text. Counsel did not ask about the FaceTime call.

(S.D.N.Y. 2000) (refusing to disqualify prosecutors who conducted interview without witness). A party who wants to make a witness out of opposing counsel must show "a compelling and legitimate need." *United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997). There is no such need here.

Notwithstanding the government's preference that it is only government counsel who should be able to interview witnesses*, see* Gov't Mem. at 20 n.6, speaking with witnesses and then questioning those same witnesses on the stand is a basic permissible act for defense counsel to take and happens every single day. Indeed, the government's attempt to use such action as a basis for disqualification would have no limit. Any defense lawyer who interviews a witness would become a witness himself whenever the government claimed the account had changed. Courts have rejected such a proposition.[9]

In fact, in a courtroom nearby, one of this Court's colleagues recently thwarted this same effort by this same U.S. Attorney's office to disqualify counsel for interviewing witnesses. *See United States v. Clase de la Cruz*, (No. 25-cr-346 (KAM), ECF No. 211 at 1, 3–5 (E.D.N.Y. Aug.

---

[9] The government's cases do not support disqualifying a lawyer for interviewing a witness. Each involves a lawyer who took part in the events on trial, committed wrongdoing, or had represented the government's witness. *See United States v. Locascio*, 6 F.3d 924, 934 (2d Cir. 1993) (disqualification involved counsel who was "recorded on government tapes when discussions of allegedly illegal activity took place" and was allegedly involved in a charged tax fraud count); *United States v. Arrington*, 867 F.2d 122, 124–25, 129 (2d Cir. 1989) (disqualification involved counsel who threatened a witness as part of a "plot to silence witnesses"); *United States v. Jones*, 381 F.3d 114, 117–18, 121 (2d Cir. 2004) (disqualification where counsel's discovery materials were found in the apartment of another client under investigation, counsel faced a likely grand jury investigation, and counsel conceded he "could very easily end up being a witness in the government's case-in-chief"); *United States v. Kwang Fu Peng*, 766 F.2d 82, 86–87 (2d Cir. 1985) (disqualification where the alleged fraud victim testified that his post-arrest meeting with defense counsel ended in a threat from counsel, making counsel "a participant in an event relating to the alleged fraud"); *United States v. Iorizzo*, 786 F.2d 52, 54 (2d Cir. 1986) (defense counsel had represented "the government's key witness in a related state proceeding"); *United States v. Cunningham*, 672 F.2d 1064, 1069, 1075 (2d Cir. 1982) (in an obstruction case, where counsel allegedly told a firm employee that subpoenaed envelopes were "safe" and that the government would have to find them, holding that the right to counsel of choice "is too important to be denied on the basis of a mere, though substantial, possibility" that the testimony would be admitted); *United States v. Liszewski*, No. 06-CR-130 (NGG), 2006 WL 2376382 (E.D.N.Y. Aug. 16, 2006), ECF No. 118 at 23–25 (denying the government's motion to disqualify).

25, 2026) (Matsumoto, J.) (baseball pitch-rigging prosecution). Apparently, this is the government's playbook in these gambling trials.

In *Clase de la Cruz,* Clase's lawyers interviewed four witnesses and prepared declarations for them. *Id.* at 3. Three signed under penalty of perjury. *Id.* at 3–4. The lawyers gave all four declarations to the government. *Id.* at 4. Two of the witnesses then recanted. *Id.* The government suggested that handing over the declarations may have been obstruction of justice and a false statement. *Id.* It served grand jury subpoenas on the lawyers, and the court quashed them. *Id.* at 14. The government then argued that the lawyers had an unwaivable conflict and would become sworn or unsworn witnesses at trial. *Id.* at 5, 11–12. Judge Matsumoto denied the motion.

The court noted that disqualification is "an extraordinary remedy," *id.* at 7, and that disqualification motions are "ripe for 'tactical use' by opposing counsel" and are "viewed [by courts] with disfavor." *Id.* (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989), and *First Trust Nat'l Ass'n v. Moses & Singer*, 2000 WL 1093054, at *6 (S.D.N.Y. Aug. 4, 2000)). A motion under the advocate-witness rule gets "fairly strict scrutiny" because such motions invite "opportunistic abuse." *Id.* at 10 (quoting *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009)). The movant must show that the lawyer's testimony is necessary. *Id.* "The existence of additional witnesses with the ability to testify to the same facts is often fatal to a claim for disqualification under the lawyer as witness rule." *Id.* at 11 (quoting *Rothman v. Complete Packaging & Shipping Supplies, Inc.*, 2023 WL 2740862, at *2 (E.D.N.Y. Mar. 31, 2023)).

Judge Matsumoto found that the government could not meet that test. The court also rejected the unsworn-witness theory. The interviews took place after the charged conspiracy ended. They were "ancillary to the charged conduct." *Id.* at 18–20. The court noted that no one had suggested disqualifying the trial prosecutor who attended a defendant's proffer, even though that

proffer was the basis for a charged false-statement count. *Id.* at 20. It found that disqualification of a lawyer as an unsworn witness "is reserved for the most serious instances 'where they have become enmeshed in their clients' alleged criminal acts.'" *Id.* at 20–21 (quoting *United States v. Finkelstein*, 2021 WL 2555832, at *4 (S.D.N.Y. June 22, 2021)).

Every one of those reasons applies here with more force. Counsel prepared no declaration. He took no sworn statement. He gave the government nothing that a witness later recanted. He has done nothing that could come close to obstruction. By the government's own description, the impeachment comes from the investigator and his report. Counsel's conversations with the Friend took place in the summer and fall of 2026, more than three years after the March 2023 events the jury will decide. They are further from the charged conduct than the interviews in *Clase* were. And Counsel's actions were no different than that of the prosecutors. Three prosecutors and their agent questioned the Friend in January. Prosecutors examined him before [redacted] in April and again in November. They heard his account as it changed. No one suggests that they must step aside. The rule is the same for the defense.

Counsel did nothing wrong by speaking with the witness, and there is no prohibition on him cross-examining that same witness during the trial. Counsel does not intend for that cross-examination to include a reference to the difference between what the witness told him and what he told the government. There is no need to make this point, because the inconsistency is established by the defense investigator who interviewed the Friend before undersigned counsel was retained. The government's own motion calls that report "[t]he only contrary account." Gov't Mem. at 19 n.5. The Friend told the defense investigator that the Text referred to keeping from Mr. Rozier that Laster bet on his performance, in conflict with the government's preferred explanation.

*See* Gov't Mem. at 8. If the Friend denies his previous statement at trial, the defense can call the investigator, and the government may cross-examine him.

But even if Counsel did decide to cross the Friend about his own conversation with Counsel, an examination of this nature would be perfectly appropriate and commonplace.[10] To the extent that the witness denies having made the earlier statements, that would be the witness's prerogative, and it would be for the jury to determine his credibility. It does not convert defense counsel into an unsworn witness, because defense counsel has no first-hand knowledge of anything that happened in March 2023. An "attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *Locascio*, 6 F.3d at 933. The lawyer in *Locascio* was "recorded on government tapes when discussions of allegedly illegal activity took place." *Id.* at 934. Even on those facts, the Second Circuit called disqualification "a drastic remedy." *Id.* Here, Counsel knows only what a witness told him in an interview. Every trial lawyer knows that much.

The government's thinly-veiled suggestion that Counsel pressured the Friend into making certain statements that conflict with the government's preferred version of events is wholly unfounded. It also makes no logical sense. At the time the defense investigator, and then Counsel, spoke with the Friend he had not told the government that the Text referred to casino gambling. Rather, his statements that the text referred to the March 23 game were made to the investigator and Counsel on a clean slate. Only later, when the Friend was pressed by the *government*, did he give a one word agreement to the government's version of events.

[10] That a non-lawyer witness was not present for this conversation only means that the lawyer must be "prepared to forgo impeachment of a witness by the lawyer's own testimony as to what the witness stated in an interview." *United States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988) (quoting ABA Standards for Criminal Justice, Standard 4-4.3(d) (2d ed. 1979)). It does not make the lawyer an unsworn witness.

Here is the chronology of the government's communications with the Friend. In January 2026, [redacted] Then, he was [redacted] in April, where a prosecutor opened her examination by reminding him that "it is a federal crime to lie to federal law enforcement agents." Apr. 2, 2026, [redacted] She told him he could be charged with perjury "if you say you don't recall something when you really do recall it." [redacted] The Friend repeatedly invoked the Fifth Amendment. [redacted]

Then, during the November testimony, a prosecutor told him he was now [redacted] Nov. 4, 2026, [redacted] She told him he could be charged with contempt if he refused to answer. [redacted] The Friend then testified on a broader range of subjects than in April. The prosecutor asked whether he had done anything to refresh his recollection. He answered: "Y'all didn't really ask me nothing like that in April." [redacted] She said: "Okay. Totally fair." [redacted]

But then, thirteen pages later, *the prosecutor* suggested a different reason, suggesting that undersigned counsel had pressured him to change the testimony they had already established that he hadn't even given before. She reminded him that he had spoken with Mr. Rozier's lawyer. She asked the Friend: "do you understand that as a represented party, lawyers are ethically not permitted to reach out to you without going through your attorney?" Nov. 4, 2026, [redacted] (This was false on a number of grounds – he was not represented, not a party, and the NY ethical rules do not prohibit counsel from speaking to him). She then said: "you're now recalling discussions about sports betting; is that correct?" [redacted]

The government's motion picks up its unsupported assumption that the Friend's account changed after he spoke with Counsel. Gov't Mem. at 8, 20. But nothing in the record supports the implication that Counsel influenced his testimony, as his *first* story to the defense was that "the bet" referred to the game, and the change in his testimony happened in the direction of the government's version. Not the other way around.

The record offers two other better explanations for the witness's change in story that have nothing to do with defense impropriety. The first is the Friend's own explanation: he said no one had asked him about it in April, and the prosecutor accepted that answer as "[t]otally fair." The second is the government's own intimidating conduct. Before he gave the new testimony, [redacted] and told him that nothing he said in April could be used against him. The government presumes no pressure in any of that. Instead, it is concerned that a powerless defense lawyer spoke with the witness on a short phone call.

The government's threat to move to disqualify Counsel is a transparent effort to get the Court to exclude the admissible and exculpatory Text. The government all but says so:

> Although the disqualification issue is not yet ripe, in the event that the Text is admitted, the government anticipates moving to disqualify lead defense counsel. In order to avoid an eleventh-hour trial delay, or a mid-trial mistrial, we respectfully request that the Court address this issue well in advance of the pretrial conference. In the alternative, if the Text is properly excluded as hearsay and/or on relevance and FRE 403 grounds, the Friend's testimony will be irrelevant and so too will these attorney-as-witness issues.

Gov't Mem. at 21. The Supreme Court has warned against this abusive tactic: "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Wheat v. United States*, 486 U.S. 153, 163 (1988).

The government's motion raises an entirely manufactured issue designed to keep the jury from seeing a piece of evidence that the government knows looks bad for its case. The government told the Court that the "attorney-as-witness issues" disappear if the Text is excluded. Gov't Mem. at 21. The government is seeking to use the threat of disqualification as a strategic tool. Wrongly depriving a defendant of his counsel of choice is structural error. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Using the threat of that issue to keep out exculpatory evidence is similarly improper. This strategy should be rejected.

The Text is a highly relevant and admissible piece of exculpatory evidence. The jury should be allowed to see it, should be allowed to hear from the witnesses the parties choose to call to explain it, and then should be permitted to determine for itself what the Text means. The government's motion to exclude the Text should be denied.

## II. THE COURT SHOULD EXCLUDE EVIDENCE THAT MR. ROZIER PAID LEGAL FEES.

Paying legal fees for others is a frequent, uncontroversial, everyday occurrence in criminal cases throughout the country. Companies pay their employees' legal fees. Friends and family come up with money to retain attorneys for their loved ones. People often make severe sacrifices to have what the Sixth Amendment guarantees: the "Assistance of Counsel." In this case, any payments by Mr. Rozier were based on the advice of his prior counsel.

Still, the government requests this Court to bless its unprecedented plan to introduce evidence that Rozier paid for some of the legal fees of a close friend and his family who could not afford counsel on their own. Gov't Mem. at 24. The government should not be allowed to do so,

nor should they be permitted to argue that the legal, routine, and advisable payment of legal fees is somehow nefarious or evidence of guilt. This Court should deny the government's motion because it violates the Sixth Amendment, Rule 403, and is premature.

### A. The Sixth Amendment Prohibits This Evidence.

The Second Circuit treats outside funding of a defense as protected by the Sixth Amendment. Specifically, the Sixth Amendment "protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain," and it "prohibits the government from interfering with financial donations by others, such as family members and neighbors—and employers." *United States v. Stein*, 541 F.3d 130, 156 (2d Cir. 2008).

In *Stein*, the government pressured KPMG to condition, cap, and then stop advancing legal fees to former partners and employees under indictment. The court held that KPMG's fee policy "followed as a direct consequence of the government's overwhelming influence," that the government "unjustifiably interfered with defendants' relationship with counsel and their ability to mount a defense," and that dismissal of the indictment was proper. *Id*. at 136. Of course, the right here belongs to the Lasters, but the government could not have pressured Mr. Rozier to stop paying. It cannot obtain a similar result by turning those payments into exhibits.

The Sixth Amendment also includes "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The right to choose counsel includes the right to pay for that counsel. That right is "fundamental." *Luis v. United States*, 578 U.S. 5, 12 (2016) (plurality opinion). In *Luis*, the plurality held that freezing untainted assets of a defendant violated the Sixth Amendment, because the government "would undermine the value of that right" by taking away the funds needed to pay

counsel. *Id*. at 10, 12. The concurrence said it plainly: constitutional rights "implicitly protect those closely related acts necessary to their exercise," and without resources, "a defendant's right to counsel of choice would be meaningless." *Id*. at 26 (Thomas, J., concurring in the judgment). The government should not be allowed to disincentivize Sixth Amendment rights by framing payments as evidence against Mr. Rozier.

The law already has a constitutionally permissible tool for third-party fee payments, and it was properly employed by this Court. When one person pays for another's lawyer, the concern is "divided loyalties." *Wood v. Georgia*, 450 U.S. 261, 263 (1981). *Wood* provides the appropriate remedy to address those concerns: a conflict inquiry. *See id*. at 272–73. This Court conducted that inquiry at an April 7, 2026, Status Conference and found no conflict. The government now asks to recycle this settled issue as evidence of guilt. The Court should not allow it.

**B. Rule 403 Bars This Evidence.**

Rule 403 advises the Court to exclude evidence that leads to delay, confusion, and an unjustified intrusion into this Court's and the jury's time. The proposed evidence also has low probative value, a high likelihood of prejudice, and a more probative substitute.

Preventing the government from further litigating this issue avoids delay, wasting time, and confusing the issues. Counsel can only guess how the government will attempt to prove up this issue, but it will likely involve numerous attorneys being called to testify. The government admits the defense will be forced to "cross-examine the government's witnesses, introduce their own evidence, and argue alternative explanations for the payments to the jury." Gov't Mem. at 26. Mr. Rozier would call fact witnesses on what his prior counsel directed him to do and what he was told the implications of those payments would be. Mr. Rozier will also have to obtain an expert witness to convey to the jury how common it is for one party to pay the legal fees of another in a criminal

case. The transcript of this Court's prior conflict hearing will also need to be read to the jury. This Court and the jury would be forced to spend trial days on fee arrangements that are far afield of the relevant issue in this case, which is whether Mr. Rozier agreed to a bribe.

Furthermore, the probative value is speculative at best under Rule 403. The government does not claim the payments were made to influence anyone's testimony. Of course they were not. Attempting to find caselaw that legal-fee payments have any relevance in a criminal case, the government spends most of its legal discussion proving a point no one contests. Fee payments are not privileged. Gov't Mem. at 24–25. *Shargel* decided whether a lawyer had to answer a grand jury subpoena about his fees. *In re Shargel*, 742 F.2d 61 (2d Cir. 1984). *Lefcourt* ruled on whether a lawyer had to identify a client who paid in cash on an IRS form. *Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997). The defense agrees fee payments are not protected by privilege.

The unreported *Raniere* ruling does not help the government either. The court there admitted payments came from a defendant who had pleaded guilty. *United States v. Raniere*, No. 18-CR-204 (NGG), 2019 WL 2163189, at *6 (E.D.N.Y. May 16, 2019). So the jury in that case heard about payments by someone who was not on trial. Mr. Rozier is the one on trial here.

Rather, what the government says it wants the jury to hear is that a wealthy NBA player paid "hundreds of thousands of dollars" to lawyers for his co-defendant's family. Gov't Mem. at 24. But appeals to class prejudice "are improper and have no place in a court room." *United States v. Stahl*, 616 F.2d 30, 33 (2d Cir. 1980) (reversing conviction where the prosecutor sought "to arouse prejudice against the defendant because of his wealth").

When conducting Rule 403 balancing, the Court weighs "not only . . . the item in question but . . . any actually available substitutes as well." *Old Chief v. United States*, 519 U.S. 172, 182 (1997). In this case, as the defense advised the government before the motion was filed, the defense

remains willing to stipulate that Mr. Rozier and Laster were best friends. While a line in one of the privilege cases suggests that the payment of fees "may imply facts about a prior or present relationship," *Shargel*, 742 F.2d at 64, the relationships here are not in dispute and are otherwise provable. The government says it will prove that Mr. Rozier has known Laster's sister since childhood, and that her number was saved in his phone. Gov't Mem. at 25–26. That evidence proves the relationships directly.

Given the defense's stipulation that Deniro Laster was Mr. Rozier's best friend, the payments prove almost nothing.[11] Whereas the government's proposal invites hours of irrelevant testimony. Rule 403 requires exclusion.

## III. THE COURT SHOULD APPLY THE SAME RULE TO EVERY TREATING PROVIDER REGARDLESS OF WHICH SIDE CALLS THEM.

Mr. Rozier does not oppose the government's request that the Court admit lay witness testimony from treating medical providers. Mr. Rozier only asks for parity: that the medical providers he calls as witnesses who examined him before, during, and after the March 23 game, also be allowed to testify as lay witnesses who provided medical treatment.

## IV. THE COURT SHOULD NOT ADMIT THREATS THAT THE GOVERNMENT HAS NOT TIED TO MR. ROZIER.

Mr. Rozier never threatened or intimidated a witness. Until the government provides some support for its unfounded allegations, they should be excluded. Here is the government's entire proffer:

> The government moves to introduce evidence at trial that a cooperating witness (the "CW") received threats aimed at intimidating the CW into not cooperating with the government. The CW will testify that these threats came from Laster and from a person the CW believed

[11] In a footnote, the government argues that the payments may be relevant to impeach the Lasters. Gov't Mem. at 26 n.8. But that theory depends on future testimony that may never happen. Laster is a co-defendant with a Fifth Amendment right not to testify, and the government has not said it will call either sibling. If one of the Lasters takes the stand for the government, the Court can rule then, with the actual testimony in front of it. *See, e.g., Luce*, 469 U.S. at 41; *Paredes*, 176 F. Supp. 2d at 193.

to be either Rozier or someone associated with him, and independent evidence will corroborate that testimony.

Gov't Mem. at 29. The memo does not identify the CW. It does not identify the threats, when they were made, how they were delivered, or who sent them. It does not say why the CW "believed" that one of them came from "either Rozier or someone associated with him." It does not say what the "independent evidence" is. On that record, the government asks the Court to rule now that the jury may hear speculation that Mr. Rozier may have tried to intimidate a witness.

On November 13, 2026, undersigned counsel asked the government to identify the CW, to produce the report documenting the issue, and to produce the independent evidence it claims to have. The government has not responded to those requests. The Court should not rule on evidence that neither it nor the defense has seen.

Before the Court rules on the government's motion, it should order the government to produce, by a date certain: (1) the CW's identity, which can be disclosed for attorneys' eyes only under the existing protective order; (2) each alleged threat, with its content, date, means of delivery, and the account or phone number it came from; (3) the basis for the CW's belief about who sent it; and (4) the "independent evidence" the government says corroborates the CW. At a minimum, the Court should defer ruling on this motion until the defense has the material needed to fully respond.

Threat evidence offered to show consciousness of guilt is only relevant and admissible if the defendant made the threat or caused it to be made. A threat made by someone else says nothing about Mr. Rozier's state of mind. The Second Circuit applied that principle in *United States v. Cummings*, 858 F.3d 763 (2d Cir. 2017), and vacated a conviction because of it. A cooperating witness there testified that the defendant had threatened to kill him. Asked whether the defendant had spoken to him, the witness answered: "Not directly." He said the defendant "said stuff to

people around me." *Id*. at 769. The government offered the threat as evidence of consciousness of guilt. The Second Circuit explained that the threat was probative only if the person who relayed it "actually heard Cummings make this threat." *Id*. at 774. Without that link, "it would not be probative of Cummings's consciousness of guilt." *Id*. The error was not harmless and the court ordered a new trial. *Id*. at 779.

Other circuits apply the same rule. Evidence of threats to a witness is admissible only "if a direct connection is established between the defendant and the threat." *United States v. Smith*, 629 F.2d 650, 651 (10th Cir. 1980). Such testimony "is generally not properly admissible when the conduct is not attributable to the defendant." *Id*. The Seventh Circuit granted habeas relief where threats against a witness "were not traced to [the defendant] or his codefendants, except by innuendo." *Dudley v. Duckworth*, 854 F.2d 967, 971 (7th Cir. 1988).

The government's proffer gives the Court less than the witness gave in *Cummings*. That witness at least said the threat came from the defendant. The CW here says it came from "either Rozier or someone associated with him." Gov't Mem. at 29. That is a choice between two possibilities, one of which is not Mr. Rozier. That is a guess, which is neither personal knowledge nor a connection. If the government cannot make a direct connection between Mr. Rozier and the threat, the Court should not allow the testimony.

The Second Circuit treats threat evidence with particular caution. Threat testimony is ordinarily kept from a jury because its potential for "causing unfair prejudice outweighs its probative value with respect to a defendant's guilt." *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir. 1976). The court has "carefully limited [its] use to situations where there was a clear need for the prosecution to use such evidence." *Cummings*, 858 F.3d at 778 (quoting *United States v. Check*, 582 F.2d 668, 685 (2d Cir. 1978)). In *Morgan*, the defendant's own letters said the

government's informant had to die. The Second Circuit held that admitting them was an abuse of discretion and vacated the conviction. *United States v. Morgan*, 786 F.3d 227, 229 (2d Cir. 2015).

The government's fallback is that if Mr. Rozier suggests on cross that the CW held back information, the government may explain the CW's reluctance as fear. Gov't Mem. at 29–30. Every case it cites decided that question after the cross-examination happened. *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999) (cross-examination on the relocation payments); *United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir. 1991) (redirect may "rebut false impressions arising from cross-examination"); *Panebianco*, 543 F.2d at 455. The government asks the Court to rule on a door that has not been opened.

Mr. Rozier can cross-examine the CW on the cooperation agreement, the benefits that the CW hopes to receive, and the CW's prior statements without suggesting anything related to fear. If the government believes that a question opens the door, it can raise it at sidebar, and the Court can rule on a question that is properly in front of it. The Court should deny this motion or, at a minimum, defer ruling until the government produces the information requested about the CW and the threats.

## V. THE COURT SHOULD NOT LIMIT NBA EVIDENCE TO THE GOVERNMENT'S PREFERRED HALF OF THE STORY.

This Court should reject the government's "heads I win, tails you lose" approach. The government claims the NBA investigation was so thorough and reliable that Mr. Rozier's answers prove a guilty mind. Gov't Mem. at 33. But when the same investigation cleared Mr. Rozier, the government downplays and criticizes it. *Id.* at 34. That cannot be right: "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence . . . central to the defendant's claim of innocence." *Crane*, 476 U.S. at 690 (holding that the Constitution guarantees a defendant

the chance to present a complete defense, including the full circumstances of any defendant statements). If any part of the NBA's investigation is admitted, the jury should learn about all of it. Mr. Rozier stands on his previously filed "Motion in Limine to Prohibit the Government from Using Mr. Rozier's Alleged Statements to the NBA, Unless the NBA's Full Report and Notes Are Disclosed to Mr. Rozier." ECF 169 at 8 – 13.

## VI. THE REQUEST TO BAR ARGUMENT ABOUT THE GOVERNMENT'S MOTIVES AND INVESTIGATION IS PREMATURE AND OVERBROAD.

Mr. Rozier is not asserting a selective or vindictive prosecution defense and he will not ask jurors to consider punishment. The press statements of his prior counsel are not evidence and he will not offer them. But the government's motion asks for too much. It asks the Court to bar any evidence or argument "that put[s] at issue the government's motives, charging decisions, or investigative techniques." Gov't Mem. at 35–36. The government's own authority does not support a bar on investigative techniques. In *Saldarriaga*, the Second Circuit approved a charge that told jurors the government need not use every available technique. The same charge told them that if the things the government could have done left them with a reasonable doubt, they could act on it. *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000). The jury decides on "the evidence or lack of evidence," *id*. at 52 (quoted at Gov't Mem. at 37), and what the government chose not to collect is part of the lack of evidence. Whether a particular question crosses the line is a question for trial. The Court should deny the government's motion without prejudice to specific objections made during trial.

## VII. MR. ROZIER WILL NOT BLAME THE VICTIMS, BUT HE IS ENTITLED TO CONTEST MATERIALITY.

Mr. Rozier never defrauded anyone, so he will not argue that the sportsbooks, the Hornets, or the NBA deserved to be defrauded. To that extent, the motion is unopposed. The government

goes much further than that. It also asks the Court to bar any "evidence or argument" that the betting operators "lost little or no money," and to exclude all evidence of their "actual or intended losses." Gov't Mem. at 38. Read literally, that would keep from the jury the primary element of a federal fraud prosecution: materiality. The Court should deny that part of the motion or limit it to argument that loss is a legal requirement.

*Kousisis* holds only that a fraudulent-inducement conviction does not require proof that the defendant sought to cause the victim economic loss. *Kousisis v. United States*, 605 U.S. 114, 124 (2025). But, again, the government emphasizes only the half of the case it likes. In that case, the petitioners warned that, without a loss requirement, every lie about money would become federal fraud. The Court's answer was materiality. It "reiterate[d] that materiality of falsehood is an element of" the fraud statutes and held that a fraudulent-inducement conviction "cannot be sustained without it." *Id*. at 132 (cleaned up). The Court labeled the materiality requirement "demanding" and explained that the standard "substantially narrows the universe of actionable misrepresentations." *Id.* at 134–35 (internal citations omitted). *Kousisis* therefore provided the future landscape of federal criminal fraud litigation, giving materiality the work of separating fraud from ordinary deception.

In this case, evidence of materiality includes how sportsbooks offer player props; whether they accepted, paid, or voided the March 23 wagers once flagged; and how the Hornets and the NBA responded once they learned the relevant facts. The government's own proffer relies on part of this evidence (the sportsbooks' limits on prop bets). Gov't Mem. at 2. And much of it will touch on money, because that is what guides a sportsbook's decisions. That does not make it "loss" evidence. A bet the operator would have taken and paid anyway is an immaterial bet under the new federal fraud landscape.

The Court should grant this motion to the extent it bars argument that the victims deserved the fraud. The Court should deny it to the extent it would exclude evidence or argument on materiality, including evidence of how the betting operators, the Hornets, and the NBA treated the activity in this case.

## VIII. THE JURY MAY HEAR ABOUT ROZIER'S CHARACTER, HIS BACKGROUND, AND HIS GOOD FAITH.

Contrary to a long line of cases, the government moves to bar evidence of Mr. Rozier's "personal or family background, including his lack of a criminal record and other supposed 'good acts.'" Gov't Mem. at 38. This is improper as a defendant "may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged." *Michelson v. United States*, 335 U.S. 469, 476 (1948). Such testimony "alone, in some circumstances, may be enough to raise a reasonable doubt of guilt." *Id.*

The Second Circuit has held that Rule 404(a)(2)(A) "applies a lower threshold of relevancy to character evidence than that applicable to other evidence." *United States v. Han*, 230 F.3d 560, 564 (2d Cir. 2000). The court explained that "the defendant who, with the considerable forces of government arrayed against him and who may have little more than his good name to defend himself, should not be precluded from presenting even such minimally probative evidence." *Id.* (quoting *United States v. Pujana-Mena*, 949 F.2d 24, 30 (2d Cir. 1991)). The Rule "requires only that the proffered evidence of a character trait relate to some element at issue in the case." *Id.* The trial court in *Han* "erred in excluding the proffered reputation testimony." *Id.*

In *United States v. Blackwell*, the Second Circuit held that "it was error to strike the evidence of a prior clean record." 853 F.2d 86, 88 (2d Cir. 1988). A clean record is "something that the trier of the fact has a right to know." *Id.* In *United States v. Inniss*, a case the government cites,

the court held that "[e]vidence of a defendant's lack of criminal record is, however, typically admitted as 'background' evidence." No. 18-CR-134 (KAM), 2019 WL 6999912, ECF No. 86 at 26 (E.D.N.Y. Dec. 20, 2019); *see* Gov't Mem. at 39.

Evidence of Mr. Rozier's "personal or family background" comes in too.[12] "Evidence which is essentially background in nature … is universally offered and admitted as an aid to understanding." *Blackwell*, 853 F.2d at 88 (quoting Fed. R. Evid. 401 advisory committee's note). It tells the jury "something about the defendant as a person, and his experience in life." *Id.* In *Inniss*, the government asked the court to "preclude evidence of any personal or background information" about the defendant. Judge Matsumoto denied that request. ECF No. 86 at 28–29. Mr. Rozier's background is also relevant to explain why he had no motive to commit this crime.

Mr. Rozier intends to call character witnesses. They will give their opinions of his honesty, his integrity as a competitor, and his law-abiding nature. They will describe his reputation for those traits. Each trait is pertinent. A character witness "must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." *Michelson*, 335 U.S. at 478. The witnesses will therefore tell the jury who Mr. Rozier is and how they know him. An opinion witness "must testify from personal knowledge," and "once that basis is established the witness should be allowed to state his opinion." *United States v. Watson*, 669 F.2d 1374, 1382 (11th Cir. 1982). A coach or teammate who has watched Mr. Rozier practice and play for years may say so. That is foundation.

---

[12] Courts also decline to rule on background evidence in the abstract. In *United States v. Maxwell*, the government asked to bar evidence of the defendant's "charitable works" and "family history." No. 20-CR-330 (AJN), ECF No. 380 at 47–48 (S.D.N.Y.). The court agreed with the defense "that there is no need for me to rule on this presently." Tr. of Nov. 1, 2021, Conf., ECF No. 465 at 38:8–11.

The government will tell the jury that Mr. Rozier took a bribe and betrayed his team. It calls his injury "supposed." Gov't Mem. at 27. It calls him a liar and says he deleted text messages. *Id.* at 5, 33. That is an attack on his character, and his good faith is the defense. "Culpable intent or lack of good faith is not merely an element of the crime" of fraud. "[I]t is in fact practically crucial." *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952). Good faith "may be only inferentially proven," so "no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have." *Id.* (citation omitted). The trial judge in *Brandt* told the jury that the defendants' failure to profit was "not at all material." *Id.* The Second Circuit ordered a new trial. "[T]he failure to profit personally, though not conclusive, establishes something of the nature of their attitudes." *Id.* Trial courts "should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind." *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989). This year the Second Circuit vacated a conviction because the trial court excluded defense evidence that bore on the defendant's state of mind. *United States v. Cardenas*, No. 24-2734, slip op. at 21–23 (2d Cir. Feb. 18, 2026). The government had called it propensity evidence. The Second Circuit disagreed: "That is not a propensity-based inference, and Rule 404(b) does not bar the evidence." *Id.* at 23. Mr. Rozier must be able to show the jury his good faith. The government's motion should be denied.

## IX. MR. ROZIER WILL NOT ARGUE WITHDRAWAL FROM THE CONSPIRACY BECAUSE HE WAS NEVER PART OF THE CONSPIRACY.

Mr. Rozier will not argue that he withdrew from the conspiracy by going over on his rebounds because <u>he was never part of the conspiracy</u>. Mr. Rozier will not request a withdrawal instruction, and the Court should not give one because Mr. Rozier never joined any conspiracy.

Respectfully submitted,


**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By: /s/ David Oscar Markus
David Oscar Markus
Florida Bar Number 119318
dmarkus@markuslaw.com

*/s/ Anita Margot Moss*
Anita Margot Moss
mmoss@markuslaw.com

*/s/ Lauren Field Krasnoff*
Lauren Field Krasnoff
lkrasnoff@markuslaw.com