JPL:KTF/BW/DIB
F. #2025R00609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

25-CR-323 (S-1) (LDH)

DENIRO LASTER,
also known as “Niro,” “Payso” and “Peso,” and
TERRY ROZIER,
also known as “Scary Terry” and “Chum,”

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TERRY ROZIER’S MOTIONS IN LIMINE


JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorneys
(Of Counsel)

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................... 1

I. The Court Should Deny Rozier's Motion to Preclude Relevant and Probative Evidence on Rule 403 Grounds ........................................................................................... 1

II. The Court Should Deny Rozier's Motion to Preclude the Government from Admitting Rozier's Statements to the NBA Absent the NBA's Production of Additional Material Related to Its Investigation ........................................................................................... 8

A. Relevant Background ........................................................................................... 9

B. Argument ........................................................................................... 11

1. The Government Cannot Compel the NBA to Produce Privileged Material .......... 11

2. Whether the Interview Notes and Memoranda Are Privileged Is Not Properly Before the Court ........................................................................................... 15

3. The Rule of Completeness Does Not Mandate Disclosure of the Interview Notes or Memoranda ........................................................................................... 19

III. Laster's Statements to the NBA Are Admissible Against Rozier Under Rule 801(d)(2)(E) ........................................................................................... 21

A. Applicable Law ........................................................................................... 21

B. Discussion ........................................................................................... 22

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

Anderson v. United States,
417 U.S. 211 (1974) ..... 22

Bourjaily v. United States,
483 U.S. 171 (1987) ..... 22

Crawford v. Washington,
541 U.S. 36 (2004) ..... 25

Grunewald v. United States,
353 U.S. 391 (1957) ..... 24, 25

In re Kidder Peabody Securities Litigation,
168 F.R.D. 459 (S.D.N.Y. 1996) ..... 17

New York Times Co. v. United States Department of Justice,
939 F.3d 479 (2d Cir. 2019) ..... 17

Ohio v. Clark,
576 U.S. 237 (2015) ..... 25

Old Chief v. United States,
519 U.S. 172 (1997) ..... 2, 5, 7, 8

United States Securities and Exchange Commission v. Herrera,
324 F.R.D. 258 (S.D. Fla. 2017) ..... 18

United States v. Avenatti,
559 F. Supp. 3d 274 (S.D.N.Y. 2021) ..... 19, 20

United States v. Bradley,
105 F.4th 26 (2d Cir. 2024) ..... 13

United States v. Brennerman,
818 F. App'x 25 (2d Cir. 2020) ..... 19, 20

United States v. Buske,
No. 09-CR-65 (LA), 2011 WL 2912707 (E.D. Wis. July 18, 2011) ..... 13

United States v. Carson,
2009 WL 10793880 (C.D. Cal. Dec. 8, 2009) ..... 13

United States v. Curley,
639 F.3d 50 (2d Cir. 2011) ..... 8

United States v. Eisen,
974 F.2d 246 (2d Cir. 1992) ..... 22, 23

United States v. Floyd,
555 F.2d 45 (2d Cir. 1977) ..... 25

United States v. Gogic,
No. 22-CR-493 (JMA), 2025 WL 3042350 (E.D.N.Y. Oct. 31, 2025) ..... 20

United States v. Ho,
No. 25-CR-03 (JAV), 2026 WL 1469724 (S.D.N.Y. May 26, 2026) ..... 13

United States v. Hwa,
No. 18-CR-538 (MKB), 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021) ..... 12

United States v. Israilov,
No. 22-CR-20 (PGG), 2023 WL 4407464 (S.D.N.Y. July 6, 2023) ..... 24

United States v. Jordan,
714 F. Supp. 3d 158 (E.D.N.Y. 2024) .................................................................... 2, 5, 6
United States v. Logan,
419 F.3d 172 (2d Cir. 2005)........................................................................................ 21, 23
United States v. Macrina,
109 F.4th 1341 (11th Cir. 2024) ........................................................................................ 20
United States v. Nobles,
422 U.S. 225 (1975)..................................................................................................... 16, 17
United States v. Nusraty,
867 F.2d 759 (2d Cir. 1989)............................................................................................... 22
United States v. Parness,
503 F.2d 430 (2d Cir. 1974)............................................................................................... 23
United States v. Stein,
488 F. Supp. 2d 350 (S.D.N.Y. 2007)........................................................................ 11, 12
United States v. Stewart,
433 F.3d 273 (2d Cir. 2006)............................................................................................... 24
United States v. Thiam,
934 F.3d 89 (2d Cir. 2019)................................................................................................. 19
United States v. Thomas,
981 F. Supp. 2d 229 (S.D.N.Y. 2013)................................................................................ 20
United States v. Vrancea,
No. 12-CR-198 (WFK), 2013 WL 549099 (E.D.N.Y. Jan. 4, 2013)................................... 22
United States v. Wedd,
993 F.3d 104 (2d Cir. 2021)............................................................................................... 22
United States v. Williams,
930 F.3d 44 (2d Cir. 2019)................................................................................................. 19
Upjohn Co. v. United States,
449 U.S. 383 (1981)........................................................................................................... 15

Statutes

18 U.S.C. § 3500.......................................................................................................... 9, 10, 16

Rules

FRE 106 ..................................................................................................................................... 9
FRE 401 ..................................................................................................................................... 6
FRE 403 .................................................................................................................................. 2, 6
FRE 801(c)(2) ......................................................................................................................... 21
FRE 801(d)(2).......................................................................................................................... 11
FRE 801(d)(2)(E).................................................................................................. 21, 22, 23, 25

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Terry Rozier's omnibus motion in limine seeking to: (i) preclude references to GMB, firearm, drug and lifestyle evidence; (ii) prohibit the government from using Rozier's statements to the National Basketball Association ("NBA") during its investigation of the March 23, 2023 NBA game between the Charlotte Hornets and New Orleans Pelicans (the "March 23 Game") unless additional material related to the NBA's investigation is disclosed; and (iii) preclude statements not made in furtherance of the alleged conspiracy. See ECF No. 169 ("Def. MIL"). For the reasons set forth below, the Court should deny Rozier's motion.

## ARGUMENT

### I. The Court Should Deny Rozier's Motion to Preclude Relevant and Probative Evidence on Rule 403 Grounds

Before even receiving a single government exhibit, Rozier has accused the government of advancing a racist and classist trial theory. See, e.g., Def. MIL at 4 ("Put together, the nickname and the photos invite the jury to see a Black man whose money must be dirty."); id. at 6-7 ("Photos of cash after April 2023 . . . invites jurors to resent him, or to suspect that he must have gotten it the wrong way. . . . [A]ppeals to class prejudice are improper and have no place in a court room." (internal quotations and citations omitted)). Rozier claims that by seeking to offer admittedly relevant evidence[1] referencing cash, guns, drugs, or his entourage of friends who refer to themselves as GMB—in a cash-bribe case where certain such friends have threatened witnesses—the government is actually pursuing an unconstitutional trial

[1] Rozier does not contend any such evidence is irrelevant. Rather, he moves to preclude this evidence solely on Rule 403 grounds, arguing that its probative value is substantially outweighed by the risk of unfair prejudice, thus effectively conceding its relevance.

strategy. Rozier's accusations on this score are unfounded and should not be countenanced by this Court.

Putting that aside, the Court should decline Rozier's invitation to wholesale preclude certain categories of relevant evidence. Such an approach would be anathema to the Federal Rules of Evidence ("FRE" or the "Rules"), which only permit a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." FRE 403. No court is capable of conducting that sort of nuanced balancing analysis in the absence of any context about a particular exhibit. Cf. United States v. Jordan, 714 F. Supp. 3d 158, 162 (E.D.N.Y. 2024) (conducting in-depth 403 balancing analysis, and ultimately excluding two specific exhibits and a statement). To be clear, the government has no interest in turning this case into a referendum on Rozier's lifestyle, his association with GMB, or his and his friends' unrelated possession of guns, drugs, and cash. But it would be wholly inappropriate to censor, in advance of trial, entire categories of relevant, probative evidence.[2] To sustain a conviction, the government has a constitutional mandate to prove each element of each crime beyond a reasonable doubt and is entitled to "evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997). "In sum, the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense." Id. at 189.

Certain specific, limited pieces of evidence containing references to cash, guns, drugs, and/or GMB are highly relevant to the case (or may become relevant depending on whether the defense opens the door). Consider just one example. Below is a screenshot of

[2] Rozier purports to know the government's trial strategy, and repeatedly tells the Court what the government intends to do. Rozier is wrong. For example, Rozier cites arguments the government made in support of co-defendant Deniro Laster's bond revocation as evidence of what the government intends to prove at trial, see Def. MIL at 5, even though the two are separate issues with different elements and standards of proof.

Instagram messages exchanged between Rozier (using the Instagram handle Godfather and elmaniac3025) and a co-conspirator ("CC-1") taken on June 13, 2023, approximately two and a half months after the March 23 Game. CC-1 is the same co-conspirator that both the defendant Deniro Laster ("Laster") and someone using the name of Rozier's deceased friend Wikk threatened post-indictment by posting rat emojis to CC-1's social media. CC-1's messages are on the right, Rozier's are on the left. The top message refers to "vez"—a nickname for the co-conspirator from whom Laster picked up $70,000 in ill-gotten gains. The next message shows that Rozier had posted an Instagram story showing his legs and feet, in colorful clothing, next to a box containing bundles of cash and two guns, and stating, "Back home ..and if u owe me money I need that!! !!" CC-1 replied to Rozier's Instagram story saying, "Shoot sum when u get back 🎲 🎲," in reference to playing dice. Rozier responded "Bet bet we locked in" and "Shoot at tootsies." The screenshot is depicted below on the left, and the photo on the right is a zoomed-in depiction of Rozier's Instagram story that was embedded in Rozier and CC-1's text exchange.







There are at least nine facets of relevance to this single screenshot that tie together multiple aspects of the government's proof. This screenshot alone:

- Establishes that Rozier and CC-1 communicated using Instagram during the timeframe of the conspiracy and, when compared to records obtained via search warrant, corroborates witness testimony about the disappearing or deleted manner of scheme-related communications;

- Corroborates that Rozier personally knows "vez," the co-conspirator who provided the bribe cash to Laster;

- Shows that in June 2023, even after Rozier knew the NBA was investigating his performance-fixing, he remained friendly with CC-1 and Vez, undermining the defense that Rozier was used or hoodwinked;

- Establishes that Rozier's relationship with CC-1 included a gambling relationship and that Rozier was aware CC-1 gambled;

- Establishes that Rozier kept significant amounts of cash, including bundles consistent with those Laster picked up in Philadelphia from the same Vez referenced in this chat;

- Establishes that, notwithstanding his wealth from his NBA salary, Rozier "need[ed]" to collect money from people who owed him;

- Indicates, through Rozier's choice to include two automatic weapons in the photograph, that this was more than a mere request or suggestion for money owed, but that there was an element of threat behind it;

- Mirrors other "point of view" or "POV"-style photographs that Rozier and Laster took when they were collecting and counting the bribe money; and

- Evidences Rozier's colorful clothing style, which corroborates his identity in other POV photographs where only his clothes or shoes, and not his face, are visible.

Thus, this evidence is unmistakably relevant and highly probative of the charged crime. See Old Chief, 519 U.S. at 187 ("Unlike an abstract premise, whose force depends on going precisely to a particular step in a course of reasoning, a piece of evidence may address any number of separate elements, striking hard just because it shows so much at once."). There is absolutely no basis to the claim that such evidence is offered simply to "invite the jury to see a Black man whose money must be dirty," Def. MIL at 4, or "invite[] jurors to resent [Rozier], or to suspect that he must have gotten [the money] the wrong way," id. at 6-7. To suggest that a properly instructed jury could not discern the highly probative nature of such evidence is a discredit to the diverse and conscientious people who comprise the Eastern District of New York's juries.

The defense's attempt to equate this type of evidence with the expressive rap lyrics excluded under Rule 403 in Your Honor's opinion in United States v. Jordan, 714 F. Supp. 3d 158 (E.D.N.Y. 2024), is misplaced. In Jordan, this Court observed that hip hop is an art form

that necessarily employs exaggeration and literary devices for the purpose of expression, and, therefore, without a clear factual and temporal nexus to the charged crime, rap lyrics standing alone may not be relevant under Rule 401 or sufficiently probative under Rule 403. Id. at 163-66. Thus, although the Court excluded general lyrics about aiming for the head and "breaking down bricks" from songs written many years after the charged murder, the Court acknowledged that rap lyrics describing a charged crime with specificity would come into evidence. Id. at 166-67 (analyzing Kendrick Lamar's song The Art of Peer Pressure and observing that "[i]f the Government wished to admit these lyrics into evidence at a subsequent trial accusing Lamar of burglarizing an occupied residence with his friends at sunset, there would be a more than sufficient basis to do so.").

The screenshot described above is nothing like the rap lyrics in Jordan. The screenshot was not even "an Instagram story by a prominent public figure" such that its expressive value can be even loosely equated with rap lyrics. Def. MIL at 5. It is a screenshot of co-conspirators' communications referencing a post that Rozier made on his private Instagram account, not his public-facing one, showcasing bundles of cash consistent with the cash bribe transacted in the scheme, and soliciting more money. Even assuming there is any prejudice to Rozier by photos of what was, at the time, Rozier's lawful gun ownership, such prejudice does not come close to outweighing the probative value of the exhibit and can be addressed through a limiting instruction.

Indeed, there are myriad ways in which specific exhibits or testimony relating to Rozier's and his co-conspirators' possession of guns, drugs, and cash, or their relationships through GMB, may be highly relevant and probative and not "substantially outweighed" by the danger of "unfair prejudice." FRE 403. A few obvious examples:

- In the course of this litigation, at least one person perceived as a cooperating witness was threatened by people associated with GMB, and assessed the threat as coming from a broader crew rather than one person, such that it had a particularly chilling effect on his testimony. See ECF No. 131 (describing witness tampering attempts). In the event the defense opens the door by attempting to impeach this witness about his initial reluctance to incriminate the defendants, these instances of witness intimidation are highly relevant to rehabilitating the witness and explaining the nature of the threat.

- Rozier's defense rests on an unsupported hearsay theory from a text message sent mere hours after his co-conspirator gambled at a casino and lost money in an illegal drug transaction (the "Text"). See ECF No. 171 at 4, 22. If the Text is admitted, the government will pursue proving up Laster's drug deal and other activities at the casino for the purpose of rebutting Rozier's assertion about the meaning of the Text. Id. at 22.

- Rozier claims he had no motive to commit the crime. But his own contemporaneous communications and photographs evince his preoccupation with cash and a motivation to, alongside his close friends, "get money boys[3] ..it's only right that money come a million ways," as he wrote in a December 2022 text, notwithstanding his multimillion-dollar NBA salary.

- And while the government has uncovered no evidence to date that Rozier made a $70,000 deposit in a bank account close in time to the bribe, there is ample evidence in the form of videos and photographs that he maintained large bundles of cash in his home, including in the days and months immediately following the scheme, as described above.

Finally, none of the cases Rozier cites supports his attempt to wholesale exclude this evidence on Rule 403 grounds. Jordan is inapplicable for the reasons discussed above. Nor does Old Chief support the defendant's attempt to stipulate away the government's proof. Instead, the Supreme Court held that "a defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." Old Chief, 519 U.S. at 183. While Old Chief did

[3] Relating back to the topic of lyrics, Rozier's insistence to the Court that GMB simply stands for "Get More Blessings" is betrayed by his own artistic expression, as well as the sworn testimony of witnesses and other evidence. At least three original songs performed by Rozier and his friends that are stored on Rozier's phone identify GMB with "get money boys": "GMB to get money boys, you can come around and get paid with me"; "GMB and TBB, get money boys we going to ball"; "GMB, get money boy." A fourth song states, "GMB, get more blessings and then get money bands." To be clear, the government does not intend to prove its case through song lyrics. But they lay bare the falsity of the defendant's claim in his brief that GMB exclusively stands for "Get More Blessings." Putting aside the lyrics, the government does not anticipate offering much, if anything, about GMB at trial. However, the government reserves the right to reference GMB, including for the highly relevant purposes of impeaching or cross-examining defense witnesses, disproving defense theories that attempt to mislead the jury, rehabilitating CC-1 on redirect regarding attempts to influence his testimony, or other appropriate bases.

recognize one exception to that principle, that exception does not apply here: "This recognition that the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story has, however, virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." Id. at 190. Thus, Old Chief held it was reversible error to not accept a defendant's stipulation to a prior felony (i.e., his legal status as a felon) in a felon-in-possession trial. But Rozier's offer to stipulate that Laster is his best friend has nothing to do with Rozier's legal status, and may not be used to deprive the government of the "evidentiary richness and narrative integrity" of its proof on the core relationship of the case. Id. at 183. And, United States v. Curley, 639 F.3d 50 (2d Cir. 2011), is inapposite. That case involved evidence of later-in-time crimes, wrongs or acts committed by the defendant and admitted under Rule 404(b) in a case that did not charge that defendant with a conspiracy. To the extent the government seeks to admit any evidence referencing cash, guns, drugs, or GMB, it will exclusively be for the purpose of proving the charged conspiracy, such as in the examples discussed above, or impeaching defense witnesses or defense arguments.

In conclusion, there is no basis for the Court to exclude wholesale entire categories of relevant, probative evidence. And as illustrated by the examples described above, the government intends to lay the appropriate foundation showing that whatever limited exhibits or impeachment the government offers referencing cash, guns, drugs, or GMB will be highly relevant and not substantially more prejudicial than probative.

## II. The Court Should Deny Rozier's Motion to Preclude the Government from Admitting Rozier's Statements to the NBA Absent the NBA's Production of Additional Material Related to Its Investigation

Rozier advances a grab-bag of theories in an effort to convince the Court that he is entitled to obtain interview notes and memoranda generated during the NBA's investigation of

the March 23 Game. These interview notes and memoranda are not in the government's possession, custody or control, and thus are not discoverable under Rule 16, Brady or its progeny, or 18 U.S.C. § 3500. Nor can FRE 106 be used as a discovery mechanism to obtain these documents. Further, the owners of these materials—the NBA and/or its outside counsel—have advised the government and Rozier that the materials are protected by the attorney-client and attorney work product privileges, an assertion the NBA has steadfastly maintained throughout the government's investigation. Nevertheless, Rozier argues that the government should be compelled to obtain these documents and that, unless Rozier can obtain these documents, the Court should preclude the government from introducing Rozier's own statements made during his interviews with the NBA. These arguments are misguided and unsupported by the cases upon which Rozier relies. Accordingly, the Court should reject this motion.

A. Relevant Background

Shortly after the March 23 Game, the NBA opened an investigation regarding whether the NBA's rules had been violated in connection with the March 23 Game. The NBA interviewed Rozier twice as part of its investigation.[4] As Rozier already knows based on his presence at the interviews, the NBA was represented at the interviews by an in-house lawyer for the NBA and various attorneys from the law firm Wachtell, Lipton, Rosen & Katz ("WLRK"), as outside counsel for the NBA. Contrary to Rozier's assertion in his motions in limine that he "had no lawyer with him" during the interviews, Def. MIL at 8, Rozier was represented during both interviews by counsel affiliated with the National Basketball Players Association, which is the primary union representing NBA players.

[4] The government's motions in limine (ECF No. 171) stated that "[s]hortly after the March 23 Game, the NBA was alerted of suspicious wagers on Rozier's underperformance in the March 23 Game." ECF No. 171 at 5. The government has since learned that the NBA was alerted of potentially suspicious wagers on Rozier's underperformance on March 23, 2023, prior to the start of the March 23 Game.

The two interviews of Rozier occurred over video teleconference and were not recorded. Lawyers from WLRK took notes during the interviews and later created memoranda memorializing the interviews. The government has not requested, nor has WLRK voluntarily provided the government, its interview notes or memoranda. WLRK has steadfastly asserted the attorney-client and attorney work product privileges over these notes and memoranda, and the government has not requested production of such materials.[5] WLRK has provided the government and Rozier's current counsel with oral summaries of Rozier's statements during the interviews. The WLRK attorney who provided those oral summaries confirmed that, when providing the summaries, the attorney was not reading from the notes that were taken during Rozier's interviews or the memoranda that were subsequently written. WLRK has informed the government that WLRK has not finalized a report of its investigation or delivered a written report of its investigation to the NBA.

Though the government and counsel for Rozier have received oral summaries of Rozier's interviews, Rozier already knows everything that the government knows about what was said during these interviews (and possibly more), since Rozier was present for the interviews and had counsel present with him, who separately may have taken notes or written a memorandum of the interview. Whereas the government has received a secondhand summary, Rozier has firsthand, percipient knowledge of the content of his interviews. Nevertheless, in accordance with its obligations under 18 U.S.C. § 3500, the government intends to produce FBI

[5] While the Department's Justice Manual ("JM") only "provides internal DOJ guidance . . . [and] is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal," JM § 1-1.200, the government notes that such a request may also be inconsistent with Department policy. See, e.g., JM § 9-28.720(a) n.2 ("[C]orporate personnel are usually interviewed during an internal investigation. If the interviews are conducted by counsel for the corporation, certain notes and memoranda generated from the interviews may be subject, at least in part, to the protections of attorney-client privilege and/or attorney work product. To receive cooperation credit for providing factual information, the corporation need not produce, and prosecutors may not request, protected notes or memoranda generated by the interviews conducted by counsel for the corporation.").

302 reports and the associated notes that memorialize WLRK's oral summaries of Rozier's interviews. The government also intends to call as a witness at trial someone who was present during Rozier's interviews to testify about what Rozier said during the interviews. The government will also produce any records in its possession that constitute 3500 material for that witness. The government is permitted to introduce Rozier's statements made during the interviews as opposing party statements. See FRE 801(d)(2).

B. Argument

1. The Government Cannot Compel the NBA to Produce Privileged Material

Rozier argues that the Court should preclude the government from admitting Rozier's statements made during his interviews with the NBA unless the NBA produces interview notes and memoranda that the NBA asserts are protected by the attorney-client and attorney work product privileges. Contrary to Rozier's argument, the government cannot compel the NBA or WLRK to produce privileged material and the cases cited by Rozier are inapposite.

Rozier relies on United States v. Stein, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) in support of his argument that "[b]ecause the NBA is cooperating with the Government, the Government can demand access to the report," i.e., to privileged material. Def. MIL at 9. The circumstances present in Stein could not be more different from the circumstances present here, and the holding of Stein is totally inapplicable here. In Stein, former KPMG partners who were defendants in a criminal case filed a motion to compel the government to produce materials in KPMG's possession and separately issued a Rule 17 subpoena to KPMG, which KPMG moved to quash. See Stein, 488 F. Supp. 2d at 352. Earlier in the life of the case, KPMG, which had been under federal criminal investigation, entered into a Deferred Prosecution Agreement (the "DPA") with the government. Id. at 353. The DPA formally "oblige[d] KPMG to cooperate extensively with the government, both in general and in prosecution of this indictment [against

the former KPMG partners].” Id. The DPA also prohibited KPMG from “asserting, in relation to the Office [the United States Attorney’s Office for the Southern District of New York], any claim of privilege (including but not limited to the attorney-client privilege and the work product protection) as to any documents, records, information, or testimony requested by the Office related to its investigation.” Id. However—and critically as relevant here—the privilege waiver in the DPA was not absolute. Id. Certain categories of documents were carved out and KPMG was permitted to assert privilege over those carved out materials. Id.

In Stein, the court held that because the DPA gave the government the “unqualified right to demand production by KPMG of any documents it wishes for purposes of this case, subject to the limited privilege carve-out,” the documents requested by the defendants were within the government’s “possession, custody or control.” Id. at 362. Critically, the court limited its holding only to those documents not “subject to the limited privilege carve-out.” Id. Which is to say, Stein held that even though the government could demand that KPMG produce any document the government requested, that power did not extend to documents that KPMG could still validly assert privilege over. Id.[6]

As a threshold matter, the government does not agree with Stein’s holding that records that are exclusively in the possession of third parties are in the possession, custody or control of the government for purposes of Rule 16—regardless of whether the government may have a legal right to obtain such materials pursuant to a deferred prosecution agreement or a cooperation agreement. Indeed, “most courts that have considered Stein [] have declined to follow it for various reasons.” United States v. Hwa, No. 18-CR-538 (MKB), 2021 WL

[6] The Stein court assessed whether the documents KPMG claimed were privileged were, in fact, privileged and ultimately concluded that they were not. Id. at 367-68. But that conclusion is irrelevant here. What is relevant is the court’s determination that the government could not force KPMG to produce documents that were privileged.

11723583, at *57 (E.D.N.Y. Sept. 3, 2021). As Chief Judge Brodie held in Hwa, "Rule 16 does not require the Government to produce materials possessed by a third party simply because it may have a legal right to obtain such materials pursuant to a cooperation agreement." Id. at *60; see also United States v. Ho, No. 25-CR-03 (JAV), 2026 WL 1469724, at *2 (S.D.N.Y. May 26, 2026) (denying defendant's motion to compel government to produce third party's materials because "the Government does not have the legal authority to demand the production of" the third party's materials and noting that "[a] number of courts have rejected the reasoning of Stein") (collecting cases); United States v. Buske, No. 09-CR-65 (LA), 2011 WL 2912707, at *9-10 (E.D. Wis. July 18, 2011) (declining to follow Stein, denying defendant's request that the government be compelled to obtain documents from putative victim company that was cooperating, in a colloquial sense, with government's investigation and holding that "if defendant wants documents from [the victim company], he needs to subpoena them"); United States v. Carson, No. 09-CR-77 (JVS), 2009 WL 10793880, at *3-4 (C.D. Cal. Dec. 8, 2009) ("There are many reasons not to follow Stein's lead . . . The tenor of Stein is inconsistent with [the] Ninth Circuit's delineation of the Government's obligations under Rule 16 and Rule 16 case law in general."). The Second Circuit has noted that "[t]here is no constructive possession concept or due diligence requirement" in Rule 16. United States v. Bradley, 105 F.4th 26, 35 (2d Cir. 2024). Bradley also described Stein—without adopting its holding or reasoning—as standing only for the proposition that "the government has 'control' over a piece of evidence if it has agreed with a third party that it has a right to obtain that evidence" and noted that in cases in which "no such agreement existed," Stein was inapplicable. Id. at 35 n.5.

Further, this case is materially different from Stein. Here, the NBA is a victim of Rozier and his co-conspirators' illegal conduct, rather than a subject of the government's

criminal investigation who has entered a deferred prosecution agreement with the government. Unlike in Stein where the DPA endowed the government with the power to demand from KPMG any document that the government desired, in this case the government has no ability—outside the use of a subpoena—to compel the NBA to produce any documents. Though the NBA is "cooperating" with the government's investigation in a colloquial sense, that is a far cry from the formal cooperation between KPMG and the government mandated by the DPA in Stein. At any point, the NBA could refuse to comply with a document request by the government and, unlike in Stein, the government would have no recourse other than to serve a subpoena. Under such circumstances, it strains the bounds of logic to find that documents within the NBA or WLRK's sole possession are nevertheless within the government's possession, custody or control.

Further, in Stein, the court held that the government could not compel KPMG to produce documents that KPMG could, under the terms of the DPA, maintain a privilege claim over. Here, the government understands that the NBA is asserting privilege over its interview notes and memoranda, and has no reason to believe that the NBA would waive privilege and disclose the documents even if the government were inclined to request such materials (which it is not). Thus, even if the Court were to conclude that the NBA's generally cooperative posture vis-à-vis the government's investigation meant that the government could compel the NBA to produce documents—which the Court should not—the government would still not be able to compel the NBA or WLRK to produce its privileged interview notes and memoranda.

Thus, Stein does not support the defendant's argument that the Court should compel the government to obtain the interview notes and memoranda from the NBA, and the Court should not compel the government to seek to do so.

2. Whether the Interview Notes and Memoranda Are Privileged Is Not Properly Before the Court

WLRK has informed the government that the NBA is asserting the attorney-client and attorney work product privileges over the interview notes and memoranda. Rozier argues the NBA has waived any possible attorney work product privilege that may attach to the interview notes and memoranda by providing "public descriptions of the conclusions of confidential interview memoranda" and by providing oral summaries of Rozier's interviews to the government. Def. MIL at 11-13. As Rozier also notes, the "NBA bears the burden of establishing privilege." Id. at 11.

Because the government is not the putative privilege holder, it is not the government's place to argue that the interview notes and memoranda—which the government has never seen or possessed—are privileged. However, the government notes that it would represent a significant departure from established corporate investigations practice if the Court were to agree with Rozier that such materials are not privileged or that providing a factual summary of Rozier's statements waived such privilege. See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 399 (1981) ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes . . . .").

Nor is that issue even ripe. The proper mechanism for this issue to come before the Court would be in the context of, for example, a motion to compel by Rozier following the NBA's privilege assertion in response to a subpoena. The government does not concede that Rozier would be entitled to materials sought by a Rule 17(c) subpoena and the government reserves all rights to oppose issuance of such a subpoena. But that is not the point. The point is that the appropriate way for the privilege waiver issue to come before the Court would be via a

Rule 17(c) subpoena, assuming Rozier was entitled to serve such a subpoena. The NBA would be a party to that litigation and could protect its privilege by asserting its rights.

That being said, the government notes that Rozier's arguments miss the point and the cases Rozier cites are inapposite. First, Rozier asserts without elaboration that "[w]ork product cannot be used testimonially [sic] and then shielded from scrutiny." Id. at 11 (citing United States v. Nobles, 422 U.S. 225, 239-40 (1975)). The government does not intend to use any work product "testimonially." The government intends to call as a witness someone who was present for Rozier's interviews. That witness will testify as to that witness's memory of what Rozier said during the interviews. To the extent the government interviews the witness prior to trial and there are reports of those interviews between the government and the witness, the government will produce those reports pursuant to 18 U.S.C. § 3500. At no point does the government anticipate being in possession of any attorney work product that was generated by the NBA or WLRK, much less using that work product "testimonially."

Nobles presents a different factual scenario. In Nobles, the defendant sought to call as a witness his own investigator to impeach two key prosecution witnesses, whom the defense investigator had interviewed prior to trial. Nobles, 422 U.S. at 227. The defendant "sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses." Id. at 239. The district court permitted the defense investigator to testify only on the condition that the defendant produce the investigator's reports after his testimony. Id. at 229. When the defendant indicated that he would not produce the reports, the district court barred the investigator from testifying. Id. The Supreme Court held that the district court had acted appropriately, noting:

> Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can

> no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

Id. at 239-40.

Thus, Nobles is inapposite. In Nobles, the defendant, in seeking to call his own defense team investigator as a witness and seeking to elicit the investigator's recollection and his mental impressions, was affirmatively seeking to use the work product that was otherwise privileged. By affirmatively seeking to use that work product, the defendant was barred from simultaneously attempting to shield that work product from the government. Here, the government is not affirmatively seeking to use any work product, which it does not even have access to. The government simply intends to call a witness who heard Rozier make certain statements to recount what those statements were. The government is not calling a witness to testify about any work product that the government maintains a privilege over. Thus, the government is not voluntarily electing to waive the work product privilege, as the defendant did in Nobles. The principles of Nobles do not apply to this case and are uncompelling.

Nor do the NBA's limited and broad public comments about its investigation into the March 23 Game constitute a waiver of the interview notes and memoranda of Rozier's interviews. Rozier relies on New York Times Co. v. United States Department of Justice, 939 F.3d 479 (2d Cir. 2019) and In re Kidder Peabody Securities Litigation, 168 F.R.D. 459 (S.D.N.Y. 1996) for the proposition that "specific public descriptions of the conclusions of confidential investigative memoranda 'waived the privilege over the sections of the memoranda and exhibits relating to the conclusion,' even though the memoranda themselves had not been released." Def. MIL at 11-12 (quoting New York Times, 939 F.3d at 496). In this case, in

January 2025, when news broke that the government was investigating the March 23 Game and before an indictment was returned, the NBA made broad, generalized statements that it did not find evidence of violations of NBA rules in connection with the March 23 Game (before later making clear that its investigation was ongoing). These broad statements made no reference to Rozier's interviews, the statements made in those interviews, or the interview notes or memoranda. Much less did those generalized statements provide the "specific . . . conclusions of confidential investigative memoranda" necessary to waive the attorney work product privilege. Accordingly, this basis for mandating disclosure of the interview notes and memoranda relating to Rozier's interviews is unpersuasive.

Nor does WLRK's provision of oral summaries of interviews conducted during the course of the NBA's investigation constitute a waiver of work product privilege over interview notes and memoranda. Rozier relies on United States Securities and Exchange Commission v. Herrera, 324 F.R.D. 258 (S.D. Fla. 2017) for the proposition that there is "little or no substantive distinction for waiver purposes between the actual physical delivery of the work product notes and memoranda and reading or orally summarizing the same written material's meaningful substance to one's legal adversary." Herrera, 324 F.R.D. at 260. As a threshold matter, Herrera is a non-binding Southern District of Florida case that has not been cited once—much less adopted—by any district court within the Second Circuit. Moreover, the WLRK attorney who provided the government with the oral summaries of Rozier's interviews advised the government that he was not reading from or orally summarizing the interview notes or memoranda, nor providing a verbatim recitation of Rozier's comments. Rather, the WLRK attorney was providing his recollections of the Rozier interviews that he was present for. Accordingly, even if this Court were to adopt Herrera's holding, it would not apply here because

WLRK did not functionally disclose the contents of the privileged interview notes and memoranda, as the Herrera court concluded the lawyers did in that case.

3. The Rule of Completeness Does Not Mandate Disclosure of the Interview Notes or Memoranda

Rozier attempts to use the rule of completeness codified in Federal Rule of Evidence 106 as a discovery mechanism to obtain the NBA / WLRK's interview notes and memoranda. That is not the purpose of Rule 106 and the Court should reject this argument.

"The 'rule of completeness' . . . provides that an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." United States v. Thiam, 934 F.3d 89, 96 (2d Cir. 2019) (quotations omitted). However, the rule does not "require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Id. "[T]he rule of completeness does not require the admission of self-serving exculpatory statements in all circumstances." United States v. Williams, 930 F.3d 44, 61 (2d Cir. 2019).

But the rule of completeness is fundamentally "a rule of admissibility," and not a rule of exclusion or a discovery mechanism. United States v. Avenatti, 559 F. Supp. 3d 274, 281 (S.D.N.Y. 2021). Avenatti is particularly instructive. There, the government obtained an export of WhatsApp messages between the defendant and one of his associates. The defendant argued that, under Rule 106, the court should preclude the government from introducing messages generated by the WhatsApp export unless the government produced "the original, electronically stored version of the chats." Id. at 279. The court rejected this argument for several reasons. First, the court noted that "it is well established that the Government's 'discovery and disclosure obligations extend only to information and documents in the government's possession.'" Id. at

280 (quoting United States v. Brennerman, 818 F. App'x 25, 29 (2d Cir. 2020) (summary order)) (emphasis in the original). "Relatedly, the Government has no obligation, under Brady or otherwise, 'to seek out information like a private investigator and valet gathering evidence and delivering it to opposing counsel.'" Id. (quoting United States v. Thomas, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (cleaned up)). The same principles apply here. The government is not in possession of the interview notes or memoranda, has no contractual right to obtain them, and is under no obligation to obtain them.

Second, the court held that the rule of completeness "provides that a court should permit the introduction of certain writings or statements that in fairness ought to be considered when other writings or statements are offered; it does not call for exclusion of the writings or statements that are offered in the first instance." Id. at 281 (emphasis in the original); see also United States v. Gogic, No. 22-CR-493 (JMA), 2025 WL 3042350, at *11 (E.D.N.Y. Oct. 31, 2025) (citing Avenatti). The same applies here—the rule of completeness deals with questions of admissibility and permits the additional admission of otherwise hearsay statements in order to achieve the purposes of the rule of completeness; the proper remedy is not exclusion of otherwise admissible statements. "Rule 106 does not provide a mechanism for precluding portions of [evidence] merely because additional context is not available to the defense." Gogic, 2025 WL 3042350, at *11.

It follows from the core principles underpinning the rule of completeness that the burden is on the party invoking the rule to identify specific additional statements that it seeks to introduce pursuant to the rule. "The objecting party must point to the specific portions he wants admitted so that the district court can assess their admissibility on fairness grounds." United States v. Macrina, 109 F.4th 1341, 1348 (11th Cir. 2024) (collecting cases). Not only does this

approach make logical sense, but as applied here it is also fundamentally fair. If Rozier wants to introduce additional statements that he made during his interviews beyond those that the government seeks to introduce, he should already know what those statements are. After all, Rozier was present at the interviews and should have as clear a memory of what he said as anyone else who was present at the interviews. Further, Rozier was represented by counsel at the interviews, and very well may have the aid of their notes or their recollections. Rozier does not need—and Rule 106 does not provide a mechanism for Rozier to obtain—additional material that is not in the government's possession in order to identify statements that he may have made during his interviews that he believes should be admitted under Rule 106. Accordingly, the Court should not compel the production of the interview notes and memoranda or preclude the government from introducing Rozier's statements in order to satisfy Rule 106.

## III. Laster's Statements to the NBA Are Admissible Against Rozier Under Rule 801(d)(2)(E)

Rozier moves to preclude statements that Laster and "other gamblers" made to NBA investigators after the March 23 Game.[7] Def. MIL at 14-15. The motion should be denied. The government will prove at trial that those statements were false. They were also made during and in furtherance of both the charged wire fraud conspiracy, which continued through March 2024, and an uncharged conspiracy between Rozier and Laster to obstruct justice. Accordingly, the statements are admissible against Rozier under Rules 801(c)(2) and 801(d)(2)(E).

### A. Applicable Law

Out-of-court statements offered not for their truth, but to show that they are false, are admissible non-hearsay under Rule 801(c)(2). See United States v. Logan, 419 F.3d 172,

[7] Rozier does not identify these "other gamblers" or their statements. Nevertheless, to the extent co-conspirators made statements to NBA investigators to conceal their involvement in the scheme, those statements are admissible under Rule 801(d)(2)(E) for the same reasons as Laster's.

177-79 (2d Cir. 2005) (admitting co-conspirators' false alibi statements because they were not offered for their truth); United States v. Vrancea, No. 12-CR-198 (WFK), 2013 WL 549099, at *4 (E.D.N.Y. Jan. 4, 2013) ("The government may [] offer . . . [a declarant's] false representations . . . [because] the statement is not being offered for the truth of the matter asserted . . . and is, therefore, non-hearsay under Rules 801(c)"); see also Anderson v. United States, 417 U.S. 211, 219-20 (1974) (admitting statements intended to "establish a foundation for later showing, through other admissible evidence, that they were false").

In addition, under Rule 801(d)(2)(E), a statement offered against a defendant is admissible non-hearsay if it was made by a "coconspirator during and in furtherance of the conspiracy." Such a statement may be admitted by the government if the court finds by a preponderance that (1) a conspiracy existed when the statement was made, (2) both the declarant and the defendant were members of it, and (3) the statement was made in furtherance of it.[8] Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); see also United States v. Wedd, 993 F.3d 104, 117, n.6 (2d Cir. 2021) ("A co-conspirator statement is admissible if it was made pursuant to any conspiracy, whether charged or uncharged."). As relevant here, "statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy." United States v. Eisen, 974 F.2d 246, 269 n.8 (2d Cir. 1992).

B. Discussion

Approximately two months after the March 23 Game, Laster told NBA investigators, in sum and substance, that he had not discussed Rozier's injury status with Rozier before the game and that he did not know of any bets placed on the game. These statements,

[8] While Rozier conclusorily asserts that "efforts to hide a completed crime do not make those statements admissible against a coconspirator, unless there was an express original agreement to lie to conceal the conspiracy," Def. MIL at 14, that is not the law. Rather, it is well settled that "evidence of a formal or express agreement" is not required to prove a conspiracy. E.g., United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989).

which the government will prove at trial were false, are admissible against Rozier under Rules 801(c) and 801(d)(2)(E).

First, because the government intends to offer Laster's statements only to show that they are false, they are non-hearsay under Rule 801(c). See, e.g., Logan, 419 F.3d at 177-79. And because their falsity is itself relevant, the statements are admissible. See United States v. Parness, 503 F.2d 430, 438 (2d Cir. 1974) ("[E]xculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force."). Specifically, Laster's statements to Rozier's employer—which was investigating suspicious betting on Rozier's performance—were designed to conceal Rozier's role in the scheme and thus reflect Laster's understanding that the truth would incriminate Rozier.

Independently, Laster's statements are also admissible against Rozier under Rule 801(d)(2)(E), because they were made during and in furtherance of both the charged wire fraud conspiracy and the uncharged conspiracy between Rozier and Laster to obstruct justice. See Eisen, 974 F.2d at 269 n.8 (statements concealing an ongoing conspiracy further that conspiracy). Regarding the charged conspiracy, the Superseding Indictment alleges that it continued through March 2024. See ECF No. 101. In fact, only weeks before the Laster interview, Rozier and Laster planned another fraudulent betting play in furtherance of the conspiracy, this one involving one of Rozier's then-teammates. ECF No. 171 at 4-5. Regarding the uncharged conspiracy, Laster and Rozier engaged in a years-long effort after the March 23 Game to conceal their involvement in the betting scheme, as detailed in the government's motions in limine and to revoke Laster's bail. ECF Nos. 130, 171. For example, in addition to Laster's false statements to NBA investigators, Rozier later texted Laster that he had deleted their encrypted communications before the NBA collected his phone for review. And although

the NBA is a private entity, Rozier and Laster could reasonably foresee that its discovery of their betting conduct would prompt a criminal investigation, so concealing the scheme from the NBA helped them evade prosecution. See United States v. Stewart, 433 F.3d 273, 291–93 (2d Cir. 2006) (co-conspirator's "statements made in the course of and in furtherance of [the] conspiratorial plan to mislead investigators" were admissible against the defendant).

The decision in United States v. Israilov, No. 22-CR-20 (PGG), 2023 WL 4407464 (S.D.N.Y. July 6, 2023), is particularly instructive. There, the defendant was charged with participating in fraud and money laundering conspiracies alleged to have continued through 2021. His co-defendants were separately charged with obstruction based on conduct occurring in 2021. Id., at *1, 9-10. Relying on Grunewald v. United States, 353 U.S. 391 (1957), the defendant argued that his co-defendants' obstructive conduct—including false grand jury testimony—was inadmissible against him because it concerned a separate, after-the-fact effort to conceal the charged conspiracies. Id., at *11-13. The court rejected that argument and admitted the obstruction evidence, explaining that the indictment and the government's proffer established that the charged conspiracies remained ongoing when the challenged statements were made. Id. Thus, as in Israilov, Laster's statements are admissible against Rozier because they were made during and in furtherance of the conspiracies described above.

For the same reasons, Rozier's reliance on Grunewald is misplaced. Def. MIL at 14-15. In Grunewald, the Court held that an "act[ ] of concealment done after [the] central objectives [of the conspiracy] ha[d] been attained, for the purpose only of covering up the crime" could not be considered part of the charged conspiracy. Id. at 405. But Grunewald's facts render it inapplicable here. Grunewald involved a single, short-lived conspiracy to impede tax fraud prosecutions with a clearly defined end. Id. at 394-95. The alleged concealment evidence

arose three years later. Id. at 396. Likewise, Rozier's reliance on United States v. Floyd, 555 F.2d 45 (2d Cir. 1977), is misplaced. Def. MIL at 14-15. Floyd involved a lone bank robbery, and the conspiracy ended when the robbers divided the loot, a day before the concealment at issue. Id. at 47-48. Here, unlike in Grunewald and Floyd, Laster's statements were made during the charged wire fraud conspiracy and the uncharged obstruction conspiracy.

Accordingly, Laster's statements to NBA investigators are admissible against Rozier under Rules 801(c)(2) and 801(d)(2)(E), and the motion should be denied.[9]

## CONCLUSION

For the foregoing reasons, the Court should deny Rozier's motion in limine in its entirety.

Dated: Brooklyn, New York
November 25, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: *David I. Berman*
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant United States Attorneys
(718) 254-7000

[9] The Confrontation Clause also poses no bar to admitting Laster's statements. Laster's statements are neither offered for their truth nor testimonial, since they were made to private investigators, not law enforcement. See Crawford v. Washington, 541 U.S. 36, 59, n.9 (2004) (the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"); Ohio v. Clark, 576 U.S. 237, 249 (2015).